**E-FILED**
Monday, 31 December, 2007  05:03:18 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| John New, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 C 3147-HAB-CHE |
| v. | ) | |
| | ) | |
| Brian Thomas, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants, SHAN JUMPER, DIANE DOBIER, JOSEPH PROCTOR and LIBERTY

HEALTH CARE CORPORATION, submit the following Memorandum of Law in support

of their Motion to Dismiss Plaintiff's Complaint:

**I.    SUMMARY OF ALLEGATIONS**

Plaintiff has been civilly detained as a "sexually violent person" pursuant to the

Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1 *et seq.*, (the "SVP

Act"). Exhibit A (Complaint) p. 6. Plaintiff currently resides at the Illinois Department

of Human Services' Treatment and Detention Facility in Rushville, Illinois (the

"Rushville TDF"). *Id.* Plaintiff has filed a civil rights complaint pursuant to 42 U.S.C.

§ 1983. This is Plaintiff's second civil rights complaint related to his confinement.[1]

---

[1]    In his first original complaint, Plaintiff alleged that he "has been subjected to a systemactic [sic] form of punishment" which involved the denial of certain amenities, such as barbeque hamburgers and ice cream, that are only afforded to residents who consent to treatment. Ex. B, pp. 6-7. Plaintiff further claimed that if he consented accept treatment (presumably to avail himself to hamburgers and better housing conditions), "he will have lost his rights to a fair trial." *Id.* at p. 8. Plaintiff also complained that a result of his refusal consent to treatment, he was been housed in an older section of the Joliet TDF along with other treatment refusers and that the conditions in the older wing are unsanitary and inhospitable. *Id.* Plaintiff complained that in contrast to the old wing of the Joliet TDF, the newer wing had air conditioning, cleaner and fresher water, writing desks and stools, screens to keep out insects and pests, that individuals living in the new wing can have family mail food to them at any time, that individuals living in the new wing can receive incoming phone calls which are not subject to a costly collect phone system, and that the older wing is crowded and

Plaintiff has sued SHAN JUMPER, DIANE DOBIER, JOSEPH PROCTOR (the "Liberty Defendants"). Complaint, pp. 2-3. The Liberty Defendants oversee or provide sex offender treatment to consenting individuals and are employed by Defendant LIBERTY HEALTH CARE CORPORATION. Complaint, p. 3. Plaintiff has also sued three DHS employees, Brian Thomas, Darrell Sanders, Sally Hougas and Tarry Williams. Complaint (caption) and pp. 2-4. Plaintiff has filed a two Count Complaint. While Count I is not a model of clarity, Count II is largely incomprehensible.

**Count I**

Plaintiff complains that when he was transferred to the Rushville TDF he "was immediately placed into the population at the [TDF], with committed people, people who are called residents, and have been adjudicated by the Courts, as being people who suffers [sic] from a mental disorder." Complaint, p. 6, ¶ B. Plaintiff complains that "Administrative Officials . . . tried to force me into a cell with a committed person, who has a known history of physically assaulting his cellmates." *Id.*[2] Plaintiff claims after he "refused to move into this committed person's room," he was "subjected to punishment by placing him on a Maximum Security Unit" despite the fact that he did not have any "disciplinary reports written in his Resident Clinical File." *Id.* Plaintiff submitted an administrative grievance which claimed that "Administrative Officials . . . punished him by placing him on a Maximum Security Unit for (121) days . . . simply because plaintiff refused to be housed in a cell with a Committed person." Complaint, p. 6, at ¶ C. Plaintiff' claims that he refusal was justified by Title 59 of the

---

that it lacks "meaningful vocational or educational programs." *Id.* Ex. B, pp. 8-9. As discussed below, aspects of these claims were dismissed. *See* Exhibit C, Memorandum Opinion and Order, pp. 5-7.

[2]     Throughout the Complaint, Plaintiff repeatedly refers to unnamed "Administrative Officials." As discussed below, this method of pleading is improper.

Administrative Code which he claims "clearly states that Civil Pre-Trial Detain [sic] persons *must* be kept separate from Committed persons."  *Id* (emphasis supplied). Section 299.200 provides as follows:  "[t]o the *extent possible considering operational, programmatic and security needs*, detained persons shall be kept separate from committed persons."  59 ILAC 299.200 (emphasis supplied).

Plaintiff further avers that he has been "subjected to a systemactic [sic] form of punishment, designed and drafted specifically by Administrative Officials."  Complaint, p. 7, at ¶ D.  Plaintiff also alleges that DHS Defendant Williams and Defendant PROCTOR are members of the "cell assignment committee" and that is it is their "policy" to house detained and committed residents "are all housed together."  *Id.* Plaintiff further complains that he and other residents who do not consent to sex offender treatment are subjected to punishment designed by the defendant(s) for the purpose of forcing the plaintiff by means as described herein to consent to treatment . . . ."  *Id.*  Plaintiff claims that this action has deprived him of "an absolute right to a trial to prove that he is not a Sexually Violent Person" because if he "unwillingly asked for treatment and [sic] he will have lost his rights to a fair trial."  *Id.*

Plaintiff claims that he has been subjected to "punishment" for refusing to consent to treatment and points to the following acts or omissions:  that residents who consent to treatment are allowed to "chose" their roommates; that residents who refuse to consent to treatment are subjected to [unspecified] acts of retaliation and reprisals; and that Plaintiff and other refusers are required to live in an over-crowded cells with other committed residents.  Complaint, p. 7, at ¶ D.

Plaintiff also references an unspecified "Court settlement" which he claims unspecified Defendants have violated.  Complaint, p. 7, at ¶ D.  Plaintiff raised a similar claim in his earlier cause of action filed in the Northern District of Illinois.

3

When he was asked to explain what settlement he was referencing he refused to answer the question. *See* Ex. D, Plaintiff's deposition in Case No. 06 C 017, p. 116-18.

Plaintiff also claims that Defendant LIBERTY HEALTHCARE CORPORATION allows "Security Therapy Aids (S.T.A.'s) to have complete access to pre-trial deaineess['] records and files, and allows these said employee staff to write fraudulent reports on detained persons for the purpose of providing false information to assure civil commitment at the trial of a detained person, in the financial interest of Liberty Healthcare Corporation . . . [which] is a conflict of interest . . . ." Plaintiff appears to be suggesting that LIBERTY HEALTHCARE encourages STAs to write negative reports which will cause residents to be adjudicated as SVPs and that LIBERTY HEALTHCARE will obtain financial benefits from the commitment of said SVPs. Aside from the fact that STAs are *DHS employees*, Plaintiff does not allege that any STA has ever had access to his records or that an STA has submitted a false report. Nor has he alleged that he was civilly committed as a result of any false report.

**Count II**

Count is largely incomprehensible and appears to raise claims solely against the DHS Defendants. Plaintiff starts out by complaining that he suffers from "chronic arthritis" and that DHS Defendant Hougas told him that Liberty Defendant PROCTOR *told her* that Plaintiff does not have a lower bunk permit. Complaint, p. 8, ¶ E. Plaintiff then claims that DHS Defendant Williams fabricated a false Resident Rooming Request stating Plaintiff requested to move into a cell with another resident, who at the time, Plaintiff did not know that Plaintiff's new assigned cellmate, is a Pre-Trial Detained persons, such as he." *Id.* It appears that Plaintiff is claiming that Williams reported that Plaintiff asked to move in with a committed resident when in fact the resident (unbeknownst to Plaintiff) was a pre-trial detainee (the *only* type of roommate

Plaintiff claims he is entitled to live with under Title 59 of the Administrative Code). *Id.* Significantly, Plaintiff does not identify any injury attributable to Defendant PROCTOR and DOBIERS' membership on the Behavior Committee. [3]

## II.    APPLICABLE CONSTITUTIONAL STANDARDS

### A.    The Eighth Amendment's "Deliberate Indifference" Standard

As a civilly detained person under the SVP Act, Plaintiff is more akin to a pre-trial detainee than a prisoner for the purposes of determining what Constitutional Amendment forms the basis of his claim. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). That being the case, his claims spring from the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. While Plaintiff's claims spring from the Due Process Clause of the Fourteenth Amendment, this is a distinction without a difference because the Seventh Circuit has repeatedly endorsed the application of the "deliberate indifference" standard to claims involving detainees and committed individuals. *Id. See also*, *Collignon v. Milwaukee County*, 163 F3d 982, 987-89 (7th Cir. 1998).

The "deliberate indifference" standard requires plaintiffs to identify a housing condition which results in "unquestioned and serious deprivations of basic human needs," or "deprive inmates of the minimal civilized measure of life's necessities."

---

[3] Count II then turns into a confusing mish-mash of references to events which took place in April of 2007, February of 2006, as well as references to medical opinions expressed by an outside physician. Plaintiff essentially claims that unnamed "Administrative Staff personnel (Security Staff) fail to acknowledge that Plaintiff has a Low Bunk Permit." Complaint, p. 8, ¶ E. This Count is not directed against any of the Liberty Defendants. Rather, Plaintiff appears to allege that DHS Defendant Hougas "told Plaintiff that he refused to go into the [sic] with his new assigned cellmate, that she personally was going to take Plaintiff back down to Special Management and lock Plaintiff back up, for refusing to move into the newly assigned cell, that the Rooming Committee told Plaintiff that he had to move into." Complaint, p. 9, ¶ E. Plaintiff goes on to allege that DHS Defendant Hougas did not do her job properly because she refused his request to inform his new roommate that he needed to sleep on the lower bunk bed. There are no other claims against the Liberty Defendants.

*Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).  *See also*, *Bell v. Wolfish*, 441 U.S. 520, 537 (1979) ("the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible . . . . does not convert the conclusions or restrictions of detention into 'punishment.'").  *Lunsford v. Bennett*, 17 F.3d 1574, 1581 (7th Cir. 1994) (Constitution does not require officials to "provide the equivalent of hotel accommodations").  Plaintiff has failed to meet this exacting standard.

### C.    The "Professional Judgment" Standard

Claims brought against mental health professionals like the Liberty Defendants are controlled by the highly deferential "professional judgment" standard.  *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 321-324 (1982) (developmentally disabled individual who had been civilly committed).  Under the professional judgment standard, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made," rather, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Id.* at 321.  Accordingly, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.   *Youngberg* justified its approach by holding that "a presumption of correctness . . . is necessary to enable institutions of this type – often, unfortunately, overcrowded and understaffed – to continue to function." *Id.* at 324.

The Seventh Circuit has consistently held that sex offender treatment programs have considerable discretion in managing sex offenders.  *See, e.g., West v. Schwebke*, 333 F.3d 745, 749 (7th Cir. 2003) (holding that the Constitution does not "immediately fall into line behind the majority view of a committee appointed by the

6

American Psychiatric Association"); *Allison v. Snyder*, 332 F.3d 1076, 1081 (7th Cir. 2003) (same).  In a class action involving the Joliet Treatment and Detention Facility, the Honorable Harry D. Leinenweber awarded judgment in favor of the Defendants and denied all claims for injunctive relief.  *Hargett v. Adams*, 02 C 1456, 2005 WL 399300, *13-*20 (N.D. Ill. 2005) (Exhibit E).  Defendants have violated this standard.

**III.    ARGUMENT**

**A.    There Are No Allegations Against Defendant Jumper**

It is axiomatic that Section 1983 "liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Plaintiff has merely listed Defendant JUMPER (the Clinical Director of the Treatment Program) in the caption of the Complaint and at page 2 of the Complaint.  Defendant JUMPER is entitled to dismissal because there are no other allegations against him in the body of the Complaint.  *See, e.g., Collins v. Kibort,* 143 F.3d 331, 334 (7th Cir. 1998) ("A plaintiff cannot state a claim against a defendant by including the defendant's name in the caption."); *Rice v. Arnett*,  2006 WL 839440, *3 (S.D. Ill. 2006) ("Because Plaintiff makes no allegations against Scro and Wertz, the Court dismisses them from this action."); *Florian v. Sequa Corp.*, 2002 WL 31844985 at *3 n. 2 (N.D. Ill. 2002) (naming of defendant in the caption was not enough to state claim).

Alternatively, *respondeat superior* is an improper method of establishing liability against upper-level administrators such as Defendant JUMPER.  *Johnson v. Snyder,* 444 F.3d 579, 583 (7th Cir. 2006); *Vance,* 97 F.3d at 991.  Further, considering JUMPER's role as the Clinical Director of a 300 person plus treatment facility, "it is doubtful that [he] would be directly involved in the day-to-day operation of the [treatment center] such that he would have personally participated in, or have

knowledge of the kinds of decisions that led to the delay in treatment complained of." *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981)). *See also, Gentry*, 65 F.3d at 561. Alternatively, Plaintiff's claims against Defendant JUMPER are subject to dismissal for the following arguments.

### B. Plaintiff Cannot Lump His Claims Against Defendants Proctor and Dobier Through His Vague References to "Administrative Staff"

With very few exceptions, Plaintiff has lumped a majority of his claims against Defendants PROCTOR and DOBIER by referring to "Administrative Staff." This method of pleading is improper and is subject to summary dismissal. *See, e.g., Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) ("Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group. Any defendant not alleged to be individually responsible for violation of Eades's constitutional rights should be dismissed from any amended complaint which plaintiff may file."); *Guy v. State of Illinois*, 958 F.Supp. 1300 (N.D. Ill. 1997) ("most of the allegations of differential treatment are generally asserted, failing to mention a defendant specifically by name, thereby lacking the element of personal involvement necessary for individual liability under § 1983."); *Woodson v. Grubman*, 2006 WL 1041044, *2 (S.D. Ill. 2006).

By pleading in this generic and vague manner, Plaintiff has precluded the Liberty Defendants from understanding the nature of the claims against them. *See, e.g., Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990) ("the complaint lump[ed] all the defendants together and [did] not specify who was involved in what activity."); *Design, Inc. v. Synthetic Diamond Technology, Inc.,* 674 F.Supp. 1564, 1569 (N.D. Ill. 1987). FRCP 8(a)(2) requires Plaintiff to allege "sufficient facts ... to allow the district court to understand the gravamen of the plaintiff's complaint." *Phelan v. City of Chicago*, 347

F.3d 679, 682 (7th Cir. 2003). *See also, McCormick v. City of Chicago,* 230 F.3d 319, 323-24 (7th Cir. 2000); *Kyle v. Morton High School,* 144 F.3d 448, 455 (7th Cir. 1998).

Alternatively, Plaintiff's claims are subject to dismissal for the following reasons.

### C.    Plaintiff's Housing Claims Are Without Merit

As a general matter, Plaintiff has no constitutional right to be housed in any particular room with a roommate of his choosing. *See, e.g., McKune v. Lille*, 536 U.S. 24, 39 (2002) ("[I]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Meachum v. Fano,* 427 U.S. 215, 225 (1976); *Williams v. Faulkner*, 827 F.2d 304, 309 (7th Cir. 1988) (there is "no constitutionally protected liberty interest in remaining in any particular wing of a prison.").

Plaintiff claims that his due process rights have been violated because he has been denied certain privileges and amenities as a result of refusing to sign a consent to treatment form. Ex. A, Complaint, pp. 6-7. In *McKune v. Lille*, 536 U.S. 24 (2002), the Supreme Court reversed the Tenth Circuit and held that the restriction of certain privileges and amenities to individuals who decline to consent to sex offender treatment does not violate the constitution. *Id.* at 31, 34-48. The alleged deprivations that the inmate faced if he did not consent to treatment were significant in that they caused him to be transferred to a maximum-security unit. *Id.* at 31-32, 36

In examining these claims, *McKune* held that an "essential tool of prison administration" is the authority to offer inmates various incentives to behave and that the Constitution accords prison officials wide latitude to bestow or revoke these privileges as they see fit. 536 U.S. at 39. *McKune* ultimately held the that the reduction of the plaintiff's privileges (loss of personal television, decreased gym time and reductions in commissary privileges) and increased restrictions based on his decision to decline to participate in sex offender treatment did not violate the

9

constitution. *Id.* at 39-40. Significantly, *McKune* held that the argument that the program could not condition the award of privileges to treatment participation ran contrary to the efficient management of that institution. *Id.* at 38-39. Here, "interests in offering rehabilitation programs and providing for efficient administration" of its sex offender treatment program overrides any discomforts Plaintiff may suffer on account of his refusal to consent to treatment. *Id.* at 40.

Additionally, Judge Leinenweber held in the *Hargett* class action that it was constitutionally permissible to afford greater privileges and rights to individuals who consented to sex offender treatment. Exhibit E, *Hargett*, 2005 WL 399300, p. *8 ("The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. * * * [M]aking privileges contingent on good behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior."). *See also*, Exhibit C, Memorandum Opinion and Order in *New v. Monahan*, 06 C 017, pp. 5-7.

Further, Title 59 § 299.200 of the Administrative Code provides DHS with broad discretion to house civilly detained and civilly committed individuals together:

> The Department may utilize a secure residential facility as a detention facility. To the *extent possible considering operational, programmatic and security needs*, detained persons shall be kept separate from committed persons.

Additionally, the Honorable Mark Filip dismissed an identical claim in *Lieberman v. Budz, et al.*, 03 C 2009. Ex. F, p. Memorandum Opinion and Order, p. 18. Even if § 299.200 did not contain discretionary language, and/or required committed and detained residents to be housed separately, it is axiomatic that violations of state law, standing alone, do not set forth a violation of constitutional magnitude. *See, e.g.,*

10

*White v. Olig*, 56 F.3d 817, 821 (7th Cir. 1995) ("failure to follow procedures mandated by state but not federal law . . . can establish only a state law violation").

Plaintiff also claims that he will be denied the right to a "fair trial" under the SVP Act if he consents to treatment to obtain certain privileges and amenities. Complaint, p. 8. While this claim less than clear, it appears that Plaintiff is complaining that he must make a Hobson's choice in that he will be deemed to be a "sexually violent person" by a jury if the jury learns that he consented to treatment (albeit for the purpose of availing himself to the privileges and amenities given to those who consent to treatment, rather than to assist in his rehabilitation efforts). *Id.* at pp. 6-7. *McKune* squarely rejected a similar argument that a treatment program violated the plaintiff's Fifth Amendment right against self incrimination by conditioning certain privileges and amenities on consent to treatment and the disclosure of prior uncharged offense. 536 U.S. at 38-46. Rather, the Court held that it was proper for officials to condition the denial of privileges on an inmate's refusal to participate in treatment and rejected the notion that the inmate was being compelled to accept these privileges in violation of his right against self-incrimination. 536 U.S. at 40 ("Respondent fails to cite a single case from this Court holding that the denial of discrete prison privileges for refusal to participate in a rehabilitation program amounts to unconstitutional compulsion.").

Because *McKune* rejected the notion that the inmate was being subjected to a violation of the Fifth Amendment if he consented to treatment *and* admitted past sex offenses despite to the absence of "legal immunity from prosecution," it naturally follows that there is no merit to Plaintiff's contention that he will be denied a right to a fair trial to the extent, to the extent he simply *consents to treatment* in order to obtain

11

the privileges that are afforded to residents in treatment.  To hold otherwise would serve to eviscerate the State of Illinois' sex offender treatment program.

### D.    Alternatively, Plaintiff's Fair Trial Claim is Barred by *Younger*

Plaintiff claims that the if he consents to set offender treatment he will be denied a fair trial in his pending circuit court state law commitment case.  This is not the proper forum in which to complain of issues related to his underlying commitment proceedings.  *Younger* abstention bars Plaintiff from litigating matters related to his civil commitment proceedings in this forum.  *Younger v. Harris*, 401 U.S. 37 (1992); *Barichello v. McDonald*, 98 F.3d 948, 954 (7th Cir. 1996) ("absent unusual circumstances, a federal court must refrain from entertaining injunctive relief which might interfere with the officers or judicial process of state courts").  Abstention is proper where the following factors are met:  "(1) the judicial or judicial in nature state proceedings must be on-going; (2) the proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state court proceeding to raise constitutional challenges." *Id.* at 955.

*Barichello* upheld abstention on the basis that the plaintiffs were subject to state court proceedings and that the proceedings implicated an important state interest. *Id.* ("the protection of the community from mentally ill persons with violent criminal tendencies is an important, not to say compelling, state interest, the second of the three criteria.").  Here, abstention should apply as proceedings under the SVP Act are perpetual and serve an important state function (keeping society free from violent sex offenders).  725 ILCS 207/55; 207/40.  Plaintiff is free to raise these claims in his state court SVP proceedings.

6046468v2 864883

### E.    Alternatively, Plaintiff Has Failed to Identify Any Actual Injuries

Alternatively, these claims fail to identify whether Plaintiff had ever suffered any physical or mental injuries from these alleged conditions.  To establish Article III standing, a plaintiff must "show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct, and the injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983)

In Count I Plaintiff has suffered from no injuries as he has refused to consent to sex offender treatment and he has not been adjudicated to be sexually violent person.  He also fails to identify any injury which he has suffered from the alleged housing conditions or the denial of the privileges afforded to residents who consent to sex offender treatment.  Additionally, Plaintiff lacks standing to assert the rights of other residents.  *Daniels v. Southfort*, 6 F.3d 482, 484 (7th Cir. 1993) ("Daniels lacks standing to complain about injuries to his friends.").

As to Count II, he has suffered no injury at the hands of the Liberty Defendants based upon alleged false report writing by the DHS Defendants.  *See, e.g., Tineybey v. Peters*, 2001 WL 527409, *2 (N.D. Ill. 2001) ("The only claim lodged against Eisenfelder accuses him of filing false reports about Lieberman's behavior. Lieberman does not claim that any disciplinary action was taken against him as a result of the false reports, however.").   Even if Plaintiff suffered an actual injury by and through the *Liberty Defendants*, this claim should be dismissed because he admits that he "refused housing" with the proposed roommate.  By admitting that he refused to follow a direct order, Plaintiff cannot complain of the consequences.  *Rodriguez v. Briley*, 403 F.3d 952, 952-53 (7th Cir. 2005) ("deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into

13

punishment."). *See also*, *Holly v. Woolfolk*, 415 F.3d 678, 679-81 (7th Cir. 2005) (holding that a pre-trial detainee's placement in segregation without a pre-hearing was "too trivial an incremental deprivation to trigger the duty of due process.").

To the extent Plaintiff is claiming that staff could not "punish" him for failing to follow a direct order, this claim must be rejected.  The Seventh Circuit has held that sexually dangerous civil detainees can be lawfully subjected to the "usual rules of conduct" that apply in prisons, *without* such restrictions amounting to unlawful "punishment." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003).   *See also*, *West v. Schwebke*, 333 F.3d 745, 748-49 (7th Cir. 2003) (holding that civilly committed sex offenders can be subjected to "incapacitation and deterrence" in order to reduce violence); *Thielman v. Leean,* 282 F.3d 478, 482-83 (7th Cir. 2002) ("facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high."); *Young v. Bass*, 2004 WL, 765874 *5 (N.D. Ill. 2004) ("government officials may still place certain restrictions on the rights of pretrial detainees [held under the SVP Act] because it has legitimate interests in managing the facility where an individual is detained.").   *See also, Love v. Sheehan,* 156 F.Supp.2d 749 (N.D. Ill. 2001) ("'In addition to the regulatory measures that prison officials may take to ensure the effectiveness of pretrial confinement, a pretrial detainee can be punished for misconduct that occurs while he is awaiting trial in a pretrial confinement status.'").

### F.     No Constitutional Right to educational or vocational services

Plaintiff claims that he has been educational due vocational services due to his decision to refuse sex offender treatment.  Plaintiff, however, lacks a constitutional right to educational or vocational services.  *See, e.g., Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000); *Garza v. Miller*, 688 F.2d 480, 486 (7th Cir. 1982); *Higgason*

6046468v2 864883

*v. Farley*, 83 F.3d 807, 809 (7th Cir. 1996). *See also, Hargett*, 2005 WL 399300 at *13, *20 (holding SVP program afforded "reasonable" educational and vocational services).

### G.    No Constitutional Right to Have His Grievances Granted

Plaintiff claims that he has grieved one or more of the above identified deprivations. Plaintiff, however, cannot state a constitutional claim the denial of his grievances. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Greer v. DeRobertis*, 568 F.Supp. 1370, 1374 (N.D. Ill. 1983) (*Azeez v. DeRobertis*, 568 F.Supp. 8, 10 (N.D. Ill. 1982); *Grant v. Sutton,* 2006 WL 2802050, *3 (S.D. Ill. 2006); *Agrawal v. Briley*, 2003 WL 164225 (N.D. Ill. 2003).

### H.    Liberty Healthcare is Entitled to Dismissal

Liberty Healthcare is also entitled to dismissal. First, Liberty Healthcare is entitled to dismissal as no constitutional violations have been alleged. Second, it cannot be held vicariously liable for the acts or omissions of its employees on the basis of *respondeat superior* liability. *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002). Third, it is entitled to dismissal as Plaintiff has failed to essentially allege "that a constitutional deprivation occurred as the result of an express policy or custom" that is attributable to Liberty Healthcare. *Jackson*, 300 F.3 at 766; *Iskander*, 690 F.2d at 128. Plaintiff's claim that Liberty Healthcare allows DHS employees to review resident records does not constitute a constitutional violation.

WHEREFORE, for the reasons set forth above, Defendants, SHAN JUMPER, DIANE DOBIER, JOSEPH PROCTOR and LIBERTY HEALTH CARE CORPORATION, respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice.

6046468v2 864883

Respectfully submitted,

By: /s/ James C. Vlahakis
Attorney for the Defendants

James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000
Jvlahakis@hinshawlaw.com

6046468v2 864883

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2007, I electronically filed the above document, with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.  I further certify that on December 31, 2007, I served mailed a copy of the above document to the following party of record:

> John New
> c/o Department of Human
> Services
> R.R. #1, Box 6A
> Rushville, IL 62681

Respectfully submitted,

By: <u>/s/ James C. Vlahakis</u>

James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000
Jvlahakis@hinshawlaw.com

6046468v2 864883

ORIGINAL

E-FILED
Monday, 81 December, 2007 05:03:43 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

FILED

JUN 0 7 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JOHN NEW, JR.                     )
     Plaintiff/Petitioner      )
                        )
                        )
   -VS-                          )     Case No. 07-3147
                        )
BRIAN THOMAS, et al.,             )
     Defendant/Respondent(s)   )
                        )

MOTION AND AFFIDAVIT IN SUPPORT OF
REQUEST TO PROCEED IN FORMA PAUPERUS

I, John New, Jr., being first duly sworn, depose and says that I am the petitioner in the above entitled cause; that in support of my request to proceed without being required to prepay fees, cost or give security thereof I state that because of my poverty, I am unable to pay cost of said proceeding or give security thereof and that I believe I am entitled to relief.

The nature of the action is:

[XX] Civil Rights Action; Pursuant to 42 U.S.C. § 1983

1.  Are you presently employed ?  ( No )

a.  If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer;

_____

_____

b.  If the answer is "no", state the date of last employment and the amount of your salary or wages per month which you received;

_____

_____

2.  Have you received within the past twelve months any money from any of the following sources ?

a.  Business, profession or from self-employment ?     Yes ( )    No (✓)
b.  Rent payments, interest or dividends ?              Yes ( )    No (✓)
c.  Pensions, annuities or life insurance payments ?    Yes ( )    No (✓)
d.  Gifts or inheritances ?                             Yes ( )    No (✓)
e.  any other sources ?                                 Yes ( )    No (✓)

f.    If the answer to any of the above is "yes", describe each source of money and state the amount received during the six months

_____

_____

3.    Do you own real estate, stocks, bonds, notes, automobiles or other valuable property ( exculuding ordinary household furnishings and clothing ? )

                    Yes ( )   No ( X )

**There is none**

4.    Do you own cash or do you have money in checking accounts ?

                    Yes ( )   No ( X )

**There is none**

5.    List the persons who are dependent upon your support, state your relationship to those persons, and indicate how much you contribute their support.

            _____

## DECLARATION UNDER THE PENALTY OF PERJURY

    I, John New, Jr., under the penalty of perjury, state that I am the plaintiff in the above action, that I have read the foregoing petitiion for leave in proceed in forma pauperus, and this motion and affidavit to proceed in forma pauperus, and the information contained therein is true and correct.  I say this under and by virtue of title 28 U.S.C. § 1746, 18 U.S.C. § 1621.

SUBSCRIBED AND SWORN TO BEFORE ME

This  8  day of May   2007

_____                    _____
N O T A R Y   P U B L I C                  Signature of Affiant

OFFICIAL SEAL
SANDRA J. HAYS
COMMISSION NO. 655223
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-11-2010

NAME OF PETITIONER:  JOHN NEW, JR.

INSTITUTION WHERE CONFINED: ILLINOIS DEPT OF HUMAN SERVICES, TREATMENT FACILITY

REGISTERED NUMBER: # 863120

_____

_____

( INSTRUCTIONS ):  this section is for completion by authorized officer of the above institution only.  The petitioner may _not_ write below this line.  Please complete the following certificate for the petitioner John New, Jr..  If the said petitioner is confined in a Mental Health Facility you are further requested to attach a printout of all transactions for this person's account for the past six months.

I hereby certify that John New Jr. currently has the sum of $ 1.00 on account to his credit at the below named :

_____

| | | |
|---|---|---|
| In the first calendar month immediately proceeding the date of this certificate, Petitioner John New, Jr., has a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |
| In the second calendar month,      he had a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |
| In the third calender month,      he had a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |
| In the fourth calendar month,      he had a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |
| In the fifth calendar month,      he had a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |
| In the sixth calendar month      he had a maximum balance of | $ | 1.00 |
| ...........................................and a minimum balance of | $ | 1.00 |

I certify that petitioner John New, Jr., likewise has the following securities to his credit according to records of this facility.

_____

5-23-07
Date

_____
Signature of Authorized Officer

REPORT ID: QATF421A
DATE PRODUCED: 01/03/2007

TRUST FUNDS QUARTERLY ACTIVITY STATEMENT
AS OF 12/31/2006

PAGE: 1268

* INDICATES MONEY ON HOLD
DOCUMENTS LISTED IN
ORDER OF ENTRY

DEPT: 462  FAC: 41 TREATMENT & DETENTION FA    FUND: 1143

| ACCT NO/ CHECK | DOC DATE | TRAN CODE | DOC NUMBER | DR AMOUNT | CR AMOUNT | DR BALANCE | CR BALANCE | DESCRIPTION | SOURCE/ PURPOSE |
|---|---|---|---|---|---|---|---|---|---|
| NEW | JOHN | | | | | | | | |
| 200 R01 | 09/30/2006 | BEGIN QTLY BAL | 863120 | | | | .00 | BEGINNING BALANCE | |
| 200 R01 | 12/31/2006 | END QTLY BAL | 863120 | | | | .00 | ENDING BALANCE | |
| NEW | JOHN | | | | | | | | |
| 200 001 | 09/30/2006 | BEGIN QTLY BAL | 863120 | | 1.00 | | 1.00 | BEGINNING BALANCE | |
| 200 001 | 12/31/2006 | END QTLY BAL | 863120 | | 1.00 | | 1.00 | ENDING BALANCE | |
| NEW | JOHN | | | | | | | | |
| 200 005 | 09/30/2006 | BEGIN QTLY BAL | 863120 | | | | .00 | BEGINNING BALANCE | |
| 200 005 | 12/31/2006 | END QTLY BAL | 863120 | | | | .00 | ENDING BALANCE | |
| NEW | JOHN | | 863120 | | | | 1.00 | RECIPIENTS TOTAL END BAL | |

SOURCE/PURPOSE LEGEND:
CL-CLOTHING CM-COMMISSIONARY CA-CIVIL SERVICE ANNUITY IT-INTEREST MI-MISCELLANEOUS PN-PERSONAL NEEDS RB-REIMBURSEMENTS RR-RAILROAD
SS-SOCIAL SECURITY SI-SUPPLEMENTAL SS TG-TAX GRANT VA-VETERANS WC-WORKSHOP
TRAN CODES: TF-TRANSFER DR-DEBIT CR-CREDIT RE-RECEIPT DB-DISBURSEMENTS DM-DEBIT

REPORT ID: OATF421A

DATE PRODUCED: 04/03/2007

DEPT: 462  FAC: 41  TREATMENT & DETENTION FA

TRUST FUNDS QUARTERLY ACTIVITY STATEMENT
AS OF 03/31/2007

FUND: 1143

PAGE: 1313

* INDICATES MONEY ON HOLD
DOCUMENTS LISTED IN
ORDER OF ENTRY

| ACCT NO/ CHECK | DOC DATE | TRAN CODE | DOC NUMBER | DR AMOUNT | CR AMOUNT | DR BALANCE | CR BALANCE | DESCRIPTION | SOURCE/ PURPOSE |
|---|---|---|---|---|---|---|---|---|---|
| NEW | | | | | | | | JOHN | |
| 200 R01 | 12/31/2006 BEGIN QTLY BAL | | 863120 | | | | .00 | BEGINNING BALANCE | |
| 200 R01 | 03/31/2007 END QTLY BAL | | | | | | .00 | ENDING BALANCE | |
| NEW | | | | | | | | JOHN | |
| 200 001 | 12/31/2006 BEGIN QTLY BAL | | 863120 | | 1.00 | | 1.00 | BEGINNING BALANCE | |
| 200 001 | 03/31/2007 END QTLY BAL | | | | 1.00 | | 1.00 | ENDING BALANCE | |
| NEW | | | | | | | | JOHN | |
| 200 005 | 12/31/2006 BEGIN QTLY BAL | | 863120 | | | | .00 | BEGINNING BALANCE | |
| 200 005 | 03/31/2007 END QTLY BAL | | | | | | .00 | ENDING BALANCE | |
| NEW | | | | | | | | JOHN | |
| | | | | | | | 1.00 | RECIPIENTS TOTAL END BAL | |

SOURCE/PURPOSE LEGEND:
CL-CLOTHING CM-COMMISSIONARY CA-CIVIL SERVICE ANNUITY IT-INTEREST MI-MISCELLANEOUS PN-PERSONAL NEEDS RB-REIMBURSEMENTS RR-RAILROAD
SS-SOCIAL SECURITY S1-SUPPLEMENTAL SS TG-TAX GRANT VA-VETERANS WC-WORKSHOP
TRAN CODES: TF-TRANSFER DR-DEBIT CR-CREDIT RE-RECEIPT DB-DISBURSEMENTS DM-DEBIT

| | | | | | |
|---|---|---|---|---|---|
| NEW | | JOHN | 863120 | | |
| 200 R01 | 03/01/2007 | BEGIN YTD CR DR | | | BEGINNING BALANCE |
| 200 R01 | 03/31/2007 | END YTD DR CR | | | ENDING BALANCE |
| 200 .001 | 02/28/2007 | BEGIN YTD CR DR | | 1.00 | BEGINNING BALANCE |
| 200 .001 | 03/31/2007 | END YTD DR CR | | 1.00 | ENDING BALANCE |
| 200 .005 | 03/01/2007 | BEGIN YTD CR DR | | | BEGINNING BALANCE |
| 200 .005 | 03/31/2007 | END YTD DR CR | | | ENDING BALANCE |
| NEW | | JOHN | 863120 | 1.00 | RECIPIENTS TOTAL END. BAL. |

REPORT ID: MATF3240                          TRUST FUNDS MONTHLY ACTIVITY STATEMENT                          PAGE:   300
DATE PRODUCED: 05/01/2007                              AS OF 04/30/2007

DEPT. 462  FAC.  41 TREATMENT & DETENTION FA.      FUND. 1143 RESIDENTS TRUST FUND                * INDICATES MONEY ON HOLD
                                                                                                   DOCUMENTS LISTED IN
                                                                                                     ORDER OF ENTRY

| ACCT NO./ CHECK | DOC. DATE | TRAN CODE | DOC. NUMBER | DR AMOUNT | CR AMOUNT | DR BALANCE | CR BALANCE | DESCRIPTION | SOURCE/ PURPOSE |
|---|---|---|---|---|---|---|---|---|---|
| 200 001 | 03/31/2007 | BEGIN YTD DR DR | | | | | 1.00 | BEGINNING BALANCE | |
| 200 001 | 04/30/2007 | END YTD DR CR | | | | | 1.00 | ENDING BALANCE | |
| 200 005 | 04/01/2007 | BEGIN YTD CR DR | | | | | | BEGINNING BALANCE | |
| 200 005 | 04/30/2007 | END YTD DR CR | | | | | | ENDING BALANCE | |
| NEW | | JOHN | 863120 | | | | 1.00 | RECIPIENTS TOTAL END BAL | |

*ORIGINAL*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

JOHN NEW, JR.
    Plaintiff/Petitioner         )
                       )
                       )    Case No. 07-3147
   -VS-                 )
                       )    CIVIL RIGHTS COMPLAINT
                       )    Pursuant to 42 U.S.C. § 1983
BRIAN THOMAS, SHAUN JUMPER,   )    (State Detained/Prisoner )
DARRELL SANDERS, JOSEPH PROCTOR, )
DIANE DOBIER, SALLY HOUGAS,    )
TARRY WILLIAMS, LIBERTY HEALTH  )
CARE CORPORATION, AND VARIOUS   )
DEFENDENT(S), THAT WILL BE NAMED )
UPON THE DISCOVERY OF THEIR IDENTITIES )
    Defendent/Respondent(s).      )

## CIVIL RIGHTS COMPLAINT
## WITH A JURY DEMAND

    This is a § 1983 action filed by **John New, Jr.,** a State Detained/Prisoner alleging violations of his Constitutional Rights and he is seeking money damages, declaratory judgement, and **EMERGENCY INJUNTIVE RELIEF.** The Plaintiff request a trial by jury.

### I.    JURISDICTION

    A.    The jurisdiction of this Court is invoked pursuant to **28 U.S.C. § 1331** as this action arises under the Constitution and Laws of the **United States,** and pursuant to 28 **U.S.C. § 1343** (a)(3) as this action seeks redress for Civil Rights violations under 42 U.S.C. § 1983.

    B.    Plaintiff's mailing address and/or registered number and place of confinement: John New, Jr., registered number # 863120, Illinois Department of Human Services, Rushville (TDF) Treatment and Detention Facility, R.R. 1, Box 6A, Rushville, Illinois 62681.

C.    Defendant    BRIAN THOMAS                        is employed as
                ( Name of First Defendant)

ACTING FACILITY DIRECTOR FOR THE ILL DEPT OF HUMAN SERVICES, TREATMENT FACILITY
                    (Position/Title
ILLINOIS DEPARTMENT OF HUMAN SERVICES, TREATMENT AND DETENTION FACILITY
COUNTYFARM LINE ROAD AND HORNEY BRANCH ROAD, R.R. 1, BOX 6A, RUSHVILLE, ILL 62681
                (Employers Name And Address)

D.    At the time claim(s) alleged in this complaint arose, was the
      the defendant employed by the state, local or federal government ?

                    Yes  (XX)        No  (  )

      If your answer is "yes", briefly explain :

      At all times relevant to the claim's that are alleged in this
      complaint the defendant that is named in paragraph (C) was and
      remains the Acting Facility Director for the Illinois Department
      of Human Services, at it's Treatment and Detention Facility for
      Sexually Violent Persons, a State of Illinois Facility, that is
      duly organized under and by virtue of the laws of the State of
      Illinois.  This defendant is hereby being sued in his individual
      and his personal capacity.

E.    Defendant        SHAUN JUMPER                    is employed as
                (Name of Second Defendant)

                    CLINICAL DIRECTOR
                    (Position/Title)
ILLINOIS DEPARTMENT OF HUMAN SERVICES, TREATMENT AND DETENTION FACILITY
COUNTYFARM LINE ROAD AND HORNEY BRANCH ROAD, R.R.1, BOX 6A, RUSHVILLE, ILL 62681
                (Employers Name And Address)

F.    At the time the claim(s) alleged in this complaint arose, was
      the defendant employed by the state, local or federal government ?

                    Yes  (XX)        No  (  )

      If your answer is "yes", briefly explain:

      At all times relevant to the claim's that are alleged in this
      complaint the defendant that is named in paragraph (E) was and
      remains the Clinical Director for the Illinois Department of
      Human Services, at it's Treatment and Detention Facility for
      Sexually Violent Persons, a State of Illinois Facility, that is
      duly organized under and by virtue of the laws of the State of
      Illinois.  This defendantis hereby being sued in his individual
      and his personal capacity.

G.      Using the outline of the form provided.  Include the above information
        for any additional defendant(s).

H.      The below named defendant(s) are employed at the Treatment and Detention
        Facility for Sexually Violent Persons, which is a State Agency within the
        Illinois Department of Human Services, said facility is duly organized under
        and by virtue of the laws of the State of Illinois and is located at the
        address of Countyfarm Line Road and Horney Branch Road, Rural Route 1,
        Box 6A, Rushville, Illinois 62681.  These named defendant(s) are here by
        being sued in their individual and their personal capacity.

1.      DARRELL SANDERS, at all times relevant to the claim's alleged in this
        complaint, was and remains the Director of Security, he directly employed
        with the Illinois Department of Human Services, at the Treatment and
        Detention facility, located at the above said address.

2.      JOSEPH PROCTOR, at all times relevant to the claim's alleged in this
        complaint was and remains a Clinical Treatment Leader and Rooming Committee
        Member at the Treatment and Detention facility, he directly employed by
        Liberty Health Care Corporation, which is a subcontractor for the Illinois
        Department of Human Services.

3.      DIANE DOBIER, at all times relevant to the claim's alleged in this
        complaint was and remains a Clinical Treatment Leader and Clinical
        Therapist, at the Treatment and Detention facility, she directly employed
        by Liberty Health Care Corporation, which is a subcontractor for the
        Illinois Department of Human Services.

4.      LIBERTY HEALTH CARE CORPORATION, at all times relevant to the claim's
        alleged in this complaint was and remains a subcontractor for the Illinois
        Department of Human Services, contracted to provide Sex Offenders Treatment
        for those pre-trial detained persons who request such, and for persons who
        have been Committed as a Sexually Violent Persons and placed in a secure
        facility under 725 ILCS 207/50., of the Illinois Sexually Violent Persons
        Act.  The Illinois Department of Human Services are located at the above
        address said.

        All of the above said Defendant(s) are hereby being sued in their
        individual and their personal capacity.

4.    <u>SALLY HOUGAS</u>, at all times relevant to the claim's alleged in this
      complaint was and remains a Security Therapist Aid, with the rank
      and/or Title of Sergeant STA II, she directly employed with the
      Illinois Department of Human Services, at the Treatment And Detention
      facility, located at the above said address.

5.    <u>TARRY WILLIAMS</u>, at all times relevant to the claim's alleged in this
      complaint was and remains a Security Therapist Aid, with the rank
      and/or Title of Captain Executive IV, he directly employed with the
      Illinois Department of Human Services, at the Treatment And Detention
      facility, located at the above said address.

      All of the above said Defendant(s) are hereby being sued in their
      individual and their personal capacity.

## II.    PREVIOUS LAWSUIT

A.    Have you begun any other lawsuits in State or Federal Court relating
      to your detention and/or imprisonment ?    **Yes (XX)    No (  )**

B.    If your answer to "A" is "yes", describe the lawsuit(s) in the space
      below.  (If there is more than (1) lawsuit, you must describe the additional
      lawsuits on an addititional sheet of paper, using the same outline.) Failure
      to comply with this provision may result in summary dismissal of your complaint.

1.    **Parties To Previous Lawsuit:**

      Plaintiff:  <u>John New</u>
      Defendant(s):  <u>Jack Hartwig, et al.</u>

2.    Court (If Federal Court, name the district; if State Court, name
      the County).  <u>United States District Court For The Southern District
      of Illinois.</u>

3.    Docket Number: <u>99-744-WLB.</u>

4.    Name of Judge to whom case was assigned: <u>Honorable G. Patrick Murphy</u>

5.    Type of case ( For example; was it a Habeas Corpus or Civil Rights
      Action ? ) <u>This was a Civil Rights Complaint, Pursuant to 42 U.S.C. § 1983.</u>

6.    Disposition of case:  <u>This case was dismissed with prejudice.</u>

7.    Approximate date of filing lawsuit:  <u>October 4, 1999.</u>

8.    Approximate date of disposition:  <u>December 4, 2001.</u>

9.    **Parties To Previous Lawsuit:**

      Plaintiff:  John New
10.   Defendant(s):  Thomas Monahan, et al.
11.   Court ( If Federal Court, Name the district; if State Court,
      name the County ). United States District Court For The Northern
      District of Illinois.
12.   Docket number:  06-C-0017.
13.   Name of Judge to whom case was assigned:  Honorable Joan B. Gottschall.
14.   Type of case ( For example; was it a Habeas Corpus or Civil Rights ? )
      This was a Civil Rights Complaint, Pursuant to 42 U.S.C. § 1983.
15.   Disposition of case:  case is still pending.
16.   Approximate date of filing lawsuit:  February 16, 2006.
17.   Approximate date of disposition:  _____ N/A _____.


## III.    GRIEVANCE PROCEDURE

A.    Is there a grievance procedure in the institution ?

                   Yes (XX)      No (   )

B.    Did you present the facts relating to your complaint in the
      institution grievance procedure ?

                   Yes (XX)      No (   )

C.    If your answer to "B", is "yes", briefly explain:

1.    What steps did you take ?  I filed an institutional grievance reguarding
      the issues that are complained of in this Civil complaint, each individual
      issue that is named described and complained of herein has been formally
      fully grieved.


2.    What was the results ?  My grievances was summarily denied by the
      Grievance Officer and Brian Thomas.


D.    Plaintiff aver that he has written letters to the individual
      administrative officials and that he has spoken verbally with them
      and all of plaintiff's efforts has been completely ineffective.

E.    Attached hereto are copies of the plaintiff's grievances and other attached documents to be used as exhibits of evidence

## IV.    STATEMENT OF CLAIMS

The facts necessary to an understanding of this issues that are presented by this civil complaint are set fourth as follows:

### COUNT    I

A.    Plaintiff, John New, Jr., aver that he is currently a Civil Pre-trial Detainee, domiciled at the Illinois Department of Human Services, Rushville (TDF) Treatment and Detention Facility, for the Illinois Department of Human Services, thus it is a State of Illinois facility, duly organized under and by virtue of the laws of Illinois.

B.    Plaintiff aver that on the date of June 19, 2006, he was transported from the Old Joliet Annex Prison building, in where the Illinois Department of Human Services, Treatment and Detention facility was located at, to this present location, plaintiff aver that he was immediately placed into the population at the Treatment and Detention facility, with committed people, people who are called residents, and have been adjudicated by the Courts, as being people who suffers from a mental disorder.

C.    Plaintiff aver that on the date of October 6, 2006, Administrative Officials here at the (TDF) Treatment and Detention facility tried to force me into a cell with a Committed person, who has a known history of physically assaulting his cellmates, while Plaintiff refused to move into this Committed person's room, Plaintiff was subjected with punishment by placing him on a Maximum Security Unit, while plaintiff at the time, had no disciplinary reports written in his Residental Clinical File.  Plaintiff then filed a Institutional Grievance stating that the Administrative Officials of this facility, punished him by placing him on a Maximum Security Unit for a ( 121 ) days, from October 6, 2006, to January 27, 2007., simply because plaintiff refused to be housed in a cell with a Committed person, in accordance with Title 59 of the Illinois Administrative Code, 299.200, which clearly states that Civil Pre-Trial Detain persons must be kept seperate from Committed persons.

D.    Plaintiff aver that as a direct and proximate result of him refusing to move into a cell with a Committed person, plaintiff was continued to be subjected to a systemactic form of punishment, designed and drafted specifically by the Administrative Officials, Plaintiff aver that the defendant(s) Tarry Williams and Joseph Proctor, who are members and or connected with the cell assignments committee at the Treatment and Detention facility, and as there policy residents who have been adjudged to be Sexually Violent Persons, and Pre-Trial detained persons who have not been adjudge as being Sexually Violent are all housed together in the Rushville (TDF) Treatment and Detention facility if they will not sign there name to a consent to treatment form and attend group treatment sessions, Plaintiff aver that as a pre-trial detained person who maintains and asserts that he is not a Sexually Violent Person, that he has an absolute right to a trial to prove that he is not a Sexually Violent Person, without being subjected to punishment designed by the defendant(s) for the purpose of forcing the plaintiff by means as described herein to consent to treatment for Sexually Violent persons and thus as in the United States Supreme decision in Hendricks, who ask for treat-ment, Plaintiff himself will have unwillingly asked for treatment and he will have lost his rights to a fair trial.  Plaintiff aver that defendant(s) as named herein has a policy designed to allow for and to relocate those residents and pre-trial detained persons who have signed there names to a consent to treatment form and attend group treatment sessions for Sexually Violent Persons, access to choose who they want to room with as potiental roommates, while Civil Pre-Trial Detainees are subjected to acts of retaliation and reprisals, Plaintiff and other pre-trial detained persons similary situated as the plaintiff, are force to live in an over-crowded cells, with committed persons.  While the defendant(s) are now in direct contempt of Court, in which the defendant(s) agreed in a recent Court settlement with this Court to prohibit punishment of any form, Plaintiff aver that the agents acting for Liberty Health Care Corporation, allows for none credential employee staff, known as Security Therapist Aides, [ S.T.A.'s ], to have complete access to pre-trial detainees records and files, and allows these said employee staff to write fraudulent reports on detained persons for the purpose of providing false information to assure civil commitment at the trial of a detained person, in the financial interest of Liberty Health Care Corporation, and thus Liberty Health Care Corporation financial interest being involved as it is, is a conflict of interest for pre-trial detained persons.

COUNT II

E.     That the plaintiff suffers from a chronic arthritis condition that causes extreme and excruciating pain to the plaintiff, and that Administrative Staff Employee [ Sally Hougas ], who told Plaintiff that he does not hava a Low Bunk Bed Permit, by [ Dr, Joseph Proctor ], and threaten plaintiff with taken him back to Special Management, better known as [ Administrative Segregation ] because Plaintiff was just released from Special Management on April 27, 2007 at 2:00pm, because on the date of April 25, 2007, Plaintiff was taken to Special Management, because Plaintiff refused housing, after [ Captain Executive II Tarry Williams ], who is one of the members of the Rooming Committee, fabricated a False Resident Rooming Request stating that Plaintiff requested to move into a cell with another resident, who at the time, Plaintiff did not know that Plaintiff's new assigned cellmate, is a Pre-Trial Detained person, such as he is.  Nonetheless, Sgt, Sally Hougas who also sits on the Behavior Management Committee, along with Dr. Joseph Proctor and Dr. Diane Dobier, who are also members of the Behavior Management Committee, had written a fraudulent disciplinary report, stating that Plaintiff had violated a Rule infraction by refusing to lock-up for the facility count, creating a Major Disturbance.   However that statement was false, because Plaintiff was taken to Special Management at 8:50a.m., the morning of April 25, 2007 for refusing to move over to Housing Unit Alpha 1, Room 11.   While just previously stated back to February 8, 2007, Plaintiff was taken to the University of Illinois at Chicago Medical Center, to do a [ M.R.I. ] on Plaintiff's neck and back, to see if Plaintiff sustained any nerve damage, in which in a Medical Report by the Chief Surgeon, Dr. James A. Stone, Professor of Neurosurgery and Neurology, stated in a written report to the Primary Care Physician of the Rushville Treatment and Detention Facility [ Dr. Jovita Anyanwu ], that was sent to him by via Fax machine on March 1, 2007, Plaintiff needs corrective surgery to relieve the presure in Plaintiff's lower back, neck, shoulder, arm and hand, hand on Plaintiff's left side, which at times, Plaintiff's entire left side of his body be in a Parlyze state, at numerous times, Plaintiff be in a state of Paralysis.  In which the Primary Care Physician [ Dr. Anyanwu ] issued a Low Bunk Bed Permit to Plaintiff first on February 6, 2006, because Plaintiff cannot climb up to the Top Bunk, which would in terms aggregates Plaintiff's spinal cord, in which a bone is lodged directly into Plaintiff's  C-3 Verebrete, which makes it high impossible for the Plaintiff to climb into a Top Bunk.  However Administrative Staff personnel ( Security Staff ) fail to acknowledge that Plaintiff has a Low Bunk Permit, while on April 27, 2007, Sgt. Sally Hougas told Plaintiff that he refused to go into the

with his new assigned cellmate, that she personally was going to take Plaintiff
back down to Special Managment and lock Plaintiff back up, for refusing to move
into the newly assigned cell, that the Rooming Committee told Plaintiff that he
had to move into.    Although after Plaintiff tried pleading with Sgt. Hougas,
stating that it was not his job to tell Plaintiff's new cellmate, that he would
have to move his mattress and place it on the top bunk, because Plaintiff told
Sgt. Hougas that it was her job, because she is Security, and Plaintiff stated
that he did not want to start an altercation with his new cellmate, because of
Plaintiff's medical condition, and that Plaintiff must be placed on the Bottom
Bunk, to relieve any stress of aggravating the nerves in Plaintiff's spinal cord.


## V.  RELIEF


WHEREFORE, plaintiff request that the Court grant the following
relief:

A.    Issue a declaratory judgement stating that:
      That the defendants' Brian Thomas, Shaun Jumper, Darrell Sanders,
      Joseph Proctor, Diane Dobier and Sally Hougas, violated the Plaintiff's
      and all other residents' and Pre-Trial detainee's similarly situated
      as the plaintiff when they deliberately caused the forced housing
      of Pre-trial detained persons with committed people and force them
      to live in animal like conditions if they refuse to ask for Sex
      Offenders Treatment and thereby give up their rights to a fair
      Civil Commitment Trial.

B.    To have Plaintiff remain on Housing Unit [ Alpha 1 ], without placing him
      in a cell with a roommate, unless Plaintiff signs in writting that he
      is requesting for a certain individual/resident that he can trust, to
      be placed in a assigned cell with him, over on Housing Unit [ Alpha 1 ].

C.    That defendants' Brian Thomas, Shaun Jumper, Darrell Sanders,
      Joseph Proctor, Diane Dobier and Sally Hougas, and each of their
      officers, agents, employers, and all persons acting in concert
      or participation with them, from lauching acts of Retailiation
      or reprisals for the filing of this Civil Action Complaint

D.     Issue an injuction ordering the Health Care Administrator to
       write a permanent Low Bunk Permit to Plaintiff, so Plaintiff
       would never have to endure these atrocies again, of being forced
       to climb up to a Top Bunk, due to Plaintiff's serious medical
       condition.

E.     Award Compensatory Damages in the following amounts :

1.     $ 10,000  jointly and severaly against the defendants Thomas,
       Jumper, and Sanders, for forcing Plaintiff to endure these atrocies
       by their subordinates. the plaint

2.     $ 10,000  jointly and severaly against the defendants' Proctor,
       Dobier and Hougas for falsifying Behavior Committee Incident Report
       of Plaintiff, and ignoring Plaintiff's serious medical condition of
       forcing Plaintiff to climb up to a Top Bunk, acting in deliberate
       indifference to Plaintiff's serious medical condition.

F.     Award punitive damages in the following amount :

1.     5,000  from each named defendant in this Civil complaint.

G.     Grant such other relief as it may appear that the Plaintiff
       is entitled, for this is so prayed for.

[ DATE ]_____

Respectfully Submitted by:

_____
John New, Jr. Reg No.# 863120
Illinois Department of Human Services,
Treatment and Detention Facility
Rual Route 1, Box 6A
Rushville, Illinois 62681

SUBSCRIBED AND SWORN TO BEFORE ME

This 8 day of May  2007

_Sandie_____
N O T A R Y    P U B L I C

OFFICIAL SEAL
SANDRA J. HAYS
COMMISSION NO. 655223
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-11-2010

Page 10-OF-10



**DEPARTMENT OF HUMAN SERVICES**

**TREATMENT AND DETENTION FACILITY**

## NOTICE OF APPEARANCE BEFORE THE BEHAVIOR COMMITTEE

Resident:  New, John                    DHS# 863120

Date and Time of Incident: 2-9-07 approximately 11:45am

Nature of Incident/Potential Rule Violation:  On the above date and time, resident New refused to lock up for facility count.

This notice is to inform you that the Behavior Committee will be meeting to review the incident mentioned above.  This meeting is scheduled to occur on 2-13-07 or later, between the hours of 10:00 AM and 3:00 PM.

You will be contacted by security staff during this time frame.  You will be asked if you wish to appear before the Behavior Committee.  Attendance at a Behavior Committee meeting is optional.  If you do plan to attend, please be prepared to appear when called to do so..  You may present written documentation (i.e.: your own account of incident, witness statements, etc.)  and discuss the circumstances surrounding this incident.  Upon determination that a resident has violated a rule, the Behavior Committee shall determine appropriate management status, determine appropriate treatment recommendations, impose behavioral restrictions or any combination thereof.

My signature below indicates that I have received notification of my scheduled appearance before the Behavior Committee.

_____                    2/12/07
Resident Signature                                          Date

_____                    2/12/07
Staff Signature                                               Date

Date Notified: 2/12/07            Time Notified: 10:28

ILLINOIS DEPARTMENT OF HUMAN SERVICES
TREATMENT & DETENTION FACILITY

# BEHAVIOR COMMITTEE MEETING
## INITIAL

NAME: <u>New, John</u>      DHS#: <u>863120</u>      DATE OF INITIAL MEETING: <u>02/13/07</u>

DATE OF ADMISSION: <u>7/26/05</u>  MANAGEMENT STATUS: <u>Temp Secure ( Int A)</u>  PRIMARY THERAPIST: <u>Palac</u>

Date Of Event: <u>2-9-07 approximately 11:45am</u>

Description Of Event: <u>On the above date and time, resident New refused to lock up for facility count.</u>

Resident Addressed Behavior Committee: (Yes)/No   Received 24 hour notification: (Yes)/No.  Waived notification Yes/No/NA

Resident Comments: Previous day went to UIC for medical, + I found out
I was getting a room mate. They put him in my room
while I was gone. They asked me to give them 12 hrs to
deal w/ the chores. I am willing to go back to my
room now w/ a room mate. You have my word.

Behavioral History for the past six months: No behavior incidents in the past six months.

Determination Of Rule Violation: Major — Create a Disturbance - refusing to
lock up.

Treatment Recommendation (if none, reason): Resident advised to discuss concerns
with primary therapist.

Committee Decision: Major Rule Violation — drop one RM Status.
Return to same room with Roommate and await
Rooming Committee Decision.

SIGNATURES: Dobrel R?
Proctor Psy D
Palac

TITLES: Team Leader
Team Leader
Staff

DATE OF REVIEW: N/a

cc: Primary Therapist, Facility Director, Clinical Director, Associate Clinical Director; Security Director, Secure Management Log,
Unit Directors, Internal Investigator, Vocational Director, Administrator On Duty and Resident

Revised: 06/30/04



State of Illinois
Department of Human Services

# TDF Resident Grievance

| Name of Resident: John New Jr | ID #: 863120 | Date of Incident Occurrence: 2-9-07 | Unit: A-2-1 |
|---|---|---|---|
| Date Received   03-01-07 P05:34 IN | | Grievance # **03 07 GR 0185** | |

**Nature of Grievance**

☐ Personal Property  ☐ Staff Conduct  ☐ Mail Handling  ☐ Meals  ☐ Medical  ☑ Other: (Specify) _ROOMING COMMITTEE_

☑ Disciplinary Report:  Report Date: 2-9-07

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

I, the above named resident, submit this grievance to grieve the acts of Reprisals and Retaliatory tactics by the Resident Rooming Committee, of trying to force me to live in a room with a Committed person...

On February 8, 2007, while I was on a Medical Writ, up to U.I.C. Medical Center in Chicago, the Rooming Committee made a very "INCORRIGIBLE DECISION" by placing Resident Grey Mottis, a person who smokes cigarettes, in my assigned room, while I was not present, or I wasn't even in the facility at the time...

I It is documented in the Health Care Unit, in my Medical File, that I do not smoke cigarettes anymore, and the Rooming Committee did not even take into consideration of my health, of me breathing 2nd Hand Smoke, etc..

Relief Requested:

☑ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Resident Signature: _____   Date: 2-26-07

IL462-5001 (R-6-06)    Distribution: Master File; Resident    Page 1 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

Grievance Examiner's Signature:

Date: _____

Date Received: _____

## FACILITY DIRECTOR'S RESPONSE

Facility Director's Decision: Grievance: ☐ Upheld    ☐ Denied

Behavior Committee Decision Appeal: ☐ Upheld    ☐ Denied

Response:

Facility Director Signature: *See page 4 of 4*    Date: _____

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____

## PROGRAM ADMINISTRATOR'S RESPONSE

Program Administrator Concurs With The Facility Director's Decision: ☐ Yes    ☐ No

Response:

Program Administrator Sigature: _____    Date: _____

462-5001 (R-6-06)    Distribution: Master File; Resident

State of Illinois
Department of Human Services



# TDF Resident Grievance

| Name of Resident: John New, Jr | ID #: 863120 | Date of Incident Occurrence: 2-9-07 | Unit: A-2-1 |
|---|---|---|---|

| Date Received | Grievance # 03 07 GR 0185 |
|---|---|

**Nature of Grievance**

☐ Personal Property  ☐ Staff Conduct  ☐ Mail Handling  ☐ Meals  ☐ Medical  ☑ Other: (Specify) ROOMING COMMITTEE

☑ Disciplinary Report:    Report Date: 2/9/07

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

Also, the Administration is presently aware that I have filed numerous grievances in the past about Title 59, Ill Admin Code, 299.200, which clearly states that: Pre-Trial Civil Detained persons and Civilly Committed persons are to be kept separate and not be housed together.

Now this was stipulated to Facility Director (Thomas Monohan) on 5/26/06, and again on 6/10/06, in a Correspondence letter from Resident New's Attorney (Kim R. Kardas) stating to him about Resident New current Injury conditions, etc...

However, I have sent numerous Resident Rooming Requests to the Rooming Committee, Mr. Terry Williams, Mr. Guy Groot, Dr. Joseph Proctor, and Security Director (Mr. Darrell Sanders)

Stating to these gentlemen, that myself and Resident Arnold Roberts, who submitted numerous Rooming Requests to the Rooming Committee, ever since 2/23/06.

Relief Requested:

☑ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Resident Signature: | Date: 2-26-07 |
|---|---|

IL462-5001 (R-6-06)    Distribution: Master File; Resident    Page 1 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

Grievance Examiner's Signature: _____  Date: _____

Date Received: _____  **FACILITY DIRECTOR'S RESPONSE**

Facility Director's Decision: Grievance: ☐ Upheld   ☐ Denied

Behavior Committee Decision Appeal: ☐ Upheld   ☐ Denied

Response:

Facility Director Signature: _See page 4 of 4_   Date: _____

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____  **PROGRAM ADMINISTRATOR'S RESPONSE**

Program Administrator Concurs With The Facility Director's Decision: ☐ Yes   ☐ No

Response:

Program Administrator Sigature: _____  Date: _____

L462-5001 (R-6-06)                    Distribution:  Master File; Resident                    Page 2 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



| Name of Resident: John New, Jr | ID #: 863120 | Date of Incident Occurrence: 2/9/07 | Unit: A-2-1 |
|---|---|---|---|

| Date Received | Grievance # 03 07 GR 0185 |
|---|---|

**Nature of Grievance**

☐ Personal Property ☐ Staff Conduct ☐ Mail Handling ☐ Meals ☐ Medical ☑ Other: (Specify) ROOMING COMMITTEE

☑ Disciplinary Report: Report Date: 2/9/07

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

Nonetheless Resident Roberts, who is not a person who smokes cigarettes, is also forced to live with a person who is a cigarette smoker...

And that's why the both of us, filled out Resident Rooming Requests to the Rooming Committee, stating that the both of us, would like to become roommates with one another, since neither of the both of us smoke, period...

However, since the Rooming Committee has totally ignored all of my Rooming Requests to be placed in a non-smoking room with Resident Roberts who is also a non-smoker...

My present health is in serious jeopardy, from constantly breathing in the 2nd hand cigarette smoke from Resident Morris, my current roommate...

Relief Requested:

☑ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Resident Signature: _____ Date: 2-26-07

IL462-5001 (R-6-06)      Distribution: Master File; Resident      Page 1 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

Grievance Examiner's Signature: _____    Date: _____

Date Received: _____    FACILITY DIRECTOR'S RESPONSE

Facility Director's Decision: Grievance: ☐ Upheld    ☐ Denied

Behavior Committee Decision Appeal: ☐ Upheld    ☐ Denied

Response:

Facility Director Signature: _See page 4 of _    Date: _____

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____    PROGRAM ADMINISTRATOR'S RESPONSE

Program Administrator Concurs With The Facility Director's Decision: ☐ Yes    ☐ No

Response:

Program Administrator Sigature: _____    Date: _____

IL462-5001 (R-6-06)        Distribution:  Master File; Resident        Page 2 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance

| Name of Resident: John New, Jr | ID #: P63120 | Date of Incident Occurrence: 2/9/07 | Unit: A-2-1 |
|---|---|---|---|

| Date Received | Grievance #: 03 07 GR 0185 |
|---|---|

**Nature of Grievance**

☐ Personal Property  ☐ Staff Conduct  ☐ Mail Handling  ☐ Meals  ☐ Medical  ☑ Other: (Specify): ROOMING COMMITTEE

☑ Disciplinary Report:  Report Date: 2/9/07

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

In which poses a "SUBSTANTIAL RISK OF SERIOUS HARM, and the Rooming Committee acted with deliberate indifference to that risk...

And that's why I refused housing on 2/9/07, and was taken to Special Management, because I refused to be housed in a same room with (1): A person who smokes cigarettes, and (2) A Civilly Committed person, in which I am not.

While the Behavior Committee on 2/13/07, drop me down to B grade status for something that I had a right to refuse to be placed in a room with a smoker, but still I was punish because I exercise my Constitutional rights...

Relief Requested: (1) THAT THE ROOMING COMMITTEE PLACE ME AND RESIDENT ARNOLD ROBERTS AS ROOMMATES TOGETHER IN A NON-SMOKING ROOM (2) THAT THE BEHAVIOR COMMITTEE DECISION BE TOTALLY EXPUNGE FROM MY CLINICAL FILE.. (3) THAT I BE PLACED BACK INTO INTERMEDIATE "A" GRADE STATUS

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Resident Signature: | Date: 2-26-07 |
|---|---|

IL462-5001 (R-6-06)          Distribution:  Master File; Resident          Page 1 of 2

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

Grievance Examiner's Signature:                                                    Date:

FACILITY DIRECTOR'S RESPONSE

Date Received:    3-28-07

Facililty Director's Decision: Grievance: ☐ Upheld   ☑ Denied

Behavior Committee Decision Appeal: ☐ Upheld   ☑ Denied

Response:

Facility Director Signature:                                              Date:  3-28-07

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____   PROGRAM ADMINISTRATOR'S RESPONSE

Program Administrator Concurs With The Facility Director's Decision: ☐ Yes   ☐ No

Response:

Program Administrator Sigature:                                              Date:

IL462-5001 (R-6-06)                    Distribution:  Master File; Resident

## STATEMENT OF FACTS

The following is a brief synopsis of a chain of chronological events that took place prior to John New's being placed in segregation on Friday, February 9th, 2007.  I, Michael Lewis, have personally witnessed the chain of events that are type written below.

1). Saturday, the 27th day of January, 2007  10:00a
Resident John New was moved from his cell on Delta 3. (herein further known as D3) to his new assigned cell on Alpha Unit/Pod 2-room 1. A short time thereafter, Mr. New showed me a copy of a list containing five (5) names of other civil detainees' like himself who had not been committed whom he had requested that the rooming committee to choose from these individuals if they were going to put anyone in a cell with him. In fast, it was the rooming committee themselves (Joseph Proctor & Tarry Williams) who had asked Mr. New to submit this list of names to them for their consideration.

2). Thursday, the 8th day of February, 2007.  8:00a
Resident John New was notified by staff that he had a Medical Writ that he was scheduled to go on. Mr. New had not been previously notified of any such writ for security reasons. Mr. New was taken on a 6 hour writ to the University of Chicago Hospital. About three (3) hours after he had left for his medical writ, a resident named Greg Morris was moved of his old wing (Delta) and although not requested was forced to cell with Mr. New. Greg Morris was moved into Mr. News room at about 11:00a that same morning after New had left on his writ. Greg Morris was civilly committed, Mr. John New was not. According to Title 59 subsection 299.200, those who are civilly detained are to be kept separated from those who are civilly committed. At about 6:00p Mr. New returned from his medical writ only to find that another resident had been moved into his cell. That resident was none other Greg Morris. Mr. Morris was not only civilly committed, but he smoked as well. Mr. John New on the other hand did not smoke and was not civilly committed. What is even more bizarre both residents had been requested by the same individuals on the rooming committee to submit a list of name(s) that they felt comfortable sharing a cell with. Not only did the rooming committee ignore each of these men's request for compatable cell mates, they seem to have deliberately put each of them in a cell with someone who by law they were not supposed to be celled with that being Mr. New

-1-

was still a civil detainee while Mr. Morris was already civilly committed and a smoker. It appears that each of these men were being retaliated against because each one had civil litigation pending against this facility where they are being held. Thinking that there had been some kind of mistake, Mr. New requested to speak with a "White Shirt" (Sergeant). Finally, one showed up. Mr. New as well as Mr. Morris voiced their concerns as to why after being requested by the rooming committee themselves to submit names of individuals whom each would be compatable cell mates, why were the requests ignored. The Sergeant didn't have the answere but said that he was going to check as to why John New was given a cell mate that was committed already and smoked as well. The Sergeant asked Mr. New to please be patient and go ahead and stay the night with Mr. Morris and he would check first thing in the morning about moving either him or Mr. Morris to another cell.

3). Friday, the 9th day of February.
First thing Friday morning about 8:00a, resident New requested another "White Shirt" (Sergeant). Mr. New told the staff in the control booth that the Sergeant was going to see about what he could do about getting Mr. New or Greg Morris into a different room. However, although requested, not one Sergeant ever showed up like they said they would. Mr. New then politely told staff that he was going to walk himself to Segregation. Mr. New tried everything he knew how to find a resolve to the situation. Instead he was meet with one lie after another. Finally about 11:05a two STA's came on the unit to talk New into changing his mind about walking himself to seg. While standing outside John News room along with the STA's I was able to witness the conversation and demeanor of Mr. New. At no time was he disrespectful, beligerent, hateful or threating to the staff. It was then out of the corner of my eye did I catch sight of a "White Shirt" standing outside the Alpha's enterance door up against the wall where he was less noticible. The Sergeant that was trying to hide was Sergeant Parsons. I told Mr. New "look out, they're trying to set you up John." They're coming for you. By that time, it was 11:45a and time for the 11:45a count. Everyone went to their perspective rooms including myself. Mr. New still requested peacefully to be walked to seg. I left my cell door open so that I could observe. After the count began, Sergeant Parsons came out of hiding and came onto the unit. Mr. New held out his hands to Sergeant Parsons and asked to be taken to seg which they did without incident.

-2-

4). Friday evening the 9th of February. 6:35p.

As the individual who copies "legal documents" for the residents on Alpha and Baker units, I am also required to go to the segregation unit to see if anyone there as well needed any copies. This particular night (Friday, the 9th) the STA that accompanied me was STA Pennock. As I went to Pod three where Mr. New had been taken I began asking if any of the residents there had need of any legal copies. I came across Mr. New and asked him if he needed any legal copies done. He said that he didn't even have as much as a ink pen nor any writing paper in which to write with. It was then that did I learn from Mr. New that he had been without any drinking water since 12:00 noon that day and here it was now 6:35p. I asked him what the problem was and he told me that he wasn't given a cup or anything to write with. I then asked officer Pennock if it would be alright if I went to John's cell on Alpha 2 and get him his cup to drink out of as a and also give him an ink pen and writting tablet as well as his insulated mug to drink out of. I was told by Mr. Pennock that he would have to check with his boss and see if it was permissible for Mr. New to have a cup to drink with. I was shocked! It was then did I also find out that this man had also been denied soap to wash his hands with as well as other toiletries. Although Mr. New was quite the gentleman through the whole thing, it was apparent that he was now being punished for something he didn't do. According to the Administrative Code Title 59, Section 299 subsection 620, "Restrictions on diet, medical or sanitary facilities, clothing, bedding, or legal mail, or access to legal counsel and reductions in the frequency of use of toilets, washbowls and showers shall be prohibited from consideration under the Resident Behavior Management System." Plain and simple, **Corporal punishment is forebidden!**

5). After spending about a week in segregatin for something he didn't do, Mr. New was returned to the Alpha 2 unit to share his cell still with Mr. Morris present. Both men have been extremely patient in the light of all the lies and manipulative tactics done by this facility. I was shocked when Mr. New showed me his "Behavioral Committee" decision upon returning to our unit. It accused Mr. New of creating a dangerous disturbance on the unit. He did no such thing! Nothing could be further from the truth. If that wasn't enough, Mr. Proctor and Ms. Dobier said that their Attorney (James Vlahakis) told them that they were not required to follow the Administrative Code.

-3-

This is incorrect. Rules adopted by an administrative agency pursuant to statutory authority have the force of Law and the administrative agency is bound by the rules. Hetzer v. State Police Merit Board (1977), 49 Ill.App.3d 1045, 1047, 8 Ill.Dec.23, 25, 365 N.E.2d 261, 263;.... However, an agency has no power to misapply or extend an unambiguous rule through strained interpretation. Inwang, 117 Ill.App.3d 608, 612, 73 Ill.Dec. 71, 74, 453 N.E.2d 896, 900. Where the language of a statute is unambiguous and conveys a clear and definite meaning, a court has no right to look for or impose another meaning. Roth v. The Department of Public Aid (1982), 109 Ill.App.3d 457, 460, 65 Ill.Dec.55, 58, 440 N.E.2d 910, 913..

End of Report

A F F I D A V I T

I, Michael Lewis, under penalties as provided by law pursuant to sec. 1-109 of the Code of Civil Procedure, I certify that the statements set forth in the foregoing statement of facts and this affidavit are true and correct except as to matters therein stated to be on information and belief, and as to such matters I certify that I believe the same to be true.

_Michael Lewis_
Michael Lewis, Affiant

-4-

State Of Illinois)
County Of Schuyler)

## S W O R N   A F F I D A V I T

I, Gregory Scott Morris, of my own free will and under no form of duress or coercion am attesting to the following facts:

On February 08, 2007, I was forcefully instructed by DHS security personnel, specifically STA II Parsons, that I was to move into a cell, specifically A2-1. At approximately 10:30 a.m. of that day, I moved into the cell. The fellow resident who resided in that cell, and still resides in that cell, is one Mr. John New. Mr. New has not yet been adjudicated a sexually violent person in any Illinois court of law. I was adjudicated a sexually violent person on, or about, May 28, 1998, in a court of law within the jurisdiction of Cass County, Illinois. Title 59, Part 299 of the Sexually Violent Persons Administrative Code, states that those individuals being detained and awaiting SVP commitment or an adjudication declaring them not to be sexually violent persons are to be housed separately from those detained who have been adjudicated as sexually violent persons. Additionally, I smoke, have smoked for over 22 years. Mr. John New does not smoke. Furthermore, when I learned that I was being transferred to the cell in which Mr. New resides, I informed both the security staff and the clinical staff that I and another resident (Mr. Joshua Clemons, who has also been adjudicated as a sexually violent person) had agreed to become cellmates when it was necessary to double residents up due to overcrowding (although this, too, is in violation of Title 59, Part 299).

Furthermore, after security staff and clinical staff failed to resolve the crisis of forcing Mr. New and me to become cellmates, having formerly requested that Mr. New give them 12 hours to come to a resolution (to which Mr. New agreed), Mr. New then, at approximately 11:45 a.m. on February 09, 2007, politely refused to be forced any longer to reside in cell A2-1 with my person, and he then respectfully requested security staff, specifically STA II Parsons, to handcuff him and place him in special management, also known as segregation. Mr. New in no manner or form created a dangerous disturbance.

For now, affiant has nothing more to declare.

Subscribed and sworn under oath and under penalty for perjury pursuant to 725 ILCS 5/32 and §1-109 of the Illinois Civil Code of Procedure, on this, the 7th day of March, 2007. I, Gregory Scott Morris, the affiant do hereby certify that all statements set forth above are true and correct, both in substance and in fact, to the best of my knowledge and beliefs.

Gregory Scott Morris, affiant
R.R. #1, P.O. Box 6-A
Rushville, IL 62681

### Joint Committee on Administrative Rules

# ADMINISTRATIVE CODE

TITLE 59: MENTAL HEALTH
CHAPTER I: DEPARTMENT OF HUMAN SERVICES
PART 299 SEXUALLY VIOLENT PERSONS
SECTION 299.200 DETENTION FACILITY

## Section 299.200  Detention Facility

The Department may utilize a secure residential facility as a detention facility. To the extent possible considering operational, programmatic and security needs, detained persons shall be kept separate from committed persons. The Department also approves all Illinois Department of Corrections correctional facilities for the detainment of individuals until they complete any term of imprisonment imposed for a criminal conviction or adjudication of delinquency.  While in the Department of Corrections, the Department of Corrections remains responsible for their care and custody.

The Department also approves the use of a county jail for a detention facility where there is a written agreement between the Department and the county sheriff authorizing such usage.  Any written agreement shall outline responsibilities assigned to both parties.  The Department shall determine which detention facilities it will use based upon geographic area, space availability, willingness of the local officials to participate, and adequacy of the facility to meet the needs of the detained individual.

(Source:  Amended at 24 Ill. Reg. 6567, effective April 5, 2000)

1/5/2005
E. BROWN

I.



**DEPARTMENT OF**
**HUMAN SERVICES**

**TREATMENT AND**
**DETENTION FACILITY**

## NOTICE OF APPEARANCE BEFORE THE BEHAVIOR COMMITTEE

Resident: __New, John__          DHS# __863120__

Date and Time of Incident: __04-26-17  approximately 4:00pm__

Nature of Incident/Potential Rule Violation:  **Resident New refused housing and went to**
**Special Management: Pod1 Room 12**

This notice is to inform you that the Behavior Committee will be meeting to review the incident
mentioned above.  This meeting is scheduled to occur on **4-27-07** or later, between the hours of
**10:00 AM** and **3:00 PM**.

You will be contacted by security staff during this time frame.  You will be asked if you wish to appear
before the Behavior Committee.  Attendance at a Behavior Committee meeting is optional.  If you do
plan to attend, please be prepared to appear when called to do so.  You may present written
documentation (i.e.: your own account of incident,  witness statements, etc.)  and discuss the
circumstances surrounding this incident.  Upon determination that a resident has violated a rule, the
Behavior Committee shall determine appropriate management status, determine appropriate treatment
recommendations, impose behavioral restrictions or any combination thereof.

My signature below indicates that I have received notification of my scheduled appearance before the
Behavior Committee.

_____
Resident Signature

_____
Date

_____
Staff Signature

04-26-07
Date

Date Notified: __04-26-07__     Time Notified: __12:25pm__

ILLINOIS DEPARTMENT OF HUMAN SERVICES
TREATMENT & DETENTION FACILITY

# BEHAVIOR COMMITTEE MEETING
## INITIAL

NAME: <u>New, John</u>    DHS#: <u>863120</u>    DATE OF INITIAL MEETING: 4/27/07

DATE OF ADMISSION: <u>03/07/05</u>    MANAGEMENT STATUS: <u>Temp Special</u> PRIMARY THERAPIST: <u>Payne</u>
(Int B)

Date Of Event: <u>04-25-07 approximately 11:305am</u>

Description Of Event: <u>On the above date and time, resident New refused to lock up for facility count.</u>

Resident Addressed Behavior Committee: (Yes)/No    Received 24 hour notification: (Yes)/No.    Waived notification Yes/No/(NA)

Resident Comments: I am willing to go back to my room on A Unit

Behavioral History for the past six months: <u>No behavior incidents in the past six months.</u>

Determination Of Rule Violation: Major Rule Violation — Creating a Major Disturbance

Treatment Recommendation (if none, reason): Discuss appropriateness of behavior with Primary Therapist

Committee Decision: Major Rule Violation — Drop one RMS level to Intermediate C. Remove from Temp Secure & return to Unit with same roommate

SIGNATURES: Cooper P.    TITLES: Team Leader

D. Hongas    STAFF

Jw Proctor Psys    Team Leader

DATE OF REVIEW: N/A

cc: Primary Therapist, Facility Director, Clinical Director, Associate Clinical Director; Security Director, Secure Management Log, Unit Directors, Internal Investigator, Vocational Director, Administrator On Duty and Resident

Revised: 06/30/04

State of Illinois
Department of Human Services

# TDF Resident Grievance



| Name of Resident: John New, Jr. | ID #: 863120 | Date of Incident Occurrence: April 27, 2007 | Unit: A-1 |
|---|---|---|---|

| Date Received 05-08-07 A07:49 LN | Grievance #: 05 07 GR 0338 |
|---|---|

### Nature of Grievance

☐ Personal Property ☒ Staff Conduct ☐ Mail Handling ☐ Meals ☐ Medical ☐ Other: (Specify): _____

☒ Disciplinary Report:   Report Date: 4/25/07

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

I, the above named resident submit this grievance to grieve the acts of Unprofession[al] Conduct of Behavior Committee Members, Dr. Diane Dobier, Dr. Joseph Proctor and STA II, Sgt. Sally Hougas, in making a incorrigible decision of dropping me down in ( RMS ) status, from Intermediate "B", down to Intermediate "C" status.

However, on the date in question of April 25, 2007, I was placed in Special Manageme[nt] and put on Temp Secure Status, because I refused to move over to Alpha 1, because I did not fill out a Resident Rooming Request to move into a cell with Resident Miller, who currently resides in Room 11, over on Alpha 1.

Although, if you were to review my " Notice of Appearance before the Behavior Committee on April 26, 2007, at 12:55pm, you will see that the Behavior Committee had written a fraudulent behavior report, saying that on [ 04-26-17 ] at approximate[ly] **4:00P**, when the incident happened on the original date of **April 25, 2007, at approximately**, that the charge that should of been written, that I refused housing, instead of someone stated that **On the above date and time, resident New, refused to lock up for facility count.**

Saying that I created a **Major Disturbance**, in which that statement was a deliberately lie, and it was fabricated by the Behavior Committee, in dropping my ( RMS ) status, in which the **Behavior Committee**, did not investigate the allegation that I was telling them the truth, about they maded a critical mistake in penalizing me even more, than what the original charge was suppose to be.

In conclusion, that I would also like for the Security Staff to honor my Low Bunk Permit, which was issued by Dr. Anyanwu on May 1, 2007, because as of this very date, I was forced to climbing to the Top Bunk,

Relief Requested: That my ( RMS ) Status be placed back to Intermediate "B", immediately from the original date of February 13, 2007, in which I was reduced from Intermediate "A" Status on February 13, 2007... (2) That the Security Staff honor my Low Bunk Perm[it] that was issued to me by Dr. Anyanwu on May 1, 2007...

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreperable harm to self.

Resident Signature: _____     Date: 5-4-07

State of Illinois
Department of Human Services

# TDF Resident Grievance



Grievance Examiner's Response:

Grievance Examiner's Signature:                                     Date:

Date Received: _____ 5 - 14 - 07 _____                     **FACILITY DIRECTOR'S RESPONSE**

Facililty Director's Decision: Grievance: ☐ Upheld    ☐ Denied
Behavior Committee Decision Appeal: ☐ Upheld    ☑ Denied

Response:

Facility Director Signature: _____                     Date: 5 - 14 - 07

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____         **PROGRAM ADMINISTRATOR'S RESPONSE**

Program Administrator Concurs With The Facility Director's Decision: ☐ Yes    ☐ No

Response:

Program Administrator Sigature:                                     Date:

462-5001 (R-6-06)                     Distribution: Master File; Resident



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name _____ John New, Jr. _____    Date ___ 4/6/07 ___

Unit _____ Alpha # 2 _____    Room # _____ 1 _____

Describe Health Care Problem ___ If possible, I have to see Dr. Joe, because Security is
having me wear a " BLACK BOX ", along with other handcuff restraints, which be
aggravating the nerves in my ( " NECK, SHOULDER, ARM AND LEGS " ) and Dr. Joe, can
verify my current Medical Condition of me having a slip disc in my lower back, and he
could sign a " MEDICAL ORDER ", telling Security not to place the Black Box on me,
because it is ######## Discomforting wearing that device for (4) four hours at a time...

Thank You, Respectfully
Resident New

Resident Signature _____

### Do Not Write Below This Line

Date Received _____    Time Received _____

Resolution: ___ 5/1  seen  by  MD _____

Date Completed _____

HCU Staff Name (Signature and Print)

IL462-5400  (N-7-04)



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name _____JOHN NEW_____  Date _____APRIL 27, 2007___

Unit _____ALPHA # 1_____  Room # _____11_____

Describe Health Care Problem____I SERIOUSLY NEED TO SEE DOCTOR JOE, BECAUSE I AM HAVING__

__SEVERE EXCRUCIATING PAIN IN MY BACK, LEFT ARM AND SHOULDER, WHICH SOMETIMES LEAVES ME__

__IN A STATE OF PARALYSIS..._____

_____THANK YOU, RESPECTFULLY____

_____

_____

_____RESIDENT NEW_____

_____ALPHA 1, ROOM # 11_____

Resident Signature_____

### Do Not Write Below This Line

Date Received_____  Time Received_____

Resolution:___5/1  Seen by MD_____

_____

_____

_____  Date Completed_____

HCU Staff Name (Signature and Print)

IL462-5400 (N-7-04)

NEW, JOHN - 80306899

## Neurosurgery Note

* Final Report *

| | |
|---|---|
| Result Type: | Neurosurgery Note |
| Result Date: | March 01, 2007 2:36 PM |
| Result Status: | Modified |
| Performed By: | Stone MD, James L on March 01, 2007 2:57 PM |
| Verified By: | Stone MD, James L on March 01, 2007 2:57 PM |

## * Final Report *
## Document Contains Addendum

Neurosurgery Note: First seen 2/8/07  with numbness and tingling of the left arm and the left hand.  43 year old male. MRI done today shows a C34 disk off to the left - with associated surrounding PLL thickness behind the C3 body. the spinal cord is indented by the lesion.
This problem goews back to 2004.
Exam  gait is good, negative romberg tandem gait intact.
Motor-  some weakness of left grip. He is left handed. Brisk DTRs in the legs. Plantars down.
No ankle clonus
Sensory has decreased scratch left arm forearm and hand  and only thumb.


IMP C34 disck herniation and cervical myelpopathy
 Rec. C3-4  ACDF and possible C3 vertebrectomy

Procedure and risks discussed, he wishes to wait and think it over.
Soma as a muscle relaxant he tolerates, appears to be a reasonable choice for the symptoms and I recommend it.
RTc
James L. Stone MD

**Addendum by Stone MD, James L on March 01, 2007 2:58 PM**
RTC PRN

James L. Stone MD


**Completed Action List:**
* Sign by Stone MD, James L on March 01, 2007 2:58 PM
* Modify by Stone MD, James L on March 01, 2007 2:57 PM
* Perform by Stone MD, James L on March 01, 2007 2:57 PM
* Sign by Stone MD, James L on March 01, 2007 2:57 PM
* VERIFY by Stone MD, James L on March 01, 2007 2:57 PM

| | |
|---|---|
| Printed by: | Stone MD, James L |
| Printed on: | 3/1/2007 2:58 PM |

**RECEIVED**

JAN 0 3 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NEW,

    Plaintiff/Petitioner,

**FILED 06C 0017**

Case No. _____

−VS−

FEB 16 2006 CIVIL RIGHTS COMPLAINT
Pursuant to 42, U.S.C. §1983

THOMAS MONAHAN, CAROL VANCE,
JOVITA ANYANWU, SHAN JUMPER,
LEA CHANKIN, STEVE STROCK,
ADDUS HEALTH CARE INC.,
LIBERTY HEALTH CARE CORPORATION,
AND VARIOUS OTHER DEFENDANT(S),
THAT WILL BE NAMED UPON THE
DISCOVERY OF THEIR IDENTITIES,

    Defendant/Respondent(s).

(State Detained/Prisoner)

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JUDGE GOTTSCHALL

MAGISTRATE JUDGE SCHENKIER

<u>CIVIL RIGHTS COMPLAINT</u>
<u>WITH A JURY DEMAND</u>

This is a § 1983 action filed by **John New**, a State Detained/
Prisoner, alleging violations of his Constitutional Rights and he is
seeking money damages, declaratory judgment, and **EMERGENCY INJUNTIVE
RELIEF**. The plaintiff request a trial by jury.

### I. JURISDICTION

A. The jurisdiction of this Court is invoked pursuant to
28 U.S.C. §1331 as this action arises under the Constitution and Laws
of the United States, and pursuant to 28 U.S.C. §1343 (a)(3) as this
action seeks redress for Civil Rights violations under 42 u.S.C. §1983.

B. Plaintiff's mailing address and/or registered number and place
of confindment: <u>John New, registered number 863120, Illinois Department</u>
<u>of Human Services, Treatment And Detention Facility, 401 Woodruff Road.</u>
<u>Joliet, Illinois 60432-1288.</u>

C. Defendant_____ is employed as
                    (Name Of First Defendant)

_____
                    (Position/Title)

_____
                    (Employers Name And Address)

D. At the time the claim(s) alleged in this complaint arose, was
   the defendant employed by the state, local or federal government?

                    Yes (XX)          No ( )

   If your answer is "yes", briefly explain:

   At all times relevant to the claim's that are alleged in this
   complaint the defendant that is named in paragraph (C) was and
   remains the clinical Director for the Illinois Department of
   Human Services, at it's Treatment And Detention Facility for
   Sexually Violent Persons, a State of Illinois Facility, that is
   duly organized under and by virtue of the laws of the State of
   Illinois. This defendant is hereby being sued in his individual
   and his personal capacity.

E. Defendant_____ is employed as
                    (Name Of Second Defendant)

_____
                    (Position/Title)

_____
                    (Employers Name And Address)

F. At the time the claim(s) alleged in this complaint arose, was
   the defendant employed by the state, local or federal government?

                    Yes (XX)          No ( )

   If your answer is "yes", briefly explain:

   At all times relevant to the claim's that are alleged in this
   complaint the defendant that is named in paragraph (E) was and
   remains the Hospital Administrator for the Addus Health Care Inc.,

who is currently subcontracted to the Illinois Department of
Human Services, at it's Treatment And Detention Facility for the
Sexually Violent Person, a State of Illinois Facility, that duly
organized under and by virtue of the laws of Illinois. This def-
endant is hereby being sued in her individual and her personal
capacity.

G.   Using the outline of the form provided. Include the above infor-
     mation for any additional defendant(s).

H.   The below named defendant(s) are employed at the Treatment And
     Detention Facility for Sexually Violent Persons, which is a state
     agency within the Illinois Department of Human Services, said
     facility is duly organized under and by virtue of the laws of the
     state of Illinois and is located at the Address of 401 Woodruff
     Road, Joliet, Illinois 60432-1288, These named defendant are here
     by being sued in their individual and their personal capacity.

1.   JOVITA ANYANWU, at all times relevant to the claim's alleged in
     this complaint, was and remains the resident physician at
     the Treatment And Detention Facility, he is directly employed by
     Addus Health Care Inc., which is a subcontractor for the Depart-
     ment of Human Services.

2.   SHAN JUMPER, at all times relevant to the claim's alleged in this
     complaint, was and remains Clinical Director of Treatment at the
     Treatment And Detention Facility, he directly employed by Liberty
     Health Care Corporation, which is a subcontractor for the Illinois
     Department of Human Services.

3.   LEA CHANKIN, at all times relevant to the claim's alleged in this
     complaint, was and remains the Assistant Clinical Director of
     Treatment , at the Treatment And Detention Facility, she is dire-
     ctly employed by Liberty Health Care Corporation, which is a
     subcontractor for the Illinois Department of Human Services.

4.  **STEVE STROCK**, at all times relevant to the claim's alleged in this complaint was and remains a Security Therapist Aid, with the rank and/or Title of Captain Executive II, he directly employed with the Illinois Department of Human Services, at the Treatment And Detention facility, located at the above said address.

5.  **ADDUS HEALTH CARE INC.**, at all times relevant to the claim's alleged in this complaint was and remains a subcontractor for the Illinois Department of Human Services, contracted to provide residents and pre-trial detained person, who are domiciled and or detained at said facility with adequate medical care. The Illinois Department of Human Services is located at the address of 401 South Clinton Street, 7th., Floor, Chicago, IL 60607.

6.  **LIBERTY HEALTH CARE CORPORATION**, at all time relevant to the claim's alleged in this complaint was and remains a subcontractor for the Illinois Department of Human Services, contracted to provide Sex Offenders Treatment For those pre-trial detained person who request such, and for persons who have been Commited as a Sexually Violent Persons and placed in a secure Facility under 725 ILCS 207/50., of the Illinois Sexually Violent Persons **Act.** The Illinois Department Of Human Services are located at the above said.

All of the above said Defendant(s) are hereby being sued in their individual and their personal capacity.

## II. PREVIOUS LAWSUIT

A.  Have you begun any other lawsuits in State or Federal Court relating to your detention and/or imprisonment?   Yes (XX)  No (  )

B.  If your answer to "A" is "yes", describe the lawsuit(s) in the space below. (If there is more than (1) lawsuit, you must describe the additional lawsuits on an additional sheet of paper, using the same outline.) Failure to comply with this provision may result in the summary dismissial of your complaint.

1.    **Parties To Previous Lawsuit:**

      Plaintiff: <u>John New</u>;
      Defendant(s): <u>Jack Hartwig, et al</u>.

2.    Court (If Federal Court, name the district; if State Court,
      name the County). <u>United States District Court For The
      Southern District of Illinois</u>.

3.    Docket number: <u>99-744-WLB</u>.

4.    Name of Judge to whom case was assigned: <u>Honorable G.Patrick
      Murphy</u>.

5.    Type of case (For example; was it a Habeas Corpus or Civil
      Rights Action?) <u>This was a Civil Rights Complaint, Pursuant
      to 42 U.S.C. §1983</u>.

6.    Disposition of case: <u>This case was dismissed with prejudice</u>.

7.    Approximate date of filing lawsuit: <u>October 4, 1999</u>.

8.    Approximate date of disposition: <u>December 4, 2001</u>.


                    **III. GRIEVANCE PROCEDURE**

A.    Is there a grievance procedure in the institution?
                    **Yes  (XX)        No ( )**

B.    Did you present the facts relating to your complaint in the
      institution grievance procedure?
                    **Yes (XX)        No ( )**

C.    If your answer to "B", is "yes", briefly explain:

1.    What steps did you take? <u>I filed an institutional grievant
      regarding the issues that are complained of in this Civil
      complaint, each individual issue that is named described and
      complained of herein has been formally and fully grieved</u>.


2.    What was the results? <u>My grievances was summarily denied
      by the grievance officer and Thomas Monahan</u>.


D.    Plaintiff aver that he has written letters to the individual
      administrative officials and that he has spoken verbally  with
      them and all of plaintiff's efforts has been completely
      ineffective.

                    **Page -5- Of -14-**

E.    Attached hereto are copies of the plaintiff's grievances and
       other attached documents to be used as exhibits of evidence

## IV. STATEMENT OF CLAIMS

        The facts necessary to an understanding of the issues that are
presented by this civil complaint are set fourth as follows:

### COUNT  I

A.    Plaintiff, John New, aver that he is currently a civil detainee,
domiciled at the Old Joliet, Annexe Prison building, llocated in
Joliet, Illinois. The old Joliet, prison is now being used and is now
named Treatment And Detention Facility, for the Department of Human
Services, thus it is a State of Illinois Facility, duly organized under
and bu virtue of the Laws of Illinois.

B.    Plaintiff aver that on the date of March 7, 2005., he was trans-
ported from the Statesville Correctional Facility, to this present lo-
cation, plaintiff aver that he was immediately placed into the popula-
tion at the Treatment And Detention Facility, with commited people,
people who are called residents, and have been adjudicated by the Courts
as being people who suffers from a mental disorder, plaintiff aver
that immediately upon his arrival at this said facility, he was appro-
ached by agents acting in behalf of Liberty Health Care Corporation,
and told that he was required to sign his name to a form that basically
says that plaintiff is a Sexually Violent Person, this said form is
called a consent to treatment form, Plaintiff refused to sign this said
form and informed this agent representive for the Liberty Health Care
Corporation that he, plaintiff maintained absolutly that he is not a
person that suffers from a mental disorder and thus he intented to
prove his position in a Court of Law, which he has Constitutional Rights
to do.

Page ~6~ Of ~14~

C. Plaintiff aver that as a direct and proximate result of his re-
fusal to sign his name to a consent to treatment form, before having
been given a civil commitment trial on the matter as to whether or not
the plaintiff dose or dose not suffer from a mental disorder and there-
fore should or should not be civilly commited, plaintiff has been sub-
jected to a systemactic form of punishment, designed and drafted spec-
ifically by the defenant Liberty Health Care Corporation, and it's
agents acting in it's behalf. Plaintiff aver that the defendant Thomas
Monhan, Shan Jumper, Lea Chankin, Steve Strock and Carol Vance, has
upon the plaintiff's arrival at this said facility, subjected the
plaintiff to restriction or food, while other detained persons and
commited persons was given this food, the food consist of Bar-BQue
hamburgers and smoke saugages, with ice cream soda pops and other
assorted foods, plaintiff aver that because he is a pre-trial detained
person who has not signed his named to a consent to treatment form and
attends group treatment, he has and is still now force to reside in
the old Joliet prison cell block where plaintiff is assigned to an old
prison cell inwhich there is only a steel double bed bunk, steel sink
and toliet, there is no writing table or chair provided for the plain-
iff in his cell, the paint on his cell walls and ceiling is pilling
and constantly falling, the water from his sink faucet is very foul
smelling and discolored gray when it comes out of the faucet, his cell
toliet stinks because of the very old plumbing, and when his next door
neighbor cell toliet over flow, human feces mixed with urin, backs up
into the plaintiff's cell, plaintiff steel bed bunk runs parallel to
his cell window and there is very poor insulation in the plaintiff's
window, thus cold air from the outside flows freely threw the plaint-
iff's window and the plaintiff has to sit on his bed bunk as his only
place to sit in this cell, plaintiff aver that the defendant(s) Thomas
Monahan, Shan Jumper, Lea Chankin, Steve Strock, Carol Vance, are all
members and or connected with the cell assignment committee at the
treatment and detention facility, and as there policy residents who
have been adjudged to be Sexually Violent Persons, and Pre-Trial
detained persons who have not been adjudge as being Sexually Violent
are all housed together in the old Joliet prison building, if they will
not sign there name to a consent to treatment form and attend group
treatment sessions, plaintiff aver that as a pre-trial detained person

who maintains and asserts that he is not a Sexually Violent Person,
that he has an absolut right to a trial to prove that he is not a Sex-
ually Violent Person, without being subjected to punishment designed
by the defendant(s) for the purpose of forcing the plaintiff by means
as described herein too consent to treatment for Sexually Violent per-
sons and thus as in the United States Supreme decision in Hendricks,
who ask for treatment, plaintiff himself will have unwillingly asked
for treatment and he will have lost his rights to a fair trial. Plain-
tiff aver that the defendant(s) as named herein has a policy designed
to allow for and to relocate those residents and pre-trial detained
persons who have signed there names to a consent to treatment form and
attend group treatment sessions for Sexually Violent Persons, access
to a new building that is located at the Joliet Annexx Prison, this
new building is air in summer months, and the windows in this new build-
ing is permanently sealed and thus there is no flies, wasp, mosquito's
or other type insect's coming threw those resident's and detained per-
sons windows, plaintiff aver that because there is no screens on his
cell window there are constant wasp, flies, mosquito's and other insect
coming threw his cell window and that throughout the year his cell is
roach infested, while there are no roaches in the cell's in this build-
ing. plaintiff aver that residents and detained persons assigned to cell
in this new building, are allowed to have food mailed directly in from
there outside family and friends while the plaintiff is allowed this
only during the Christmas holidays, that the residents and detained
persons assigned to cell in this building, are allowed to recieve in-
coming outside phone calls from there family and friends, while the
plaintiff must make collect calls to his family at ridiculously high
phone rates, that the residents and detained persons assigned to this
new building has a mounted table for writing and a stool for sitting
or writing on the table, that the plumbing is new with water filters
connected to the plumbing system in the new building, and thus the
residents and and detained persons located in this new building has
a more cleaner and fresher water to drink, than that which the plaint-
iff and other pre-trial detained persons who are force because of the
defendant Liberty Health Care Corporations agents acting in Lliberty
Health Care Corporation behalf provides for them, that the plaintiff

plaintiff and other pre-trial detained persons similarly situated as
the plaintiff, are force to live in over growded conditions, in his
resident living united and there are no, none what so ever, meaningful
vocational or educational programs for plaintiff and other pre-trial
detained persons, that the defendant Liberty Health Care Corporation
agents are now in direct contempt of Court, inwhich the defendant(s)
agreed in a recent Court settlement with this Court to provided these
programs, and to prohibit punishment of any form, plaintiff aver that
the agents acting for Liberty Health Care Corporation, allows for none
credential employee staff, known as Security Therapist Aids, [S.T.A.']
to have complete access to pre-trial detainees records and files, and
allows these said employee staff to write fraudulent reports on detain-
ed persons for the purpose of providing false information to assure
civil commitment at the trial of a detained person, in the financial
interest of Liberty Health Care Corporation, and thus Liberty Health
Care Corporation financial interest being involved as it is, is a con-
flict of interest for pre-trial detained persons.

### COUNT II

D.    That the plaintiff suffers from a chronic arthritis condiction
that causes extreme pain to the plaintiff, and that because the plaint-
iff's assign cell is constantly cold because of poor insulation for the
window located in his cell, plaintiff is in constant pain, plaintiff
aver that he has made several sick call request and he has informed the
defendant Jovita Anyanwu of this problem with his arthritis and the
pain caused by it, and that he has asked for an electric heat pad for
the purpose of seeking releif from the pain that he constantly suffers
from, plaintiff aver that he has asked for outside medical treatment
by a certified nucrologist, and the defendant Jovita Anyanwu, and Carol
Vance has refuse this, plaintiff aver that the defendant Carol Vance
purposefully refuses to obtain the plaintiff's full and complete medical
records from the Illinois Department Of Corrections because of financ-
ial cost of these records, further the defendant Jovita Anyanwu acts as

a puppet on a string for the defendant Carol Vance, when it involves
outside medical appointments for medical care. Plaintiff aver that the
defendant Carol Vance, Jovita Anyanwu and Thomas Monahan are acting
in deliberate indifference to the plaintiff serious medical needs when
they purposefully allow the facility hospital care unit nurses to
open residents and detained persons perscribe medication in their ab-
sence and as a direct and proximate result of the defendant Carol
Vance who is the facility hospital administrator allowing the nurses
to handle and dispense perscribed medication without having to ware
sanitary gloves of any kind, plaintiff has tasted and smell perfume on
his medication that he has had to take orally, that the defendant Carol
Vance  allows her nurses staff to open needles in the absence of the
person the needle is intended to be used on, and when plaintiff and
other residents and detained persons question this policy, the defend-
ant Carol Vance and her nurses will write false behavior reports as
a form of reprisal on the plaintiff and other residents and detained
persons, plaintiff aver that the defendant Carol Vance has altered
medical records with the intent to deny perscribe medical care for
residents and detained persons and that the nurses have on several
occasions while dispencing medication during what is med-line dropped
residents medications on the floor and then in the presence of the
residents and the [S.T.A.'s pick this medication up and dispence to the
resident it has been perscribed for, that complaints have been filed
in the form of grievances by residents and detained persons to the
administrative staff and to the Defendant Thomas Monahan, and letters
have been sent to Addus Health Care Inc., about this but nothing has
been done to stop this from occurring, plaintiff aver that the medica-
tion cart that is used to bring the resident's and detainees medicat-
ion around to the different cell house unit, has a large plastic gar-
bage bag tape to the front of it for resident and detained persons
to throw away the liquid medication cups and that as a result of this
spillage from the liquids spills onto the counter top of this med-
cart, and that on occasions medication is dropped into this spillage,
and this is seen by the residents and employee [S.T.A.'s] and the
employee staff who see's this will turn a blind eye to it because of

Addus being a private company and the facility is controled and opera-
ted by private companies who turns a blind eye to each others unlaw-
ful policy and practises, Plaintiff John New aver that because of the
unsanitary policy and practises as they are described and complained
of herein he is being denied adequate medical care and in fact he and
other residents and detained persons receives less care than animals,
and that his living conditions are in fact less than that fit for ani-
mals.

### V. RELIEF

WHEREFORE, plaintiff request that the Court grant the following
relief:

A.  Issue a declaratory judgment stating that:
    The denail of for food that is served to residents and detained
    persons must be served to all persons who are similarly situated
    as Involuntarily Civilly Commited, and detained persons must be
    given an equal same amount of the same food, or the defendant(s)
    are violating the plaintiff's United States Constitutional Rights
    protected by the equal protection of the Law, and more over the
    use of restriction on food as punishment is in violation of Feder-
    al and State Law.

B.  That living condition and over crowding pre-trial detainee's with
    Commited persons in prison cells with foul smelling toliets and
    sinks and providing discolored water that is foul smelling for the
    residents and detainee's to drink as described and complained of
    in this Civil Complaint is in fact forcing those persons who has
    not commited any crimes to live in animal like conditions, more-
    over for the defendant's to provided a more cleaner facility for
    those persons only who sign there name to a consent to treatment
    for Sexually violent Persons  and attend group treatment is a den-
    ial of the equal protection of the law and a deliberate form of
    coercement for the financial interest of the defendant Liberty
    Health Care Corporation and it's agents acting in it's behalf.

Page -11- Of -14-

C.   That the defendant's Thomas Monahan, Shan Jumper, Lea Chankin, Steve Strock, and Carol Vance violated the plaintiff's and all other resident's and Pre-Trial detainee's similarly situated as the plaintiff when they deliberately caused the forced housing of Pre-trial detained persons with commited people and force them to live in animal like conditions if they refuse to ask for Sex Offenders Treatment and thereby give up their rights to a fair Civil Commitment Trial.

D.   That the defendant's Jovita Anyanwu, Carol Vance, and Addus Health Care Inc., violated the plaintiff's Right to adequate medical care when they delberately denied outside medical care simply to avoid the money cost of it.

E.   That the defendant(s) Carol Vance, Jovita Anyanwu, Thomas Monahan and Addus health Care Inc., are acting with delerate indifference to plaintiff serious medical needs when they allow unqualified nurses to dispence perscribe medication to plaintiff without being required to ware some type of sanitary gloves, and to open sealed medication in the absence of the persons it's intended for and moreover to unpackage needles in the persons absence that the needle is intended to be used on for an injection.

F.   That the defendant(s) Carol Vance, Jovita Anyanwu, thomas Monahan and Addus health Care Inc., are acting with deliberate indifference to plaintiff's serious medical needs when they refuse to obtaine the plaintiff's full and complete medical records and or history upon the plaintiff's request, simply because of the money cost of it to obtain such records from the Illinois Department of Corrections and such records are available for them.

G.   that the Defendant(s) Carol Vance, Jovita Anyanwu, Thomas Monahan and Addus Health Care Inc., are acting with deliberate indifference to plaintiff's serious medical needs whan they allow their unqualified nurses to tape a plastic bag for a garbage bag to the cart that is used to dispence perscribe medication to plaintiff for the throw-away of cups used for drinking liquid medication

by residents and detained persons who may or may not have communicable disease such as colds, flu, particularly infectious hepatitis and such throw away cups with the liquid contents spill onto the med-cart counter top where medication is handed out without the use of sanitary gloves.

B.   Issue an injuction ordering defendant(s) thomas Monahan, Liberty Health Care Corporation  and it's agents acting in it's behalf to immediately provide plaintiff with equal housing as those provided for the residents and detained persons who have sign the consent to treatment form and attend group treatment, and provide the same phone service as that described for those who have been commited and called residents and detained persons, allow food packages from home to all pre-trial detained persons.

C.   Immediately stop all forms of punishment for pre-trail detained persons who have not been adjudge to be a Sexually Violent person and who have not consented to Treatment.

D.   Issue an injuction ordering the defendant Carol Vance, Jovita Anyanwu, Addus Health Care Inc., and defendant Thomas Monahan to immediately draft and carry out a policy requiring all nurse under their supervision to ware hospital sanitary latex or other type gloves when passing out medication that is to be taken orally and immediately remove any form of garbage bag from the medication cart, and used the required hazardus wast box instead for such use, further require all per scribed medication to be open in the presence of the person it is intended for.

E.   Award Compensatory Damages in the following amounts:

1.   $25.000 jointly and severaly against the defendants Monahan, Lea Chankin, Strock, Vance and Liberty Health Care Corporation for the animal like living condition that they have imposed upon the plaintiff.

2.   $25.000 jointly and severaly against the defendants Carol vance, Jovita Anyanwu and Addus Health Care Inc., for the denial

of outside medical care and deliberate indifference to plaintiff serious medical needs.

F.    Award punitive damages in the following amount:

1.    $10.000 from each named defendant in this civil complaint.

G.    Grant such other relief as it may appear that the plaintiff is entitled , for this is so prayed for.

[Date] 12-15-05

Respectfully submitted by:

John New Reg. #:863120
Treatment And Detention Facility
Department Of Human Services
401 Woodruff Road
Joliet, Illinois 60432-1288

SUBSCRIBED AND SWORN TO BEFORE ME

This 15 day of December , 2005

OFFICIAL SEAL
FRAN ADEN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/01/08

Page -14- Of -14-

From: John New ID.#:863120
      Treatment And Detention Facility
      401 Woodruff Road
      Joliet, Illinois 60432-1288

                                              ▬▬▬▬▬▬  2005

Dr. Carol L. Adams, Ph.D. ( Secretary )        To: Mr. Kim R. Kardas
Illinois Department of Human Services               Law Office Of Kim R. Kardas
100 S. Grand Ave, East / 3rd Floor                  11 South LaSalle, Suit 1000
Springfield, Illinois 62762                         Chicago, Illinois 60603

RE:  ME NOT RECEIVING ADEQUATE MEDICAL TREATMENT, DUE TO A CHRONIC
     INJURY

Dear Dr. Adams :

My name is John New, Jr., and I am a resident here at the Treatment & Detention
Facility here located in the old Joliet Correctional Center's Annex...

Dr. Adams, the reason that I am addressing this aforemention correspondence to
you is because, I am constantly being denied adequate medical attention from the
Facility's Physician ( Dr. Jovita Anyanwu ) and from your Director of Health Care
Services ( Ms. Carol Vance )...

As you will see of the aforemention grievance that I'd attached to this correspondence
that Dr. Anyanwu & Ms. Vance, will not submit the necessary documention, in order
for me to see a Outside Specialist ( Neurologist ) due to a chronic injury that I've
sustained, prior to my arrival to this facility...

Nonetheless, I have seen Dr. Anyanwu over 3 times about the excruciating pain that
I'm constantly experiencing in my neck, upper shoulder & arm on the left side of my
body, in which, sometimes the pain leaves me numbness & even sometimes paralyze...

However, I'd stated to Dr. Anyanwu, that I wanted to see a Neurologist to find out
if I'd sustain any nerve damage to my neck, upper shoulder & arm, but Dr. Anyanwu
stated back to me, that I don't need to see a Neurologist, due to his diagnosis,
stating that I'm suffering from Degenerate Bone Loss...

Although I keep stating that something is wrong, and the pain that I'm experiencing
is constantly keeping me awake at night, in which I cannot even rest comfortably...

Please turn to the other side of this paper

STATE OF ILLINOIS    )
                     )
                     )    SS.
COUNTY OF WILL       )

## AFFIDAVIT

I, John New, Jr., do hereby declare and affirm that the following information within this affidavit is true and correct in substance and in facts:

That on _12-6-05_ , 2005, I sent to ~~Ms. Fran Aden, Grievance Examiner~~ Carol L. Adams, Secretary for the Illinois Department of Human Services Treatment & Detention Facility, a Aforemention copy of a Formal ~~Grievance~~ Letter, describing Dr. Jovita Anyanwu, the Facility's Physician, not giving me the adequate medical care that I've requested due to a chronic injury, and also him neglecting his duties as a Physician to submit documentatic to his Supervisor, Ms. Carol Vance, Director of Health Care Services, that he request me to see an outside specialist, due to my existing Medical condition.

Pursuant to 28 U.S.C. § 1746, 18 U.S.C. § 1621 or 735 ILCS 5/109, I declare, under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith.

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____6_____ of _December_ 2005

_____
NOTARY PUBLIC

/s/ _____

OFFICIAL SEAL
FRAN ADEN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/01/08





State of Illinois
Department of Human Services
**TDF RESIDENT GRIEVANCE**

| Name of Resident: John New | ID#——— 863120 | Date of Incident Occurrence: 11-10-05 |
|---|---|---|

| Date Received by Administration: 11-17-2005 RCVD | Grievance #: 11 05 GV 0363 |
|---|---|

**Nature of Grievance**

☐ Personal Property ☐ Staff Conduct (Attempt to Resolve) ☐ Mail Handling ☐ Meals ☐ Medical ☒ Other (specify):___ OF ME NOT HAVING NO HEAT WHATSOEVER IN MY ROOM

☐ Disciplinary Report:  Date of Report_____  (Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision, then forward to the Grievance Examiner.)

Use only this form to give a BRIEF Summary of Grievance:

I, the above named resident, submit this grievance to grieve the acts of the Administrative Officials of this facility of not supplying me with adequate heat in my room...

In accordance with State & Federal Laws, that the heat was suppose to be turned on by October 15th, in which it was not...

However, when I brought my complaint to the Maintenance Staff, they insisted that the heat is on, in which I'd asked them, " WHY, IS THE DIETARY SO HOT & WARM, WHILE THE REST OF THE FACILITY IS ICE COLD.", they did not want to answer that question...

Nonetheless, I'd asked them, if they were to take a temperature reading in my room, it would show that the temperature in my room is much colder than the temerature in the dayroom...

Although, the Administrative Officials of this facility have not attempted to take adequate or the necessary steps to insulate my window in my room to stop the cold air from coming in, nor did they do anything to rectify this issue about providing me with an extra blanket, due to my Medical condition of me suffering from having Rheumatoid Arthritis...

However, " THERE IS NO HEAT WHATSOEVER IN MY ROOM ", nor is the " RADIATOR " on in my room as well, and its never been on for that matter, " AND MY ROOM IS STILL ICE COLD WITH NO HEAT " ! ! ! !

Relief Requested:  (1)  That I be provided with a Extra Blanket... (2)  That my room be provided with Adequate Heat...  (3)  That my window be insulated to keep the cold air from coming in on me... Or if not, and this grievance does not be resolved within (10) working days from the date of this grivance being filed, I will have no other choice but to file a complaint in a U.S. Federal District Court, for legal relief....

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Resident Signature: | Date: 11-14-05 |
|---|---|

IL462-5001 (R-4-04)                    Distribution: Master File; Resident



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name _JOHN NEW_     Date _6·26·05_

Unit _ACPNA_     Room # _208_

Describe Health Care Problem _I NEED TO SEE THE DOCTOR, DUE TO ME HAVING SEVERE ARTHRITIC PAIN IN MY UPPER LEFT SHOULDER AND RIGHT ELBOW_

Resident Signature_____

### Do Not Write Below This Line

Date Received_____     Time Received_____

Resolution: _seen by MD_

_K Greer_ _m_
HCU Staff Name (Signature and Print)     Date Completed_ 7/6/05_

IL462-5400 (N-7-04)



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name _JOHN NEW_                          Date _8-22-05_

Unit _BAKER_                                Room # _119_

Describe Health Care Problem _I NEED TO SEE THE DOCTOR, BECAUSE I AM_
_STILL EXPERIENCING SEVERE PAIN FROM MY NECK, DOWN TO MY FINGERS_
_ON THE LEFT SIDE OF MY BODY_

_" THIS IS A MEDICAL_
_EMERGENCY, URGENT ! ! ! !_

Resident Signature _____

**Do Not Write Below This Line**

Date Received _____      Time Received _____

Resolution: _Seen by MD_

_K Gor, RN_                         Date Completed _8/26/05_
HCU Staff Name (Signature and Print)

IL462-5400 (N-7-04)



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name _JOHN NEW, JR_      Date _9-15-05_

Unit _ALPHA_      Room # _109_

Describe Health Care Problem _I need to see the doctor, BECAUSE I AM still having problems with my upper Left shoulder & Arm, and I'm still in pain !!!!_

_Thank You_
_Respectfully submitted_

Resident Signature _____

### Do Not Write Below This Line

Date Received _____      Time Received _____

Resolution: _Seen by MD 9/23/05_

_____      Date Completed _____
HCU Staff Name (Signature and Print)

IL462-5400 (N-7-04)



State of Illinois
Department of Human Services
Treatment and Detention Facility

# HEALTH CARE REQUEST

Resident Name_____ JOHN NEW _____ Date ____ 11-14-05 ____

Unit _____ ALPHA UNIT _____ Room # ____ # A-304 ____

Describe Health Care Problem____ I NEED TO SEE THE DOCTOR IMMEDIATELY, BECAUSE THE MEDICATION
THAT HE HAS PRESCRIBE FOR ME, IS NOT WORKING... IN FACT THE PAIN IN MY ARM AND SHOULDER
IS GETTING WORSE... ALONG WITH THE PAIN IN MY NECK...

Resident Signature_____

## Do Not Write Below This Line

Date Received_____ Time Received_____

Resolution: _seen by MD_

_K. Gregg, RN_ Date Completed ___11/21/05___

HCU Staff Name (Signature and Print)

IL462-5400 (N-7-04)



**State of Illinois**
**Department of Human Services**
**Treatment and Detention Facility**

# HEALTH CARE REQUEST

Resident Name ___JOHN NEW___         Date ___12-9-05___

Unit ___ALPNA___                      Room # ___304___

Describe Health Care Problem ___PLEASE LET THE DOCTOR KNOW, TO RE-NEW___
___MY MEDS FOR MY ARM & SHOULDER AND NECK, ALONG WITH THE___
___600 mg of MOTIN___

Resident Signature _____

### Do Not Write Below This Line

Date Received _____         Time Received _____

Resolution: _____

_____         Date Completed _____

HCU Staff Name (Signature and Print)

IL462-5400 (N-7-04)

**DHS**

State of Illinois
Department of Human Services
**TDF RESIDENT GRIEVANCE**

| Name of Resident: John New | ID# 863120 | Date of Incident Occurrence: ~~~~~ 12-5-05 |
|---|---|---|

| Date Received by Administration: 12-06-2005 RCVD | Grievance #: **12 05 GV 0384** |
|---|---|

**Nature of Grievance**

☐ Personal Property ☐ Staff Conduct (Attempt to Resolve) ☐ Mail Handling ☐ Meals ☒ Medical ☐ Other (specify): _____

☐ Disciplinary Report:   Date of Report_____   (Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision, then forward to the Grievance Examiner.)

**Use only this form to give a BRIEF Summary of Grievance:** 'I, the above named resident submit this grievance, to grive the acts of me not receiving adequate medical care from Facility Physician ( Dr. Jovita Anyanwu ) due to a severe and chronic injury that I'd sustained while I was in custody in the Illinois Department of Corrections, prior to my arrival here at this facility...

Nonetheless, I have seen Dr. Anyanwu, on several occasions, stating to him about the severe and chronic pain that I am experiencing on the left side of my body, which at times, causes numbness in my upper left shoulder & arm, and sometimes the pain leaves me paralyze and unable to move my shoulder, arm or leg on the left side of my body...

Although, Dr. Anyanwu stated to me, that his diagnosis of my medical problem is due to me having ( Degenerate Bone Loss ) in which I already know this, because I was diagnose with this same medical issue by Dr. Gordon, while I was a inmate at the Big Muddy River Correctional Center, back in 1998...

However, I've seen Dr. Anyanwu on (3) three occassions, July 6, 2005  August 26, 2005 & September 23, 2005, and I'd complained to him that I am still experiencing very severe and excruciating pain on the left side of my body, although he did proscribe me medication to help ease the pain, but the medication that he has proscribe isn't doing anything, and my medical condition has gotten worser than before...

And on my last visit to see Dr. Anyanwu on September 23rd, I'd asked him, could he put me in to see a Neurologist, because I seriously believe that I am experiencing nerve damage in my arm and neck, which is causing me to constantly be in severe & excruciating pain..

But Dr. Anyanwu stated back to me, that I don't need to see a Neurologist, because he read my X-Rays that he ordered, and he stated to me, that I don't need to see a Neurologist, because he already diagnose my problem...

From there, I asked Dr. Anyanwu could I see my X-Rays, and from there, he stated to me in a very sarcastic remark: " Could you read an X-Ray " ?  also Dr. Anyanwu stated that he does not have to show me anything...

**Relief Requested:**

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

12-5-05

**Resident Signature:** _~~~~~_     **Date:** _~~~~~_

-462-5001 (R-4-04)     Distribution: Master File; Resident

Page 1 of 2

**State of Illinois**
**Department of Human Services**
**TDF RESIDENT GRIEVANCE**

| Name of Resident: John New | ID# 863120 | Date of Incident Occurrence: 9/23/05  12-5-05 |
|---|---|---|

| Date Received by Administration: 12-05-2005 RCVD | Grievance #: 12 05 GV 0384 |
|---|---|

**Nature of Grievance**

] Personal Property ☐ Staff Conduct (Attempt to Resolve) ☐ Mail Handling ☐ Meals ☐ Medical ☐ Other (specify):_____

] Disciplinary Report:    Date of Report_____    (Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision, then forward to the Grievance Examiner.)

Use only this form to give a BRIEF Summary of Grievance:

However, I do feel that I have the right to know about my health concerns & issues when it concerns me especially, and I personally felt that Dr. Anyanwu was totally unprofessional, when he stated to me, that he doesn't have to show me anything, especially when it comes to my X-Rays, stating that the X-Rays isn't showing him any nerve damage...

When this facility doesn't even have the necessary medical equipment to determine nor diagnose that I've sustain nerve damage to my neck, shoulder & arm on the left side of my body...

In conclusion, all I would like is for me to see a Neurologist, and let the Neurologist tell me, as well as determine if I've sustain any nerve damage to my neck, shoulder & arm...

Relief Requested:    That the Medical Director submit documentation for me to see a Outside Neurologist, and that no forms of Retaliation or Reprisals be placed upon me by any Administrative Official or Staff of this facility for the filing of this grievance...

Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Resident Signature:_____    Date: 12-5-05

2-5001 (R-4-04)                    Distribution: Master File; Resident

Page 2-of-2

Grievance Examiner's Response:

See second page
of grievance

Grievance Examiner's Signature: _____   Date: _____

Date Received: _____   **FACILITY DIRECTOR'S RESPONSE**

Facility Director's Decision; Grievance: ☐ Upheld ☐ Denied   Behavior Committee Decision Appeal: ☐ Upheld ☐ Denied
Response:

Facility Director Signature: _____   Date: _____

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received: _____   **PROGRAM ADMINISTRATOR'S RESPONSE**

Program Administrator Concurs With The Facility Director's Decision:   ☐ Yes   ☐ No
Response:

Program Administrator Signature: _____   Date: _____

IL462-5001 (R-4-04)                    Distribution: Master File; Resident

**Grievance Examiner's Response:**

Resident grieved that on several occasions he has stated to Dr. Anyanwu about the severe and chronic pain he experiences on the left side of is body which causes numbness in his upper left shoulder and arm and sometimes the pain leaves him paralyzed and unable to move his shoulder, arm or leg on his left side. Dr. Anyanwu has stated to resident that his diagnosis is having degenerate bone loss, which resident stated he already knew from IDOC doctor in 1998. Resident stated he saw doctor on 7-6 and 8-26 and 9-23 and doctor prescribed medication to ease the pain but the medication is not doing anything and his condition has gotten worse. Resident asked doctor to see a Neurologist that resident believes he has nerve damage in his arm and neck, resident stated that doctor said he does not need a Neurologist because he read his x-rays. Resident asked if he could see his x-rays and doctor stated,"could you read an x-ray", and that he doesn't have to show him anything. Resident's relief request that the doctor submit documentation for him to see a Neurologist and no form of retaliation or reprisals be placed against resident.

Through an Administrative review, HCU stated that resident is being treated for moderate Degenerative Joint Disease. X-rays are not stored in HCU and are read by a radiologist and results forward to HCU. The Primary Care Physician decided when a resident has a condition that warrants an outside referral. HCU does not engage in retaliation or reprisals.

It is recommended this grievance be denied.

New
GV0384
12-13-05

Grievance Examiner's Signature: _____   Date: _12-13-05_

Date Received: _12/15/05_   **FACILITY DIRECTOR'S RESPONSE**

Facility Director's Decision; Grievance: ☑ Upheld ☑ Denied   Behavior Committee Decision Appeal: ☐ Upheld ☐ Denied
Response:

Facility Director Signature: _____   Date: _12/15/05_

NOTE: If appealing the Facility Director's Decision, please attach the Grievance Appeal Form and forward to Grievance Examiner

Date Received:_____   **PROGRAM ADMINISTRATOR'S RESPONSE**

Program Administrator Concurs With The Facility Director's Decision:   ☐ Yes   ☐ No
Response:

Program Administrator Signature:_____   Date:_____

IL462-5001 (R-4-04)   Distribution: Master File; Resident



**Rod R. Blagojevich,** *Governor*

**Illinois Department of Human Services**

319 E. Madison ● Springfield, Illinois 62701-1035

**Carol L. Adams, Ph.D.,** *Secretary*

December 15, 2005

Mr. John New, Jr.
Treatment and Detention Facility
401 Woodruff Road
Joliet, Illinois 60432

Dear Mr. New:

Secretary Adams has asked me to respond to your letter dated December 6, 2005 regarding your complaint that the Treatment and Detention Facility (TDF) is not addressing your medical needs.

Your complaint is best resolved at the Treatment and Detention Facility. The grievance procedure for residents detained or committed at the TDF is outlined in 59 Illinois Administrative Code, Section G, 299.800: Resident Grievances (see attached).

In summary, you must first attempt to resolve incidents, problems or complaints through your primary therapist or staff person involved. If your complaint is not resolved, it should be filed on the proper grievance form and sent to the Grievance Examiner. The Grievance Examiner will investigate the grievance and make a recommendation to Facility Director Monahan. Facility Director Monahan will issue a written decision to you. Appeals may be directed to Dr. Anderson Freeman, Deputy Director and program administrator for the Sexually Violent Persons program.

Resident grievances that do not follow this procedure will not be addressed. The decision of Dr. Freeman is the final determination for all resident complaints at the TDF.

Sincerely,

Lorrie Rickman Jones, Ph.D.
Director of Mental Health

TITLE 59: MENTAL HEALTH CHAPTER I: DEPARTMENT OF HUMAN SERVICES  PART 299 SEXUALLY VIOLENT PERSONS TREATMENT AND DETENTION FACILITY

## Section 299.800 Filing of Grievances

a) A resident shall first attempt to resolve incidents, problems or complaints other than complaints concerning behavior review proceedings, through his or her primary therapist. If a resident is unable to resolve a complaint informally, or if the complaint concerns a disciplinary proceeding, he or she may file a written grievance on a grievance form that shall be made available in all living units. A grievance shall be filed within one month after the discovery of the incident, occurrence, or problem that gives rise to the grievance or within one month after the receipt of a decision concerning an informal resolution thereof. However, if a resident can demonstrate that a grievance was not timely filed for good cause, the grievance shall be considered.

b) The grievance form shall be addressed to the Program Director and shall be deposited in the living unit mailbox or other designated repository.

c) Staff assistance shall be available for those residents who cannot prepare their grievances unaided as determined by institutional staff.

  1) All residents shall be entitled to invoke the grievance procedure regardless of their status or classification.

  2) Each facility shall take reasonable steps to ensure that the grievance procedure is accessible to residents who are impaired or disabled.

d) Residents must be informed of the grievance procedure and may request further information regarding the procedure from their primary therapists.

  1) The written procedure shall be available to all residents.

  2) A resident unable to speak or read the English language may request that the procedure be explained in his or her own language.

e) Actions or reprisals may not be taken against a resident for using the grievance procedure. A resident may submit a grievance alleging that a reprisal has been made against him or her.

## Section 299.810 Grievance Examiner

a) The Program Director shall appoint two or more employees who may serve as a Grievance Examiner to attempt to resolve problems, complaints and grievances that residents have been unable to resolve through routine channels.

b) No person who is directly involved in the subject matter of the grievance or who was a member of the Behavior Committee that heard a incident report concerning the grievance, or who is otherwise not impartial, may serve as the Grievance Examiner reviewing that particular case.

## Section 299.820 Grievance Procedures

a) A Program Director shall review grievances at least weekly, provided that one or more grievances have been filed. The Program Director shall determine whether to refer a grievance to a Grievance Examiner or to the treatment team for resolution.

b) The Program Director shall submit a copy of any grievance alleging discrimination based on disability to the facility Americans With Disabilities Act (ADA) Coordinator. The facility ADA Coordinator shall conduct such investigation as deemed appropriate and make recommendations to the Program Director for resolution of the grievance.

c) A resident may be afforded an opportunity to appear before the Grievance Examiner or treatment team. The Examiner may call witnesses as deemed appropriate.

d) The Grievance Examiner or treatment team shall consider the grievance and report findings and recommendations in writing to the Program Director within 15 working days after the grievance is received by the Grievance Examiner or treatment team, whenever possible. The Program Director shall advise the resident of the decision in writing within 10 working days after receiving the Grievance Examiner's or treatment team's report, whenever possible.

## Section 299.830 Emergency Procedures

a) If the Program Director determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the resident, the grievance shall be handled on an emergency basis.

b) The Program Director shall respond to the resident within three days after receipt of the grievance indicating what action shall be or has been taken.

## Section 299.840 Appeals

a) If, after receiving the response of the Program Director, the resident still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Program Administrator within 30 days after receipt of the response. Copies of the Grievance Examiner's or treatment team's report and the Program Director's decision should be attached.

b) The Program Administrator shall review the grievance and the responses of the Grievance Examiner and Program Director. If it is determined that the grievance is without merit, the resident shall be advised of this disposition, in writing, within 30 working days after receipt of the grievance.

c) The Program Administrator may call witnesses or examine records at his or her discretion. The Program Administrator shall make a final determination of the grievance within 45 working days, whenever possible. The resident shall be sent a copy of the Program Administrator's decision.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|                        |     |                    |
|------------------------|-----|--------------------|
| JOHN NEW,              | )   |                    |
|                        | )   |                    |
| Plaintiff,             | )   |                    |
|                        | )   |                    |
| v.                     | )   | Case No. 06 C 0017 |
|                        | )   |                    |
| THOMAS MONAHAN, et al., | )  |                    |
|                        | )   |                    |
| Defendants.            | )   |                    |
|                        | )   |                    |

## MEMORANDUM OPINION AND ORDER

The plaintiff, a civil detainee in the custody of the Illinois Department of Human Services, is facing commitment pursuant to the Sexually Violent Persons Commitment Act. The plaintiff has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that the defendants, DHS employees and contractors, have violated the plaintiff's constitutional rights by: (1) denying him equal protection (treating detainees who have signed a consent-to-treatment form more favorably than those who refuse treatment); (2) subjecting him to inhumane conditions of confinement; and (3) acting with deliberate indifference to his serious medical needs (refusing to treat his arthritis adequately and disregarding universal health care procedures relating to dispensation of medication). This matter is before the court for consideration of the various defendants' motions to dismiss. For the reasons stated in this order, the motions are granted in part and denied in part.

## I. STANDARD OF REVIEW ON A MOTION TO DISMISS

It is well established that *pro se* complaints are to be liberally construed. *Haines v. Kerner*, 404 U.S. 519, 520 (1972), *reh'g denied*, 405 U.S. 948 (1972); *see also McCormick v. City of*

*Chicago*, 230 F.3d 319, 325 (7th Cir. 2000).  They can be dismissed for failure to state a claim only

if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."  *Haines*, 404 U.S. at 521; *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7[th]

Cir. 2000).  Fact pleading is not necessary to state a claim for relief.  *Thompson v. Washington*, 362

F.3d 969, 970-71 (7th Cir. 2004).  To satisfy the notice pleading requirements of Fed. R. Civ. P.

8(a)(2), the plaintiff need only state his legal claim and provide "some indication . . . of time and

place."  *Id.* at 971.

     When considering whether to dismiss a complaint for failure to state a claim upon which

relief can be granted, the court takes the allegations in the complaint as true, viewing all facts–as

well as any inferences reasonably drawn therefrom–in the light most favorable to the plaintiff.

*Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000).  Dismissal should

be denied whenever it appears that a basis for federal jurisdiction in fact exists or may exist and can

be stated by the plaintiff.  *Norfleet v. Vale*, No. 05 C 0926, 2005 WL 3299375, at *1 (N.D. Ill. Dec.

5, 2005) (Zagel, J.).  The purpose of a motion to dismiss is to test the sufficiency of the complaint,

not to decide the merits.  *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996)

(citations omitted).

## II.  FACTS

     The plaintiff is a civil detainee either committed or facing commitment as a "sexually violent

person" pursuant to 725 ILCS § 207/5.  Under that statute, a sexually violent person is someone who

has been convicted of a sexually violent offense (or has been found not guilty of a sexually violent

offense by reason of insanity) and "who is dangerous because he or she suffers from a mental

disorder that makes it substantially probable that the person will engage in acts of sexual violence."

*Id.*, § 207/5(f). The plaintiff was held at the Joliet Treatment and Detention Facility [hereinafter, "TDF"] from March 7, 2005, until June 19, 2006, when he was transferred along with all other detainees to the new facility in Rushville, Illinois.

The defendants in the case are: (1) Thomas Monahan, an employee of the Illinois Department of Human Services [hereinafter, "DHS"], whose position is not identified in the complaint; (2) Steve Strock, a DHS Security Therapy Aide with the title of Executive II; (3) Shan Jumper, the Clinical Director of the TDF; (4) Lea Chankin, the Associate Clinical Director of the TDF; (5) Liberty Healthcare, a DHS contractor and employer of Jumper and Chankin; (6) Carol Vance, a TDF facility hospital administrator; (7) Dr. Jovita Anyanwu, a TDF resident physician; and (8) Addus Healthcare, Inc., a DHS contractor and employer of Vance and Anyanwu.

The plaintiff alleges the following, basic facts, which must be accepted as true for purposes of the defendants' motions: In Count One, the plaintiff charges that it is the policy of the DHS and Liberty Health Care to treat those detainees who sign a form consenting to treatment differently from those who refuse to sign the consent form. The plaintiff maintains that he will not sign the consent form because he is unwilling to concede that he is a sexually violent person. As a result of refusing to sign the form, the plaintiff is [or was][1] subjected to conditions he characterizes as "punishment." Challenged conditions include: certain food restrictions (e.g., no ice cream or soft drinks); assignment to a cell in the older part of the facility (which was overcrowded and pest-infested, had defective plumbing, poor ventilation and insulation, was dirty and shabby, and was equipped with a steel double bunk bed and sink but no writing desk or chair); the denial of privileges such as being

---

[1] The record does not indicate whether the plaintiff is subject to the same constraints and conditions at the new facility in Rushville.

permitted to receive food in the mail from his family year-round, receiving telephone calls from his family and friends, and attending vocational or educational programs. The plaintiff further maintains that it is in the interests of Liberty Healthcare and Addus HealthCare to write false behavior reports to justify their lucrative contracts to treat persons adjudicated as sexually violent.

In Count Two, the plaintiff claims that he has been denied adequate treatment for his painful, chronic arthritis. He asserts that he has been denied an electric heating pad to relieve his pain and that he has not been permitted to see a neurologist. He also contends that sloppy and unsanitary practices of the medical staff affect the quality of his medical care.

In addition, the plaintiff alleges that the defendant Vance and the nurses she supervises write false behavior reports to retaliate against inmates who complain about the health care staff's non-observation of universal health care safeguards.

## III.    ANALYSIS

### A.    Pleading Deficiencies

The defendants Vance, Anyanwu, and Addus Healthcare, Inc., have filed a motion to dismiss the complaint for failure to comply with Fed. R. Civ. P. 8(e)(1), which requires that pleadings be "simple, concise, and direct," as well as Fed. R. Civ. P. 10(b), which requires that each claim be stated in separate, numbered paragraphs. Their motion is denied.

As noted *supra*, the court must construe *pro se* complaints liberally. *Haines v. Kerner*, 404 U.S. at 520. "Usually [plaintiffs] need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of." *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005). The complaint at bar does just that–it is easy to tell what the plaintiff is complaining about. The plaintiff, who drafted his complaint apparently using the court's civil rights complaint form as

his model, will not be held to the technical requirements of the Federal Rules of Civil Procedure. The motion to dismiss filed by Vance, Anyanwu and Addus Healthcare, Inc., on the basis of inartful pleading is denied.

**B.  Failure to State a Claim**

All of the defendants have moved to dismiss the complaint for failure to state a claim.  Their motions are granted in part and denied in part.

**1.  Inferior Treatment**

The plaintiff claims that he is denied certain privileges and amenities because he has refused to sign a form agreeing to participate in the sex offender treatment program; those inmates who agree to treatment receive preferential treatment.  The defendants' motion to dismiss this claim is granted.

In *Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005), a sweeping class action lawsuit brought by the American Civil Liberties Union relating to the treatment of sexually violent committees, Judge Leinenweber of this court found in favor of the treatment program on identical claims.  Following a trial, Judge Leinenweber concluded that it was proper to base the receipt of privileges on "participation in treatment" and good behavior.  Judge Leinenweber ruled:

> The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff do not initially know the potential risks of a new patient. In addition, making privileges contingent on good behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior.

*Hargett*, 2005 WL 399300 at *8.

Pursuant to *Hargett*, Judge Lefkow of this district has recently dismissed a plaintiff's claim that he was subject to "retaliation" in the form of greatly reduced amenities for refusing to sign a consent-to-treatment form: "[B]ecause the plaintiff has not signed up for the treatment program, he is not entitled to the same privileges, including better housing, as those residents who have agreed to treatment. Because this issue has already been addressed and decided in *Hargett*, the plaintiff's claim . . . is dismissed." *See Williams v. Monahan*, No. 06 C 2447 (N.D. Ill.), Minute Order of June 30, 2006, at p. 2.

In short, because the plaintiff refuses to sign up the treatment program, he is not entitled to the same privileges and amenities as those detainees who have agreed to undergo treatment. This court agrees with the rulings made by Judges Leinenweber and Lefkow and adopts their shared conclusion that the preferential treatment of those who agree to treatment does not violate the Equal Protection Clause.

## 2. Conditions of Confinement

As discussed more fully in the preceding section, the denial of certain privileges and amenities because the plaintiff has refused treatment implicates neither the Due Process nor the Equal Protection clause. Furthermore, the plaintiff's placement in a less desirable housing unit did not violate his constitutional rights. In *McKune v. Lile*, 536 U.S. 24 (2002), the Supreme Court held that the use of incentives to procure consent to treatment in a prison-based program was constitutional. Recognizing that it was necessary to devise an incentive system so that residents would consent to treatment, the Court stated:

> [T]he limitation on these rights is incidental to Kansas' legitimate penological reason for the transfer: Due to limited space, inmates who do not participate in their respective programs will be moved out of the facility where the programs are held to make room for other inmates. As the Secretary of Corrections has explained, "it

makes no sense to have someone who's not participating in a program taking up a bed in a setting where someone else who may be willing to participate in a program could occupy that bed and participate in a program."

536 U.S. at 38-39. Therefore, the plaintiff's assignment to a different area of the facility from those who have agreed to participate in the sex offender treatment program did not violate his constitutional rights.

Nevertheless, the plaintiff describes conditions that may, in and of themselves, have violated his constitutional right to non-punitive conditions of confinement. The Constitution requires the defendants to house the plaintiff under "humane conditions" and to provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, *2 (N.D. Mar. 3, 2006) (Conlon, J.), *citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Like a pretrial detainee, a sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *See, e.g., Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

According to the plaintiff, his housing unit was roach-infested, inadequately heated during the winter months, overcrowded, and the drinking water was "foul and discolored gray." These allegations are sufficient to state a cause of action under 42 U.S.C. § 1983. *See e.g.*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (allegations of low temperatures and pest infestation were actionable under the Civil Rights Act); *Dixon v. Godinez*, 1154 F.3d 640, 646 (7th Cir. 1997) (common problems may rise to the level of a constitutional violation if they exist for a prolonged period); *Wellman v. Faulkner*, 715 F.2d 269, 274-75 (7th Cir. 1983) (overcrowding may rise to constitutional concern where the situation engenders undue violence, sanitary and maintenance problems, and psychological suffering). Of course, in order to survive a summary judgment motion,

the plaintiff will have to provide proof of his claims.  But at this stage of the proceedings, the plaintiff has articulated colorable claims.

### 3.  Deliberate Indifference to the Plaintiff's Serious Medical Needs

Prison officials may not act with deliberate indifference to an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Detainees awaiting trial are similarly afforded *Estelle*-like protection against medical mistreatment under the  Due Process Clause.  *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991).  "To cast this notion in the language of tort, the [State or] County  has an affirmative duty to provide persons in its custody with a medical care system that meets minimal standards of adequacy."  *Holmes*, 930 F.2d at 1199 (citations omitted).  The subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain, *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), the refusal to provide pain medication prescribed by doctor, *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards.  *Sherrod*, 223 F.3d at 611; *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

In this case, the court will assume for purposes of the motion that the plaintiff's arthritic condition is "serious" for purposes of constitutional analysis.  *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (a "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention).  The plaintiff alleges that the health care staff was deliberately sloppy and that the substandard care he received aggravated his arthritis.  The fact that a prisoner received **some** medical treatment does not necessarily defeat his claim; deliberate indifference to a serious medical need can be manifested by "blatantly inappropriate" treatment, *Greeno v. Daley*,

414 F.3d 645, 654 (7th Cir. 2005) (emphasis in original), or by "woefully inadequate action"as well as by no action at all. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). The plaintiff may also further develop his claim that the medical care system at the TDF was so deficient as to violate his constitutional rights.

Again, in order to defeat a motion for summary judgment, the plaintiff will have to substantiate his claims. It should be noted that neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Estelle*, 429 U.S. at 106; *Greeno*, 414 F.3d at 653. Nevertheless, it is not the case that the plaintiff could prove "no set of facts" entitling him to relief. *Haines v. Kerner*, 404 U.S. 519, 521 (1972), *reh'g denied*, 405 U.S. 948 (1972). The court cannot, on the basis of the undeveloped record, conclude that the plaintiff received adequate medical care while housed at the Joliet Treatment and Detention Facility.

### 4. Retaliation

In his complaint, the plaintiff alleges in passing that the defendants issued false conduct reports against detainees who filed grievances regarding the conditions at the Joliet Treatment and Detention Facility. It is well established that prison officials violate the Constitution when they retaliate against a prisoner for filing grievances or initiating lawsuits. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). However, in their motions to dismiss, the defendants assert that the plaintiff lacks standing to sue for retaliation because he has failed to allege that he personally ever received a false report. As the plaintiff has not responded to this argument, the court will deem the matter uncontested. The plaintiff's one-sentence retaliation claim is consequently dismissed for lack of standing. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

### 5. **Personal Involvement**

The defendants contend that the plaintiff has failed to state a cause of action against "upper level officials." It is true that liability under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (citations omitted). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.*

Nevertheless, *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), teaches that dismissal of a *pro se* complaint on grounds of lack of active personal involvement is inappropriate where the official's position justifies an inference that the official had some direct involvement in the alleged violation. *Antonelli* concerned broad claims of unconstitutional conditions of confinement. In that case, the court found that an inference of involvement was justified to sustain claims asserted against certain senior officials, such as the county sheriff or the prison warden, where the claims alleged "potentially systemic," rather than "clearly localized," constitutional violations. *Id.* at 1428-29. In the case at bar, the plaintiff's claims clearly focus on non-localized, systemic violations--he takes issue with the general treatment of inmates who refused to sign consent forms, as well as the general

provision of medical care.  The defendants' motion to dismiss is denied on grounds of lack of personal involvement.

### 5.  Qualified Immunity

The defendants' motion to dismiss on grounds of qualified immunity is likewise denied. "[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (2001), *citing Jacobs v. City of Chicago*, 215 F.3d 758, 765 n. 3 (7th Cir. 2000).  "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal. . . ." *Id.*  The defendants may wish to renew their affirmative defense of qualified immunity in a properly supported motion for summary judgment.

### 5.  Mootness of Claims for Injunctive Relief

It would seem that some or all of the plaintiff's claims for injunctive relief may have been mooted by his transfer to the new facility in Rushville.  Certainly, he is no longer subject to the conditions of confinement presented in the old wing at the Joliet Treatment and Detention Facility. If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to return to that prison.  *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996).  However, as mootness was raised in the one of the defendants' reply briefs, the plaintiff has not had the opportunity to brief that issue.  Therefore, the court will not at this time address the issue of mootness.

### <u>CONCLUSION</u>

In view of the foregoing, the defendants' respective motions to dismiss are granted only as to two claims:  (1) the plaintiff's claim that detainees who sign the consent-to-treatment forms

receive preferential treatment; and (2) the plaintiff's retaliation claim. The defendants' motions to dismiss are denied in all other respects.

IT IS THEREFORE ORDERED THAT the motion to supplement filed by defendants Vance, Anyanwu and Addus Health Care [#36] is granted. The defendants' respective motions to dismiss the complaint for failure to state a claim [document numbers 18, 28 and 32] are granted in part and denied in part. The plaintiff's claims of retaliation and preferential treatment are dismissed pursuant to Fed. R. Civ. P. 12(b)(6). The plaintiff may proceed on all other claims. The defendants are directed to answer or otherwise plead within twenty-one days of the date of this order.

**ENTER:**


_____/s/_____
**JOAN B. GOTTSCHALL**
**United States District Judge**


**DATED:** October 3, 2006

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS

3    EASTERN DIVISION

4

JOHN NEW,                    )
5                             )
  Plaintiff/Petitioner,      )
6                             )
      vs.                     )   Case No. 06-C-0017
7                             )
THOMAS MONAHAN, ET AL,        )
8                             )
  Defendant/Respondent(s).   )
9

10    Deposition of JOHN NEW, taken at the instance

11   of the Defendants, on May 18, 2007 scheduled for

12   the hour of 12:00 P.M., at DHS Detention Facility,

13   Rushville, Illinois, before Molly A. Hobbie,

14   Certified Shorthand Reporter and Notary Public,

15   pursuant to the attached stipulation.

16

17

18

19

20            GOLEMBECK REPORTING SERVICE
             Connie S. Golembeck, Owner
21                 (217) 523-8244
                   (217) 632-8244
22

23

24

116

BY MR. VLAHAKIS:

    Q.    Mr. New, I'd like to have you draw your attention to Page 9 of the Exhibit 1.

    A.    Yes.

    Q.    About five or six lines down on that page you claim that Liberty Healthcare is in direct contempt of court.

    A.    Uh-huh.

    Q.    What do you mean by that?

    A.    Just what it says, Mr. Vlahakis.

    Q.    What court settlement are you discussing?

    A.    Just what it says, Mr. Vlahakis.

    Q.    Okay.  Well, I need an understanding where you're saying we're in direct contempt of court in a recent court settlement.  Do you know what court settlement that is?

    A.    Just the way you seen it and I've written it, sir.

    Q.    So your answer is --

    A.    Just the way -- just what you see, Mr. Vlahakis.  I'm not going to say anything else.

    Q.    Let's make sure we're clear here.  Are you suggesting to me that you don't know what the name of the settlement is?

117

1     A.   I know exactly what it is.  Like I said,

2    it's clear -- it's clearcut.

3     Q.   Well, I don't see what's clearcut about

4    this.  We're asking you to identify this, what

5    settlement you're referring to.

6     A.   Oh, I think you know.  I think you know.

7     Q.   I don't know what you're referring to.

8     A.   Yes, you do, Mr. Vlahakis.  Yes, you do.

9     Q.   Here's how I can put it to you a real

10   simple way.  If you don't want to discuss with me

11   what's on this complaint, I'll ask the court to

12   strike any relief that you're requesting relative

13   to this because it's your obligation to respond to

14   questions.  Whether you think I do or should know

15   what you're talking about is irrelevant, okay.

16    A.   Okay.

17    Q.   Now I'm going to ask you what you're

18   referring to.  If you want to tell me you're not

19   going to answer it, then I'll instruct the court to

20   dismiss that aspect of your claim based on your

21   failure to respond to my question in your

22   deposition; do you understand?

23    A.   Yes, I understand, and you do not scare

24   me, Mr. Vlahakis, do you understand?

118

1      Q.  Are you still refusing to answer my

2  question?

3      A.  Yes, sir, I am.

4      Q.  Okay.

5      A.  Yes, sir, I am.

6      Q.  And when I ask you to say what you believe

7  that Liberty Healthcare is in direct contempt of

8  court, are you refusing to answer my question?

9      A.  It is clearcut, Mr. Vlahakis, as you read

10  it.  You know exactly what it is.

11      Q.  Are you refusing to answer my question to

12  identify what contempt of court you're asserting

13  here?

14      A.  I answered your question, sir.

15      Q.  It's not my duty to answer your questions.

16  I'm asking you the questions, sir.

17      A.  No, sir, I answered your questions that

18  you asked me.

19      Q.  Just so the record is clear, are you

20  refusing to identify what contempt of court you're

21  referring to here in your complaint?

22      A.  I gave you my answer, sir.

23      Q.  And your answer is no?

24      A.  That is your saying, not mine.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.
Jeffery HARGETT, et al., Plaintiffs,
v.
Carol ADAMS, et al., Defendants.
**No. 02 C 1456.**

Jan. 14, 2005.

Everett Joseph Cygal, Michael Patrick Mullins, Schiff, Hardin & Waite, Benjamin S. Wolf, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Plaintiffs.
Steven M. Puiszis, James Constantine Vlahakis, Andrew Michael Ramage, J. William Roberts, Hinshaw & Culbertson, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, J.

## I. INTRODUCTION

*1 The Plaintiffs, individuals who have been civilly committed under the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1 et seq. (the "SVP Act"), brought this suit on behalf of themselves and a class of all other similarly situated individuals challenging the conditions of confinement and quality of treatment at the Joliet Treatment and Detention Facility (the "TDF"). The Defendants are the Director of the Illinois Department of Human Services and various officials at the TDF.

Under the SVP Act, an individual who has been convicted (or found not guilty by reason of insanity) of a sexually violent offense may be detained indefinitely at the TDF if he is found to suffer from a "mental disorder that makes it substantially probable that [he] will engage in acts of sexual violence." 725 ILCS 207/40(a). The SVP Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b). The civil commitment lasts until the individual "is no longer sexually violent." 725 ILCS 207/40(a).

Plaintiffs raise a series of substantive due process constitutional claims that fall under two broad categories: (1) the conditions of confinement are impermissibly restrictive, and (2) the sex offender treatment provided is inadequate. Specifically, Plaintiffs contend, among other things, that the physical structure and layout of the TDF creates a prison-like environment that is counter-therapeutic and inappropriate for the treatment-based nature of Plaintiffs' civil confinement. In addition, Plaintiffs claim that the TDF staff imposes excessive restrictions on personal movement, conducts inappropriate room and personal searches, and improperly uses seclusion as a vehicle for punishment, in violation of accepted professional standards.

Plaintiffs also contend that the treatment provided at the TDF is constitutionally inadequate. They claim that the TDF violates accepted professional standards pertaining to informed consent and access to treatment. Specifically, Plaintiffs are required to sign a consent form that purportedly contains false and misleading statements, as well as a waiver of confidentiality that is excessively broad. Plaintiffs also complain of the TDF's practice of disclosing patient records to the Illinois Attorney General. In addition, Plaintiffs challenge the adequacy of the treatment provided at the TDF, claiming that it relies on ineffective techniques, such as arousal reconditioning and polygraph use, deprives patients of proven efficacious medications, and lacks sufficiently clear goals and requirements for successful completion of treatment. Indeed, Plaintiffs note that in the five-year history of the program, only a handful of patients have been released. Although Plaintiffs challenge the conditions and treatment at the TDF, they do not mount a facial challenge of the SVP Act itself.

*2 Defendants initially respond that many of Plaintiffs' claims are moot in light of recent changes in policies and practices. They also contend that housing Plaintiffs in a facility that has similarities to a correctional setting does not transform the TDF's program into an essentially punitive program. In addition, Defendants argue that the security measures are reasonable and necessary precautions related to legitimate security needs for both patients and staff. Defendants also contend that the seclusion standards

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

established by psychiatric organizations are not applicable because the patient population at the TDF is different in kind from the type found at psychiatric hospitals, and, moreover, the SVP Act specifically exempts the TDF from complying with the seclusion provisions in the Illinois Mental Health and Developmental Disabilities Code.

With regard to Plaintiffs' treatment-related claims, Defendants argue, among other things, that Plaintiffs merely point to areas of professional disagreement, which cannot amount to constitutional violations. Specifically, Defendants contend that arousal reconditioning and polygraph use are well-established techniques utilized in the treatment of sex offenders. Defendants also note that the treatment program has established goals for progress, and that several patients have been released, even without completing all phases of the treatment.

## II. FINDINGS OF FACT

### A. Claims Pertaining to Conditions of Confinement

### The TDF's Physical Structure and Layout

1. The physical structure of the TDF is more-akin to a high-security, prison-like facility, rather than a low-security facility or traditional mental health treatment facility. Plaintiffs' correctional facilities expert, Steve Martin, presented credible testimony showing certain functional similarities between the TDF and high-security facilities, including numerous guard and observation posts, a central security system, continually-locked doors, small prison-like rooms, invasive searches and significant restrictions on movement.

2. Plaintiffs' expert Dr. Metzner presented credible testimony showing that the TDF's physical layout was not conducive to a positive therapeutic milieu. Dr. Metzner, however, also conceded that effective psychotherapy can-and often does occur-in correctional environments that are significantly more restrictive and prison-like than the one at the TDF. Similarly, Dr. Berlin, Plaintiffs' expert, conceded that effective psychotherapy can occur within a prison setting.

3. Thus, the Court finds by a preponderance of the evidence that although the physical structure of the TDF does not facilitate a positive therapeutic

environment, it is not, by itself, a significant impediment to the delivery of effective treatment. As indicated below, other elements of the treatment program overcome the counter-therapeutic features of the TDF's physical structure.

### Restrictions on Movement

4. The restrictions on movement at the TDF are more consistent with a high-security correctional facility than a minimum or medium-security prison. Many of the practices pertaining to restrictions on movement and other restrictive practices were imported wholesale from practices established through the Department of Corrections, without full consideration of the appropriateness of all such practices in light of the patient population at the TDF. With the exception of those patients on advanced (AGE) status, patients' room doors are routinely locked throughout the day and night, and patient must request entry and exit to their room. When outside of their rooms, most patients are routinely escorted by security personnel, and must pass through numerous locked doors before reaching the secure yard.

*3 5. A Minnesota sex offender program operating under a comparable statutory scheme for civilly detaining and treating violent sex offenders provided a significantly less-restrictive environment than the TDF, but did not have significantly greater assaultive behavior from its patients. For instance, patients in the Minnesota program had keys to their rooms and could move around the facility with greater freedom than those at the TDF. However, as Dr. Schlank testified, the Minnesota program found that its level of freedoms and privileges created an unintended counter-therapeutic effect and treatment disincentives because patients began to prefer a continued stay at the facility, as opposed to working diligently in treatment to secure release.

6. Although the large majority of TDF patients are not assaultive toward staff or other patients, Defendants presented unrebutted evidence of numerous assaults on staff and between patients that warrant certain heightened restrictions on movement. In addition, Defendants showed that there are also legitimate concerns pertaining to the security of personal property within rooms that relate to rooms being locked, at least with respect to the locking of rooms after a patient has exited the room. Thus, the preponderance of the evidence shows that although the overall restrictions on movement at the TDF may be greater than those absolutely necessary in light of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
**(Cite as: Slip Copy)**

the patient population at the TDF, there are nonetheless legitimate operational and security concerns behind many of these restrictions.

### Room and Personal Searches

7. Patients' rooms are routinely searched for contraband. Although this feature is more akin to a prison environment, as opposed to a forensic mental hospital or other treatment facility, Defendants presented evidence that numerous items, including a makeshift knife ("shank") and devices to conceal contraband, have been uncovered as a result of these searches. Thus, there are legitimate institutional security concerns underlying the room searches.

8. The TDF's prior policy was to strip search every patient before and after every visit, including visits with attorneys. Under current policy, strip searches have been replaced with a scanning device (the "Rapiscan") that does not require the patient to unclothe. There was credible testimony that the TDF intended to use the Rapiscan (or a similar device) as a permanent replacement for automatic strip searches. The device cost more than $115,000 and is under a one-year maintenance program. Defendants testified that they will extend the maintenance contract for four years. In addition, there was credible testimony that the TDF staff disliked performing the strip searches. If the Rapiscan device fails mechanically, however, Defendants will revert to routine strip searches until the device is fixed.

9. Taken together, the Court finds by a preponderance of the evidence that the TDF intends to use the Rapiscan as a permanent replacement for automatic strip searches on all patients.

### Use of the "Black Box"

*4 10. The Black Box is a security instrument that covers the linking chain and keyhole on handcuffs, and is intended to make it more difficult for a person to remove handcuffs. The TDF began using the Black Box after a successful escape by two patients during transport to court. Under prior policy, the TDF used the Black Box on all patients that were being transported off-site. Under current policy, the TDF will now use individualized risk assessments to determine the necessity of the black box.

11. The Court finds that there are legitimate security concerns underlying the past and present use of the Black Box.

### Use of Special Management Status ("SMS")

12. Special or Secure Management Status ("SMS") refers to the status and set of conditions that a patient may be placed under when he is determined to be a danger to himself or others. The most common reason a patient is placed on SMS is assaultive or threatening words or behaviors aimed toward another patient or staff.

13. On or about September 2004, the TDF amended its long-standing policy pertaining to the SMS. The following findings of fact, unless otherwise noted, pertain to the terms stated in the new policy.

14. The initial determination of whether a patient is to be placed provisionally on SMS is made by a Security Therapy Aide (the "STA"), who is considered security, not treatment, personnel. STAs typically are not trained in the diagnosis or treatment of mental disorders. After a STA makes the initial SMS decision, the patient is directed to his room, and confined within (*i.e.,* the door to his personal room is locked). The patient is not restrained within his room (*i.e.,* five-point restraints or other devices are not used to restrain the patient). If the patient is not showing suicidal ideation or self-injurious behavior, he typically retains the right to use all personal items in his room, including, if available, the television, music players, and books.

15. The vast majority of patients placed on SMS comply with orders to go to their room and no staff physical intervention is typically required to place the patient in his room.

16. The administrator on duty reviews the STA's decision and has the authority to override the STA's decision. Once the patient is on SMS, the Clinician on Call is notified to perform an initial face-to-face medical and psychiatric assessment, or, if after hours, direct a registered nurse to conduct the assessment.

17. Under the terms of the new policy, a nurse (or, if available, the Clinician on Call) performs a psychiatric screen for suicidal or psychotic symptoms within one hour of placement on SMS. Under current policy, individuals with suicidal ideation or engaging in self-injurious behavior may be placed on Emergency Mental Health Status ("EMHS"). A patient on EMHS will be continually observed by staff. When necessary, a behavioral assessment by a

licensed mental health professional or registered nurse will occur within one hour of placement on EMHS. Reassessments shall occur during every shift thereafter. In all cases, the patient must have a face-to-face evaluation by a licensed clinician within 24 hours.

*5 18. Instances of suicidal ideation or behavior are rare at the TDF, and have occurred at a historical rate of twice a year. No successful suicide attempts have occurred. Dr. Jumper testified that in the past five-and-a-half years, a nurse performing an initial SMS evaluation has never identified an acute psychiatric need. Plaintiffs did not demonstrate otherwise.

19. If the nurse does not initially identify suicidal or psychotic symptoms, the patient is assessed by a nurse every 12 hours thereafter. The new policy specifies that the mental health assessments must be documented in the clinical charge and administrator-on-duty log during the shift time period.

20. Within two working days after initial placement on SMS, the Behavior Review Committee ("BRC") reviews the SMS determination. During this review process, the patient is afforded an opportunity to present his argument against the SMS decision. Following the BRC meeting, approximately one-third of the patients are released from SMS.

21. The experts in the present litigation agreed that the patients at the TDF differ in terms of typical diagnostic criteria and symptom profile from those patients typically residing at psychiatric hospitals. Specifically, under the Fourth Edition of the Diagnostic and Statistical Manual for Mental Disorders ("DSM IV") classification system, the predominant Axis I diagnoses for TDF patients falls under the category of paraphilias and sexual disorders. The most common diagnosis is pedophilia; greater than 50% of the patients at the TDF have this diagnosis. Pedophilia is a mental disorder characterized by, among other things, intense sexual urges and behaviors toward prepubescent children. In contrast, the primary diagnoses for patients in forensic psychiatric hospitals fall under the mood or psychotic disorders categories, with schizophrenia, schizoaffective, bipolar I, and severe major depression being among the most common diagnoses.

22. Thus, in a psychiatric hospital population, a significant percentage of patients suffer from severe mental disorders that can interfere with everyday perceptions of reality, including delusions and hallucinations (e.g., schizophrenia), or cause serious

suicidal ideation and behaviors (e.g., major depression and bipolar disorder). Many of the patients in psychiatric hospitals have difficulty with daily living tasks and self-care skills, and have serious interpersonal, behavioral, and cognitive deficits.

23. In contrast, the vast majority of patients at the TDF do not suffer from psychotic or severe mood disorder symptoms. Suicidal ideation or behavior is a very rare occurrence. The patients at the TDF can-and do-perform living and self-care tasks. Although paraphilias and sexual disorders are associated with significant cognitive distortions regarding purported sexual cues from victims, rationalizations of violent behavior, and compulsive and obsessive tendencies, these distortions do not result in the type of widespread impairments in reality testing, as well as other behavioral and cognitive deficits, typically seen in psychotic and serious mood disorders.

*6 24. There is significant disagreement in the psychiatric and psychological community on whether, given the diagnostic and symptomatic profile differences noted above, the seclusion and restraint standards promulgated by the American Psychiatric Association in Task Force Report No. 22 (the "APA Standards") should apply to patients at the TDF. The APA Standards provide specific recommendations on the proper use of seclusion and restraint with individuals suffering from mental disorders. Specifically, the APA Standards require, among other things, an initial written seclusion order, which is time-limited and subject to ongoing review, and a face-to-face clinical evaluation within the first three hours of seclusion. Thereafter, a patient in seclusion must be monitored every twelve hours. Once the patient is determined to be no longer a threat to himself or others, he should be released from seclusion and/or restraint.

25. The APA standards were based, in part, on concerns over the widespread improper and inconsistent use of seclusion and restraints with patients with serious mental disorders. Historically, treatment staff at psychiatric hospitals tended to use seclusion and/or restraint as a method of punishment or for convenience of the staff to avoid managing difficult patients. Because in psychiatric hospitals violent or disruptive behavior is often the product of a serious mental disorder, the APA Standards provide that seclusion and restraint must be used only for therapeutic purposes, and not punishment. In addition, particularly for individuals with serious cognitive distortions or delusions, the experience of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
(Cite as: Slip Copy)

Page 5

being locked and isolated in a foreign room and/or pinned down in five-point restraints can be extremely traumatic and counter-therapeutic. Thus, in the mental health treatment community, seclusion and/or restraint are considered last-resort alternatives.

26. Although the experts agreed on the diagnostic differences between the TDF patients and traditional psychiatric patients, they did not agree on the implications of these differences to the application of the APA Standards. Drs. Berlin and Metzner, experts for the Plaintiffs, testified that the APA Standards apply to the TDF's operations. In their view, the APA Standards apply equally to patients in psychiatric hospitals and facilities like the TDF, where decisions are primarily based on dangerousness to self or others. Under Dr. Berlin's view, the central inquiry-and one that requires a trained mental health professional-is whether the assaultive or threatening behavior is a product of a mental illness. Thus, diagnostic differences between patient populations are irrelevant to the inquiry of whether a patient's dangerousness to self or others is caused by a mental disorder, and indeed the APA Standards do not differentiate procedures based on diagnosis.

27. In contrast, Drs. Dvoskin and Tardiff, experts for the Defendants, testified that the APA Standards do not apply to the TDF because of the significant differences in the types of patients there, as compared to psychiatric hospitals. Under their views, the potential that assaultive or self-injurious behavior is a product of an underlying mental disorder is significantly attenuated in a treatment setting like the TDF, where essentially none of the patients meet criteria for psychotic disorders or severe mood disorders. Under this view, the violent behavior that occurs at the TDF is primarily targeted antisocial behavior aimed at disrupting the rules and order of the TDF, as opposed to uncontrollable behavior caused by a mental disorder. Thus, the concerns and policies underlying the APA Standards pertaining to the mistreatment and neglect of the chronically mentally ill simply do not apply in a treatment setting like the TDF.

*7 28. The Court finds by a preponderance of the evidence that the patients detained at the TDF are substantially different in diagnosis and symptom profile from those typically found at forensic psychiatric hospitals (and other similar settings). Patients at the TDF do not routinely suffer from psychotic or severe mood disorders. Although co-morbid major depression is common at the TDF, the absolute rarity of suicidal ideation or behavior, or

significant impairment in self-care skills, indicates that the depression (or dysthymia) present is of a lesser severity than that routinely found in psychiatric hospitals. Although patients at the TDF have impaired volitional control regarding sexual urges, they do not have disorders that typically manifest in uncontrollable violent outbursts toward staff or fellow patients, or present serious suicidal risk. Indeed, the evidence showed that the vast majority of TDF patients placed on SMS complied with orders to return to their room without security personnel intervention, and restraints are rarely, if ever, used.

29. Thus, the vast majority of assaultive behavior that precipitates placement on SMS is unlikely to be the product of an Axis I major mental illness. Accordingly, the concerns that future assaultive behavior may be the product of a mental disorder are severely attenuated at the TDF, in comparison to a traditional psychiatric hospital or other inpatient mental health treatment facility.

30. The Court finds that the TDF has made good faith efforts, albeit under the specter of litigation and impending trial, to improve the policy and practices relating to SMS. Following the advice of Dr. Tardiff and others, the TDF has created a written policy that requires immediate administrative review of an STA's preliminary decision to implement SMS. The current policy also properly requires a psychiatric and medical screen by a trained nurse or clinician within one hour of placement in SMS. In addition, on-call psychiatric consultation is available if acute mental health needs are present. Because the new SMS policy was recently drafted and is in the process of implementation, there is limited evidence of the effectiveness of the policy in practice at the TDF.

31. The TDF's prior SMS procedures and practices lacked clear guidelines and requirements for prompt assessment of psychiatric needs by a nurse or any mental health professional. Nurses often did not properly document when (or if) they conducted the psychiatric screen, and it is likely that patients in SMS often did not receive an appropriate evaluation within a one-hour time frame (or perhaps at all).

32. The Court finds by a preponderance of the evidence that there are legitimate safety and security purposes underlying the use of SMS, as it is presently formulated and implemented at the TDF. There are documented instances of assaults by patients on other patients and staff. SMS allows a patient to be removed from potentially harmful situations where he may injure himself, staff or other patients.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
(Cite as: Slip Copy)

Use of Close Management Status ("CMS")

**\*8** 33. Following Secure Management Status, some patients may be placed on Close Management Status ("CMS"). CMS requires patients to wear yellow jumpsuits, and also has certain restrictions on movement and times for exercise or recreation.

34. Under the prior policy, patients were uniformly placed on CMS for thirty days and were required to wear yellow jumpsuits. Under current policy, TDF officials will make individualized decisions pertaining to which patients wear a yellow jumpsuit.

35. The Court finds that there are legitimate institutional security concerns underlying the use of the yellow jumpsuit and other features of CMS. For instance, the yellow jumpsuit allows staff and security personnel at the TDF to identify quickly those patients at greatest risk for assaultive behavior, and facilitates the imposition of appropriate restrictions on movement. The Court also finds that the use of yellow jumpsuit does not carry such a stigmatizing effect that it impedes the effective delivery of treatment or creates a significant counter-therapeutic environment.

Other Restrictions

36. Patients at the TDF generally have a wide range of available commissary items, although the availability of certain items may depend upon the patients' behavioral management status. There was no evidence demonstrating that the restrictions on commissary items are excessive.

37. The use of intercoms within a patient's room facilitates institutional security. There was no evidence demonstrating that the use of such intercoms is a significant imposition on the patients' privacy.

38. The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff do not initially know the potential risks of a new patient. In addition, making privileges contingent on good

behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior.

B. Claims Pertaining to Treatment, Informed Consent, Access to Treatment and Confidentiality

39. The Consent-to-Treatment form used by the TDF prior September 2004 had an apparent typographical error in the following sentence that omitted the word "each": "I understand that, when necessary, the treatment team and program-related staff may share information with [each] other about me without my consent." The current consent form does not have this typographical error. Although the TDF apparently used a consent form with a blatant and significant typographical error for several years, there was no evidence showing that the treatment staff had relied on this error to share confidential information with others outside of treatment staff.

**\*9** 40. The Consent-to-Treatment form contains a provision notifying patients that treatment records may be provided to the Illinois Attorney General "in order to prepare for court." Under prior policy, TDF staff automatically sent copies of any records requested by a patient to the office of the Illinois Attorney General, without requiring a request from the Attorney General's office or making an individualized assessment of whether the patient was requesting the records in preparation of a court filing. The TDF has since discontinued this policy. Plaintiffs did not show, however, that the Attorney General used any patient information supplied by the TDF for purposes other than preparing for court proceedings.

41. Until recently, the Consent-to-Treatment form included a statement pertaining to Illinois' mandatory reporting law that stated: "any uncharged offense(s) against minors will be reported to DCFS." Although the TDF apparently used this form, which contained an inaccurate statement of the Illinois mandatory reporting law, for several years, the current consent form does not have this particular statement.

42. Until recently, the Consent-to-Treatment form did not contain specific information pertaining to arousal-reducing medications. The current form contains information pertaining to such medications.

43. Patients must sign the Consent-to-Treatment form to receive treatment at the TDF, as the TDF must respect a patient's right to refuse treatment. There are no provisions in the consent form that allow the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

patient to sign the form, accept treatment, but yet specifically preserve (or claim to not waive) the right to object in a court of law to certain disclosures or other matters presented in the Consent-to-Treatment form.

44. The TDF's treatment program requires patients to disclose in great detail past offenses, including uncharged offenses. There are no immunity provisions insulating the patients from future prosecution based on the disclosure of uncharged offense. The clinical practice at the TDF, however, is to advise patients not to disclose identifying information that would trigger mandatory reporting requirements. There have been three instances where the Illinois DCFS was notified under the mandatory reporting statute. Yet, to-date, no TDF patient has been prosecuted for disclosures within the treatment program.

45. The TDF uses a Psychosexual Testing Consent Form for the administration of the Multiphasic Sex Inventory that contains a hold-harmless and indemnity clause. The test may not be administered nor scored without a properly signed consent form. The consent form was drafted by the test developers, not the TDF staff. No patient has been denied treatment because of refusal to sign the consent form, nor is the test a prerequisite for participation in the treatment program.

46. Occasionally, some of the meetings between mental health staff and patients occur in the patients' rooms or in the common area directly outside of the patients' rooms. These common areas do not have adequate sound privacy to ensure patient confidentiality.

Arousal Reconditioning and Medications

**\*10** 47. The successful treatment of sex offenders like those treated at the TDF is complicated and may require multi-modal treatment techniques, including cognitive, behavioral, and medical interventions. The Practice Standards and Guidelines for the Members of the Association for the Treatment of Sexual Abusers (the "ATSA") consider arousal reconditioning, relapse prevention (cognitive-behavioral techniques), and medication techniques to be viable treatment interventions for sexual abusers.

48. There is professional disagreement in the psychiatric and psychological treatment fields as to the long-term effectiveness of sexual arousal

reconditioning, as practiced at the TDF, in the treatment of sexual abusers. Although clinicians treating sexual offenders continue to use arousal reconditioning as a treatment tool, there is significant research literature indicating that the effects of arousal reconditioning are short-term and may not significantly reduce recidivism rates. The arousal reconditioning technique, however, may have short-term utility in providing an immediate assessment of a patient's current deviant arousal.

49. Plaintiffs' expert, Dr. Berlin, a recognized expert in the field of treatment for sexual abusers, provided credible testimony showing that arousal reconditioning is typically not sufficient treatment on its own, and may indeed provide very limited value, even when used in conjunction with medications and other cognitive therapy techniques. Dr. Berlin, however, conceded that there are significant numbers of clinicians who continue to believe that arousal reconditioning is an effective cognitive therapy technique for treating sexual offenders. Indeed, the ATSA, a respected professional organization that provides recommended guidelines and standards for sex offender treatment providers, specifically encourages the use of arousal reconditioning techniques.

50. Dr. Schlank, Defendants' expert, credibly testified that techniques such as arousal reconditioning are routinely used in sexual offender treatment programs. She also testified that it is not unusual for such programs to emphasize cognitive techniques at the outset of treatment, and thereafter direct attention toward medications.

51. Dr. Berlin provided credible testimony showing that anti-androgen medications can be an important treatment tool for sexual offenders. Selective Serontinergic Reuptake Inhibitors ("SSRIs") may also have some utility in the treatment of sexual offenders, although their effectiveness on reducing deviant sexual arousal is likely to be less than anti-androgen medication. There is, however, a danger that patients may over-rely on medications as a purported "cure" and will underutilize cognitive therapy and relapse prevention techniques. Thus, over-reliance on medications may place put patients at heightened risk of a relapse under certain circumstances.

52. Under the prior policy, the TDF treatment staff may have overestimated the utility of arousal reconditioning, and underestimated the utility of anti-androgen medications.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
(Cite as: Slip Copy)

**\*11** 53. The TDF has psychiatric coverage on two days per week, for a total of 16 hours per week. Although the TDF staff concedes that this level of coverage is sub-optimal, particularly as the new treatment policies may substantially increase the use of arousal-reducing medications, it is nonetheless sufficient to cover the core psychiatric needs of the TDF patients.

### Use of the Polygraph

54. The TDF administers the polygraph test as part of its treatment program. The TDF uses a polygraph technique called the Control Question Technique (the "CQT"). The polygraph is used to assess, among other things, the truthfulness of patients' disclosures about past offenses.

55. There is significant professional disagreement about the reliability and validity of the CQT administration, as well as the proper role of the polygraph in the treatment of sex offenders in general. There is substantial research literature indicating that the CQT is unreliable and overestimates untruthful responses. Dr. Iacono, Plaintiffs' expert on the polygraph, however, conceded that there are recognized experts in the scientific community, although they tend to train at one particular research institution, who believe the CQT is a scientifically valid procedure for the polygraph. In addition, many departments of the federal government, including the FBI, routinely use the CQT.

56. Independent of the reliability or validity of the polygraph instrument as a purported "lie detector," it can be an effective treatment tool because it can facilitate patient disclosures regarding past offenses. That is, simply administering a polygraph test may encourage certain patients to make truthful disclosures before or after the test.

57. Patients who fail the polygraph examination generally cannot advance beyond Phase II in the treatment program. There was evidence, however, that patients who failed the polygraph (or have inconclusive results) can complete other work in advanced phases of the program, and even can obtain release. Thus, a failed polygraph examination is not an insurmountable obstacle to release from the TDF.

58. Under prior policy, the TDF Polygraph Review Committee reviewed only a subset of polygraph results and may have overestimated the utility of the polygraph in detecting untruthful responses. Under current policy, the Polygraph Review Committee will review all polygraph test results.

### Progress of Treatment and Prospects of Release

59. The TDF core treatment program comprises five phases, each with different treatment tasks and goals. Phase 1 (Assessment) involves initial treatment evaluation and baseline measurements. Phase 2 (Accepting Responsibility) includes use of the polygraph, extensive written descriptions ("journaling") of past offenses, and cognitive restructuring techniques aimed at correcting distortions that relate to sex offending. Phase 3 (Self-Application) includes relapse prevention techniques, which involve detailed assessments of the situational, behavioral and cognitive variables associated with offending, as well as continued cognitive restructuring and journaling work. Phase 4 (Incorporation) incorporates the prior three phases and helps the patient formulate a "wellness" plan. Finally, Phase 5 (Transition) plans the patient's reintroduction into the community.

**\*12** 60. The TDF core treatment program provides approximately 15 hours of direct sex offender treatment per week. According to Dr. Schlank's unrebutted testimony, this amount of treatment is somewhat higher than other similar treatment programs. In addition to the 15 hours of treatment, there are other ancillary treatment programs provided.

61. In general, the treatment program provides coherent treatment goals and provides an overall roadmap for progress.

62. Participation in treatment at the TDF, however, is quite low. Less than 50% of patients participate in core treatment. There are a variety of reasons why patients do not participate in treatment. Some patients do not participate because they disagree with the treatment methods, consent forms, and/or disclosures to the Attorney General. Others do not participate because they may have been advised by their attorneys not to participate in treatment pending resolution of this case and/or court appeals.

63. Certain members of the TDF staff recognize that participation in treatment is excessively low and have engaged in efforts to increase outreach to patients. The recent policy changes, including review of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
**(Cite as: Slip Copy)**

polygraphs, more-carefully delineated SMS procedures, clarification of the confidentiality provisions, increased use of anti-androgen medications, more individualized assessments of threat risks, elimination of strip searches, as well as resolution of this litigation, should provide incentives for increased participation in treatment.

64. Given the chronic and severe nature of the paraphilias and sexual disorders suffered by patients at the TDF, the course of treatment to date is not inappropriately long. The treatment program appropriately focuses on behavioral changes as the sign post for release, rather than fixed time periods. Moreover, completion of all phases of treatment is not an absolute prerequisite for release from the TDF: some patients have been released without completing all phases of treatment.

65. There is significant treatment value in having patients provide some form of written description of past offenses (the so-called "journaling" technique). Under prior policy, however, the journaling process in Phase II was overemphasized and excessively time-consuming in relation to other aspects of the treatment program. Under current policy, the process of journaling is more streamlined, having moved to a "categorical offense" description model. This should facilitate greater patient success in Phase II of the treatment program.

66. Since the program's inception more than five years ago, approximately 10 patients have been released. The large majority of these patients, however, had not completed all phases of the treatment program. In addition, several of the patients were released by court order, against the recommendation of the independent consultant hired by TDF to make release recommendations. The rate of release, although notably low, is not unusual, given the complexity of psychological issues facing TDF patients, coupled with the low participation rates in treatment.

Accreditation

*13 67. The TDF is not accredited by the Joint Commission of Accreditation of Healthcare Organizations (the "JCAHO") or the Commission on Accreditation of Rehabilitation Facilities (the "CARF"). In June 2003, the TDF performed a "mock" CARF review and determined that it had not formalized its policies sufficiently in writing to pass CARF accreditation. CARF accreditation is generally

considered to have less stringent requirements than JCAHO.

Other Issues Raised in the Complaint

68. *Staff training.* The TDF treatment staff is sufficiently trained and informed in the treatment of sexual deviance. The TDF treatment staff has the proper credentials for the tasks performed.

69. *Individualized treatment plans.* The treatment plan for the patients is sufficiently individualized to meet patient needs, and, as noted above, the treatment program provides a coherent road map and goals for treatment progress.

70. *Family participation in treatment.* There was no evidence demonstrating that family members are unreasonably excluded from participating in treatment or visiting.

71. *Grievance procedures.* The TDF has established sufficient grievance procedures. For instance, the evidence showed that the Behavioral Review Committee conducts hearings to address patients' grievances regarding SMS. In addition, there was evidence showing that patient committees are involved in providing feedback to treatment and administrative staff, and reasonable accommodations have been made.

72. *Education, Religious, Vocational, and Recreational Activities.* There was no evidence demonstrating that the TDF fails to afford reasonable educational, religious, vocational or recreational activities.

III. CONCLUSIONS OF LAW

A. Standard of Review for Constitutional Claims

1. Plaintiffs' constitutional challenges to the conditions of confinement and treatment fall broadly under the "professional judgment standard." *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Under this standard, decisions made by trained professionals are entitled to a presumption of correctness. *See id.* at 324. Constitutional violations will be found only when administrative or clinical decisions pertaining to confinement and treatment are a "substantial departure from accepted professional judgment,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

practice or standards." _Id._ at 323. In addition, courts may not "specify which of several professionally accepted choices should be made," but rather only "make certain that professional judgment in fact was exercised." _Id._ at 321. Thus, this Court's review of the TDF's practices is very limited: it can intervene only if Plaintiffs have established that TDF's practices are "such a _substantial_ departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." _Id._ at 323 (emphasis added).

2. Persons who have been involuntarily committed are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." _Youngberg,_ 457 U.S. at 321-22. The Constitution, however, does not require that the patients at the TDF receive "optimal treatment," but rather minimum levels of care are sufficient. _West v. Schwebke,_ 333 F.3d 745, 749 (7th Cir.2003); _see also Collignon v. Milwaukee County,_ 163 F.3d 982, 988 (7th Cir.1998). "[A]ll the Constitution requires is that punishment be avoided and medical judgment exercised." _West,_ 333 F.3d at 749.

*14 3. The SVP Act contains a provision that specifically exempts the TDF from complying with the Mental Health and Developmental Disabilities Code (the "MHDDC" and the "MHDDC exemption"). 725 ILCS 207/50(b) (West 2004). The MHDDC provides a series of rights and procedural requirements for mentally ill individuals, including significant limitations on the use of seclusion and restraint. _See_ 405 ILCS 5/2-108 and 405 ILCS 5/2-109. Defendants argued repeatedly at trial (and in their post-trial brief) that the MHDDC exemption is an affirmative defense that precludes Plaintiffs from challenging any practices that are required under the MHDDC. In particular, Defendants argue that the MHDDC exemption precludes the TDF from being required to comply with the APA Standards on seclusion and restraint. _See, e.g.,_ Def. Post Trial Br. at 20-21.

4. Defendants' line of reasoning here is not particularly well-developed, but they appear to argue that because the APA Standards are functionally equivalent to the MHDDC provisions on seclusion and restraint, Plaintiffs' argument runs headlong into the MHDDC exemption. _See id._ at 20-21. In addition, Defendants seem to argue that because Plaintiffs have not mounted a facial challenge to the MHDDC exemption, they must be precluded from allowing a

_de facto_ invalidation of this statutory provision via application of the APA Standards. _See id._ at 6-7, n. 9.

5. Defendants' argument on the MHDDC exemption is unconvincing. First, Defendants provide no authority for the proposition that a party challenging practices at a state-operated facility must also raise a facial challenge to any underlying statutory authority related to such practices. Nothing in _Youngberg_ or its progeny suggests that such a facial challenge is a procedural prerequisite. Second, and relatedly, Defendants misunderstand the legal implications of a Plaintiff victory on this issue. Specifically, a finding that the APA Standards apply under _Youngberg_ is not tantamount to the distinct finding that the MHDDC exemption is constitutionally invalid. Procedurally, the issue of the constitutionality of the MHDDC exemption is not before this Court. It may be that _Youngberg_ requires the TDF to follow certain seclusion and restraint practices that happen to overlap with provisions in the MHDDC, but it is incorrect to consider that equivalent to a legal finding that the MHDDC provision is unconstitutional. Indeed, there are numerous provisions in the MHDDC that would remain untouched by a finding that the APA Standards apply, and, moreover, nothing in the MHDDC exemption forbids the TDF from complying with the APA Standards. Rather, properly read, the plain language of the MHDDC exemption merely suggests that the MHDDC itself cannot provide a toehold for legal liability—and Plaintiffs indeed are not relying on the MHDDC provisions. Finally, Defendants ignore (or misunderstand) the fundamental concept that states cannot create statutory schemes that evade the requirements of the United States Constitution. That is, nothing in the SVP Act itself can serve as an affirmative defense that protects the TDF from comporting with the constitutional requirements specified in _Youngberg._

Standard on Review Regarding Mootness of Claims

*15 6. As noted above, Defendants altered many of the challenged policies, including several at the last minute, on the eve of trial. As a result of these changes, Defendants now claim that many of the Plaintiffs' claims are effectively mooted. Plaintiffs respond that many-if not all-of the policy changes are merely "adjustments of convenience" for the purposes of prevailing in the litigation, rather than bona fide and long-term shifts in policy and practice.

7. To prevail on their claim of mootness, Defendants

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
**(Cite as: Slip Copy)**

face a heavy burden: they must show that subsequent events have "made it absolutely clear that the allegedly wrong behavior could not reasonably be expected to recur." *See, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).* Defendants must show that "there is no reasonable expectation that the wrong will be repeated." *Id.* (citation omitted).

8. The Court finds that Plaintiffs' claims pertaining to the strip searches and the Consent-to-Treat form are mooted by Defendants' policy changes because Defendants have shown that there is no reasonable expectation that they will systematically return to former procedures. For instance, the TDF expended considerable funds on the Rapiscan device and has in place a reasonable maintenance plan to ensure its continued operation. Although it is possible that the device may break down and require a temporary return to strip searches, this outcome is too speculative (and infrequent) to amount to a cognizable claim. The Consent-to-Treat form omitted or changed the objectionable language, and added language pertaining to medications-these are essentially the changes requested by Plaintiffs-and there was no indication at trial that the Defendants intended to return to the old consent forms.

9. Plaintiffs' other claims are not mooted by the recent policy changes. The vast majority of these changes occurred on the eve (or even during) trial and thus have yet to become established practice. For instance, Defendants themselves acknowledged that the intended changes to the polygraph, SMS, and CMS procedures were not yet fully implemented. As noted above, the Court finds that Defendants have made good faith efforts to improve the program in various ways and intend to convert these new policies into established practice. This good faith finding alone, however, is insufficient to meet the heavy burden of showing that there is no reasonable expectation that past policies will be repeated, particularly as Defendants have maintained throughout this litigation that their past policies were entirely adequate. In addition, Plaintiffs maintain that even the new procedures are, for the most part, constitutionally inadequate. Thus, the Court will reach conclusions of law based on both the old and the new procedures in these areas.

**The Conditions of Confinement**

10. Facility administrators are afforded wide latitude to maintain institutional security, internal order, and ensure the protection of patients and staff. *See Youngberg, 457 U.S. at 322-23; West, 333 F.3d at 748.* Professional decisions made by appropriately trained personnel are entitled to a presumption of correctness. *See Youngberg, 457 U.S. at 324.* Measures employed by institutions to ensure security and order are permissible non-punitive interventions. *See id at 322-24.*

**\*16** 11. Here, there is an established history of patients acting in threatening and assaultive ways toward the staff and other patients at the TDF. Contraband items that could be used as weapons have been found. In addition, the criteria for being detained at the TDF include the commission of at least one sexually violent act, and previous violent acts are important predictors of future violence. *See Kansas v. Hendricks, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)* (citations omitted). Indeed, the large majority of patients at the TDF have repeatedly engaged in acts of sexual violence, some with adults. Most TDF patients, however, do not appear to be generally violent, but rather target specific victims, most often children. Thus, it cannot be said that this is a population particularly prone to assaulting staff, and indeed the large majority of violent episodes involving patients and staff appear to be limited to a smaller cluster of patients.

12. Although the configuration of the facility and the level of restrictions may be excessive in light of this patient population, this Court has only limited discretion to review the TDF's administrative and security decisions. Defendants' decisions (with the exception of its prior policy on SMS, as discussed below) fall under the purview of reasonable professional judgment in the administration of a hybrid detention and treatment facility. Thus, whether under old or new policies, the restrictions of movement, the room and personal searches, use of the black box, use of close management status, and use of intercoms, are not substantial departures from accepted professional judgment and standards, and therefore are constitutionally permissible. Specifically, as noted above under the Findings of Fact, there are legitimate security and institutional concerns underlying these policies that indicate that professional judgment is being properly exercised.

13. The new policies pertaining to conditions of confinement, however, are clearly superior to old practices, and will likely facilitate increased patient participation in successful treatment, which is, after all, one of the main purposes of the SVP Act.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14. With regard to Defendants' procedures pertaining to the use of secured or special management status ("SMS"), the Court finds that the APA Standards (and other similar professional standards cited by the Plaintiffs) do not apply wholesale to the use of SMS. First, the concerns underlying the APA Standards, namely that the behavior in question is the product of a mental disorder, are significantly attenuated under the present circumstances because the patient population is significantly different from that found in psychiatric hospitals. *See In re Samuelson,* 189 Ill.2d 548, 244 Ill.Dec. 929, 727 N.E.2d 228, 237 (Ill.2000)(noting the differences between persons committed under the SVP Act versus te Illinois Mental Health Code); *see also In re Treatment and Care of Luckabaugh,* 351 S.C. 122, 568 S.E.2d 338, 346 (S.C.2002) (citations omitted) (noting how violent sex offenders are a different class of committable individuals). Second, the SMS procedures are significantly different from the typical use of seclusion and restraint in psychiatric hospitals. Patients at the TDF are not secluded in designated seclusion rooms, devoid of personal artifacts or other comforts, but rather are confined in their own rooms, with access to all their personal belongings. *Cf. West,* 333 F.3d at 747 (describing the different type of "therapeutic seclusion" used in the Wisconsin SVP program, where patients were placed in a room that contained only a concrete platform for a bed, and were often deprived of clothing and other personal items and amenities). In addition, patients are not physically restrained once inside their rooms.

**\*17** 15. Thus, the nature of the precipitating behavior and the actual implementation of SMS is substantially different from the types of behaviors and procedures addressed by the APA Standards. Accordingly, rigid adherence to the entire protocol specified by the APA standards is not constitutionally required. *See West,* 333 F.3d at 749 (noting that "the Constitution does not immediately fall into line behind the majority view of a committee appointed by the American Psychiatric Association" and "[i]n a world of uncertainty about how best to deal with sexually dangerous persons, there is room for both disagreement and trial-and-error."). Moreover, even if the APA Standards applied here, this is not a negligence case where any deviation from the standard of care could impose liability. *See Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir.1998)(contrasting the professional judgment standard with negligence and intentional misconduct standards). Instead, the controlling standard in a constitutional challenge requires a substantial departure from accepted practices or standards. *See*

*Youngberg,* 457 U.S. at 323. As shown directly below, the TDF's procedures are not such a substantial departure from the protocol under the APA Standards.

16. Although the APA Standards do not control the determination of what constitutes professional judgment in the context of the TDF's use of SMS, they nevertheless inform this determination. For instance, the APA Standards recommend that there be a timely and documented initial psychiatric and medical screen shortly after placement in seclusion. This recommendation appears to be universally endorsed by the psychiatric community. Indeed, there was a consensus among the testifying experts that professional judgment in this area requires, at a minium, a timely assessment of potential mental health needs. In fact, the TDF's own expert, Dr. Tardiff, specifically recommended and guided the change in policy that now clearly requires a documented psychiatric screen within one hour of placement in SMS.

17. Given the differences in patient populations and the procedures at the TDF, staff may exercise its professional judgment in applying and modifying pertinent portions of the APA Standards (and other professional standards). For instance, the TDF's decisions to allow security personnel make the preliminary determination of SMS, to have a nurse make the initial psychiatric screen, and to amend the time period for subsequent observations all reflect the exercise of professional judgment in light of the patient population at the TDF. In fact, the competing testimony provided by recognized experts in this case pertaining to the TDF's SMS procedures show that there is, at most, bona fide professional disagreement about whether, and in what fashion, the APA Standards map onto the SMS procedures at the TDF. Indeed, Defendants' key expert, Dr. Tardiff, was the chairperson on the APA Standards task force, and yet testified that they did not apply in this treatment setting. (Plaintiffs note that Dr. Tardiff's testimony may not have been the model of consistency, considering his prior testimony in a Wisconsin case, but the Court notes that the seclusion practices at the Wisconsin facility were indeed different, *see West,* 333 F.3d at 747, and that Dr. Tardiff's observation regarding patient differences was effectively supported by Plaintiffs' own experts.)

**\*18** 18. The TDF's prior policy did not clearly require a timely psychiatric and medical assessment. Even though the concerns regarding suicidality and other products of mental disorder are attenuated in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 399300 (N.D.Ill.)
**(Cite as: Slip Copy)**

population, they are certainly not entirely absent. Professional judgment dictates that patients placed in seclusion (or, under the circumstances here, quasi-seclusion is a more-appropriate term) must receive, at a minium, an initial psychiatric screen, which must be well documented for other treatment staff. Thus, the TDF's prior policy did not meet constitutional requirements on these grounds.

19. Although the Court finds that the new SMS policies are not sufficiently established to meet the high burden of mooting Plaintiffs' claims, it finds that Defendants have made a sufficient showing that the new policy is in fact being implemented at the TDF. Thus, there is no need for the imposition of the extraordinary remedy of injunctive relief, in light of Defendants' current policies and practices. Although Plaintiffs argue that the last-minute policy changes are merely temporary litigation strategy, and, moreover, the staff at the TDF lacks the ability to implement the new SMS policies effectively, the Court finds that this litigation has caused a good faith reexamination and change in the insufficient past SMS policy. Moreover, the Court finds that Defendants presented credible testimony of their intention to adhere to the recent policies presented at trial.

The Claims of Inadequate Treatment

20. As noted above, the Constitution does not require optimal treatment. *See Youngberg,* 457 U.S. at 319; *West,* 333 F.3d at 749. All that is required is minimally adequate treatment to protect a patient's liberty interests. *See Youngberg,* at 319. The TDF's treatment practices can be found unconstitutional only if the practices are such "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323.

21. In a previous opinion in this case, this Court relied on the *Youngberg* standard, but also cited Third and Eleventh Circuit authority for the proposition that an involuntarily civilly committed person is entitled to treatment that provides "a meaningful chance to improve and win his eventual release." *Hargett v. Baker,* 2002 WL 1732911, *2-3. At that early stage in the litigation, it was possible that the treatment claims articulated by Plaintiffs fell within the gap that the Supreme Court in *Youngberg* declined to address: specifically, whether an involuntarily committed person has "some general constitutional right to

treatment *per se,* even when no type or amount of training would lead to freedom." *Youngberg,* 457 U.S. at 318; *see also D.W. v. Rogers,* 113 F.3d 1214, 1218, n. 5 (11th Cir.1997). At this stage, however, it is clear that the "minimal treatment" standard articulated in *Youngberg* is the proper controlling standard. In addition, the Supreme Court has noted that the Constitution does not "prevent[ ] a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." *Kansas v. Hendricks,* 521 U.S. 346, 366, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Moreover, even if a "meaningful chance to improve" were part of the standard here, it is clear that the TDF treatment program does provide such "meaningful chance."

*19 22. The types of chronic sex offenders who reside at the TDF are notoriously difficult to treat. They suffer from extreme and difficult-to-control sexual urges, which may have complicated biological, behavioral and cognitive causal factors. Many suffer from a variety of co-morbid problems that complicate the treatment picture, such as substance abuse, mood, and personality disorders. In addition, many patients at the TDF are reluctant to seek treatment and have an extensive history of reoffending. In short, this is a chronic, severely disturbed patient population with a multiplicity of serious and complex psychiatric difficulties. This is certainly not the typical outpatient "worried well" or depressed patient, who can be successfully treated with short-term cognitive-behavioral therapy and/or antidepressant medication.

23. Thus, the clinical staff at the TDF is faced with the unenviable competing tasks of providing adequate treatment at a pace to allow sufficient progress for potential release, while simultaneously ensuring that patients are not released prematurely into the community to reoffend. The latter task is not to be taken lightly, as the recidivism rates of sex offenders are tragically high. This, of course, is the principal rationale behind the SVP Act.

24. In light of these challenging tasks, the Court finds that the treatment program and delivery of services at the TDF adequately meet constitutional requirements. Specifically, the TDF's use of arousal reconditioning and polygraph techniques are well within the bounds of professional judgment. While arguably the TDF may have over emphasized these techniques in its treatment regimen, there is certainly widespread acceptance and use of these techniques in the sex offender treatment community. Thus, it cannot be said that the TDF's use of such techniques is a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantial departure from accepted practices and standards. *See Youngberg* 457 U.S. at 323.

25. Similarly, the TDF's use of arousal-reducing medications, while perhaps not optimal, is clearly within constitutional bounds. As noted above, there is reasonable professional disagreement as to the timing, dosage, and type of medications that are most effective in reducing deviant sexual arousal. Dr. Berlin, an undisputed expert in this area, represents one end of the professional continuum on the use of anti-androgen medications, but his testimony, coupled with that of Defendants' experts, fairly shows nothing more than bona fide professional disagreements, and these seldom, if ever, amount to constitutional violations, provided there are sufficient numbers of respected professionals on each side. *Youngberg,* 457 U.S. at 322-23.

26. The low rates of treatment participation, progress, and release at the TDF are disappointing, but do not amount to constitutional violations. As noted under the factual findings, there are a multiplicity of reasons why patients do not participate in treatment, and only some of these can be laid on the doorstep of TDF policies and practices. The treatment program has a coherent overall plan and sequence, with identifiable goals and standards. This is not to say that the treatment program is ideal: particularly under past practices, certain treatment tasks were excessively time-consuming or ill-defined, such as the former "journaling" approach under Phase II.

**\*20** 27. The primary impediment, however, to achieving greater success in the program is the severity and chronicity of the patient population. Taken together, there was insufficient testimony demonstrating that the structure or administration of the treatment program was such a substantial departure from professional judgment that it amounts to constitutionally deficient treatment. *See Youngberg,* 457 U.S. at 322-23.

28. The confidentiality practices of the TDF, although, again, perhaps not optimal, do not amount to a constitutional violation. In particular, there was evidence that certain patient-therapist interactions occurred in the common areas near other patients' rooms. This lacks adequate sound privacy to maintain confidentiality, but such activities, although not desirable practice, are not such a substantial departure to trigger constitutional relief. The disclosures to the Illinois Attorney General under prior policy, although apparently excessive in light of the provisions for disclosure under the SVP Act, do not amount to a constitutional violation. For instance, there was credible testimony by Dr. Wood that he believed the disclosures were to be used by the Attorney General for preparing for court, and Plaintiffs did not present evidence to show otherwise. Moreover, this former practice has been discontinued.

29. The absence of accreditation by JCAHO or CARF does not amount to a constitutional violation. The facility clearly could benefit from further development and refinement of written policies, and accreditation by an appropriate organization may provide additional and valuable oversight. Accreditation by itself, however, is not a litmus test for the constitutionality of the practices at the TDF. Instead, the Court must look to the actual practices, and, as noted above, they pass constitutional muster for a variety of reasons.

30. Finally, the remaining claims raised by Plaintiffs in their complaint or at trial pertaining to staff training, family participation, grievance procedures, individual treatment plans, discharge planning, and educational and vocational training had thin-if any-evidentiary support at trial. Plaintiffs certainly did not establish that the TDF's practices in these areas amounted to constitutional violations.

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' demand for Declaratory Relief is GRANTED insofar as the TDF's prior SMS was unconstitutional and Defendants failed to establish that Plaintiffs' claim on this issue was moot, but any remaining claims for declaratory relief are DENIED.

Because the TDF has made the requisite showing that the new SMS policy cures the defects in the prior policy, Plaintiffs' demand for injunctive relief is DENIED with respect to this and all other claims.

IT IS SO ORDERED.

N.D.Ill.,2005.
Hargett v. Adams
Slip Copy, 2005 WL 399300 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2257682 (Trial Motion, Memorandum and Affidavit) Defendants' Response To Plaintiffs' ""Motion for Protective Order" (Jan. 14, 2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 15
Slip Copy, 2005 WL 399300 (N.D.Ill.)
(Cite as: Slip Copy)

• 2003 WL 23820053 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Response to Defendants'
Second Motion to Reset the Expert Discovery
Schedule (Dec. 15, 2003)

• 2003 WL 23820051 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Emergency Motion to
Remove the Restraint on Their Counsels' Speech and
Lift the Protective Order Entered October 21, 2003.
(Oct. 29, 2003)

• 2003 WL 23820048 (Trial Motion, Memorandum
and Affidavit) Defendants' Response To Plaintiffs'
""Motion To Compel the Production of Master Files"
(Sep. 16, 2003)

• 2003 WL 23820045 (Trial Motion, Memorandum
and Affidavit) Defendants' Response to Plaintiffs'
""Motion to Reset Schedule" (Sep. 08, 2003)

• 2003 WL 23820047 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum In Support of
Their Motion To Reset Schedule (Sep. 04, 2003)

• 2003 WL 23820043 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum of Law in
Support of Their Cross Motion for A Declaration of
Rights Regarding Expert Witness and Other Relief
(Aug. 26, 2003)

• 2003 WL 23820042 (Trial Motion, Memorandum
and Affidavit) Defendants' Motion for Protective
Order (Aug. 22, 2003)

• 2003 WL 23820038 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Response to Defendants'
Emergency Motion to Compel (May. 06, 2003)

• 2003 WL 23820041 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Response to Defendants'
Emergency Motion to Compel (May. 06, 2003)

• 2002 WL 32682704 (Trial Pleading) Answer and
Affirmative Defenses to Class Action Complaint
(Sep. 06, 2002)

• 2002 WL 32682700 (Trial Motion, Memorandum
and Affidavit) Defendants' Reply in Support of
Motion to Dismiss (Jul. 12, 2002)

• 2002 WL 32682696 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum of Law in
Opposition to Defendants' Motion to Dismiss (Jun.
25, 2002)

• 2002 WL 32682693 (Trial Motion, Memorandum
and Affidavit) Reply Memorandum in Support of
Motion to Maintain Class Action (Jun. 12, 2002)

• 2002 WL 32682687 (Trial Motion, Memorandum
and Affidavit) Response to Plaintiffs' Motion for
Class Certification (Jun. 03, 2002)

• 2002 WL 32682682 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Motion to Dismiss (May. 21, 2002)

• 2002 WL 32682675 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Motion to Maintain Class
Action (Mar. 27, 2002)

• 2002 WL 32681617 (Trial Pleading) Class Action
Complaint (Feb. 27, 2002)
• 1:02CV01456 (Docket) (Feb. 27, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRAD LIEBERMAN (#837914), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 2009 |
| v. | ) | |
| | ) | Judge Mark Filip |
| | ) | |
| TIMOTHY BUDZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Brad Lieberman is a civil detainee in the custody of the Illinois Department of

Human Services. At the time he initiated this action, Plaintiff was facing commitment under the

Illinois Sexually Violent Persons Commitment Act, 725 ILCS § 7/1, *et seq.*; he has since been

formally committed following, *inter alia*, a jury trial at which he was found to pose a sufficient

continuing threat to society to warrant civil commitment as a sexual predator. *See generally*

*Kansas v. Hendricks*, 521 U.S. 346 (1997) (upholding the constitutionality of such civil

commitment regimes where preconditions are met). Plaintiff has brought this *pro se* civil rights

action pursuant to 42 U.S.C. § 1983 concerning alleged mistreatment and inadequate conditions

of confinement at the Joliet Treatment and Detention Facility. This matter is before the Court for

consideration of certain Defendants' motions to dismiss the complaint for failure to state a claim.

For the reasons stated in this order, the motions are granted in part and denied in part.

**I.     INTRODUCTION**

By way of introduction, the *pro se* plaintiff in this case, Mr. Bradley Lieberman (also,

"Plaintiff") has intermittently been a figure of some notoriety on the legal landscape in

Chicagoland for almost thirty years now. In 1979 and 1980, Mr. Lieberman committed a highly-

publicized series of violent rapes over several months in Cook and Lake Counties—in the communities of Skokie and Highland Park, Illinois, as well as on the north side of Chicago. *See generally, e.g., The People of the State of Illinois v. Lieberman*, 542 N.E.2d 894 (Ill. App. Ct. 1989). The rapes became particularly notorious, at least in part, because of the manner in which Mr. Lieberman committed the crimes. *See, e.g., id.*, at 897. Mr. Lieberman, a young man from an affluent Chicago suburb, would devise relatively sophisticated ruses to gain entry to the homes of his victims. *See, e.g., People of the State of Illinois v. Lieberman*, 438 N.E.2d 516, 518 (Ill. App. Ct. 1982). Oftentimes, these ruses involved Mr. Lieberman posing as a plumber or as a law enforcement officer, the latter of which involved his use of various "police" badges confiscated from him at the time of his initial arrest. *See, e.g., id.* at 518-19. The *modus operandi* for these crimes was strikingly similar—after gaining entry by posing as a plumber (or off-duty police officer who was working part-time as a plumber), Mr. Lieberman would take his victim on a tour of her apartment or home looking for an alleged "leak" that had been reported. *See, e.g., Lieberman v. Washington*, 128 F.3d 1085, 1090-91 (7th Cir. 1997). (Presumably this allowed Mr. Lieberman to verify that the woman-victim was alone.) Mr. Lieberman then would inform the victim that the leaking pipe appeared to be in or behind a bedroom closet, and he would request his victim to remove her belongings from the closet. *See, e.g., id.* at 1090. In each case, while the women were emptying their closets, Mr. Lieberman would grab his victim around her neck from behind. *See, e.g., id.* As one victim described, after grabbing her from behind, Mr. Lieberman "held a knife to her throat, and told her that if she struggled he would kill her. He added that he had previously 'cut up' another girl and that she should just close her eyes, take her clothes off, and relax." *Id.; see also, e.g., Lieberman*, 438 N.E.2d at 518 (chronicling how Plaintiff would

"occasionally threaten[] to kill" one victim with the knife while raping her "if she did not obey").
The last of these violent rapes—of a foreign exchange student who was residing in Highland Park,
Illinois, whom Mr. Lieberman bound with an electrical cord—occurred after Mr. Lieberman's
parents had secured bond for him on the series of Cook County/Skokie rape charges. *See, e.g.*,
*Lieberman*, 128 F.3d at 1088. Mr. Lieberman was apprehended after the Highland Park rape
when two schoolboys, Matthew Adler and David Schaefer, noted Mr. Lieberman leaving the
home where he committed the rape and wrote down the license plate number and make of the car
he was driving, a brown Camaro. *See, e.g., id.* at 1088-89. Mr. Lieberman, always correctly
described by his victims as a large, hulking, muscle-bound man, was arrested later that day in the
brown Camaro with the license plate that the boys had transcribed. *See, e.g., id.* at 1088.

Mr. Lieberman was convicted by juries in both Lake and Cook Counties. He steadfastly
denied any involvement in the rapes. The evidence against him, as repeatedly noted by reviewing
courts, was overwhelming. *See, e.g., Lieberman*, 128 F.3d at 1093 (discussing the "wealth of
evidence of Lieberman's guilt"); *id.* (discussing the "overwhelming evidence of Lieberman's guilt
presented during the Lake County trial"); *id.* at 1095 (discussing the "abundance of evidence
proffered at trial" concerning the Cook County rape convictions); *id.* at 1096 (discussing the
"overwhelming evidence of Lieberman's guilt in the Cook County" prosecution) (internal
quotation marks omitted).

At trial, the evidence against Mr. Lieberman included extensive eyewitness testimony,
often from victims who observed him at immediate range for as much as a half-hour, and who
typically identified him in photospreads and again at line-ups; the striking similarity of the *modus
operandi* used to commit the crimes; corroborating physical evidence in the form of, for example,

3

recovered items such as the knife and badges variously used in the rapes; and the matched automobile type and license plate number that led to Mr. Lieberman's final apprehension following the Highland Park rape while Mr. Lieberman was on bond for the Cook County rapes. *See, e.g., Lieberman*, 128 F.3d at 1088-90; *Lieberman*, 438 N.E.2d at 520. Mr. Lieberman also offered various alibis to the crimes which were affirmatively disproved by third-party witnesses. For example, Mr. Lieberman testified that he was at an automobile repair shop at the time of the Lake County rape; however, repairmen from that shop testified to the falsity of the alibi and explained that Mr. Lieberman's mother had repeatedly asked them to provide inaccurate documentation that would support the eventual alibi attempt. *See Lieberman*, 128 F.3d at 1089; *id.* at 1093. By way of another example, Mr. Lieberman offered an alibi to another rape predicated on his purported presence at the relevant time at his job at the Lutheran General Hospital in Park Ridge, Illinois; at trial, the State introduced evidence showing that Mr. Lieberman, in fact, was not working at the time, to which Mr. Lieberman responded that he "apparently" had not been working on the day in question. *See Lieberman*, 438 N.E.2d at 520. Mr. Lieberman was convicted by two juries and variously sentenced to forty years imprisonment, with some concurrent sentences within that forty-year span. *See, e.g., People of the State of Illinois v. Lieberman*, 772 N.E.2d 876 (Ill. App. Ct. 2002) (discussing sentences).

While incarcerated, Mr. Lieberman was then the subject of columns written by Mike Royko, a widely-read, Pulitzer-Prize winning columnist who variously wrote for decades in the Chicago Daily News, the Chicago Sun Times, and the Chicago Tribune. At least some of these columns are collected at the website of "The Awareness Center," which explains that is a Jewish Coalition Against Sexual Abuse/Assault. *See* http://www.theawarenesscenter.org (under tab for

"Sexual Assault in Jewish Communities (Rape)," "The Case of Brad Lieberman"). In these columns, Mr. Royko critically addressed complaints Mr. Lieberman had been expressing about his life in jail—which Mr. Royko explained had been relayed by a state legislator whom Mr. Lieberman had sought to use to improve his situation—as against the statements about the rapes from Mr. Lieberman's victims.

Mr. Lieberman reappeared prominently on the Chicago legal landscape in the year 2000. At that time, after serving somewhat less than half of his criminal sentence, he was set to be released. *See In re Detention of Brad Lieberman*, 776 N.E.2d 218, 221 (Ill. 2002). The State of Illinois designated him for consideration for continuing civil detention pursuant to the Illinois Sexually Violent Persons Act, 725 ILCS 207/1 *et seq.* (also "SVPA"). *See id.*, 776 N.E.2d at 221. Mr. Lieberman argued that an alleged technicality in the legislation, caused by an oversight of the Illinois General Assembly, precluded consideration of people like him, who had been convicted of "rape," for designation under the Sexually Violent Persons Act. *Id.* at 222. The trial judge, then-Cook County Circuit Court Judge (and present Illinois Supreme Court Justice) Thomas R. Fitzgerald, rejected that contention. *See id.* at 222. The Illinois Court of Appeals, however, found in Mr. Lieberman's favor—holding that the failure to specifically mention "rape" as a sexually violent crime was a legislative "oversight" that precluded consideration of Mr. Lieberman for designation as a "Sexually Violent Person." *See In re Detention of Brad Lieberman*, 745 N.E.2d 699, 708 (Ill. Ct. App. 2001). That decision was reversed by a Illinois Supreme Court, however, with Justice Mary Ann McMorrow writing for a unanimous court. *See In re Detention of Brad Lieberman*, 776 N.E.2d at 228 (holding that "a conviction for the crime of rape constitutes a 'sexually violent offense' under the applicable version of the [Illinois SVPA]"). In 2006, a Cook

5

County jury found that Mr. Lieberman (who had been detained throughout pending trial) warranted civil commitment under the SVPA.

Mr. Lieberman presently has filed numerous *pro se* law suits. (According to the Clerk's Office, he has filed about twenty). This is one of those suits. Defendants have made limited motions to dismiss, and for the most part have not addressed arguments (concerning claim-splitting or the first-filed rule, for example) that might bear on the propriety of the multiplicity of filed suits, as those arguments often are resolved at the summary judgment stage.

Accordingly, the Court turns to the motions to dismiss in the pending case. As explained, the motions are granted in part and denied in part.

## II.  STANDARD OF REVIEW

Precedent teaches that *pro se* complaints are to be generously construed. *See McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000) (collecting cases). They should be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See id.* Fact pleading is not necessary to state a claim for relief. *See Thompson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004).

When considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the Court takes the allegations in the complaint as true, viewing all facts, as well as any inferences reasonably drawn therefrom, in the light most favorable to Plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the

6

factual allegations. *See, e.g., Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996) (citations omitted).

## III.    FACTUAL CONTENTIONS

The Court takes the following factual contentions from the operative complaint.  The Court takes no position, of course, on whether the allegations are in fact true or not.

Plaintiff is a civil detainee, committed as a "sexually violent person" pursuant to 725 ILCS § 207/5 *et seq*, which is more commonly known as the Illinois Sexually Violent Persons Act. (See Liberty Defendants' Exhibit A, Commitment Order dated April 26, 2006.)  Under that statute, a sexually violent person is someone who has been convicted of a sexually violent offense and who is proven and found to be "dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence" again. 725 ILCS 207/5(f).  Plaintiff previously was held at the Joliet Treatment and Detention Facility (also, "TDF") from September 2000 until the summer of 2006, when he was transferred along with all other SVPA detainees to the new facility in Rushville, Illinois.  (D.E. 53.)

In this case, Plaintiff sues fifteen employees and contractors of the Illinois Department of Human Services (also, "DHS").  Defendants include: (1) Joliet TDF Director Timothy Budz; (2) Bureau Chief Thomas Monahan; (3) Secretary Linda Baker; (4) Security Guard James Kitanski; (5) Security Supervisor Sy Hopson; (6) Security Director Robert Glotz; (7) Therapist David Kregel; (8) Therapist Shan Jumper; (9) Security Supervisor Shane Tooley; (10) Security Supervisory Douglas Collins; (11) Administrative Assistant and Grievance Officer Fran Aden;

(12) Therapist Travis Heinze; (13) Clinical Director Raymond Woods; (14) Security Guard G.C. Henderson; and (15) Liberty Behavioral Health Company.[1]  (D.E. 1.)

By Minute Order of October 30, 2003, Judge Leinenweber, who was then presiding in this case, dismissed certain claims—mostly concerning alleged official misconduct or misuse of public funds and challenges to the constitutionality of the Sexually Violent Persons Act.  Plaintiff alleges the following, remaining facts, which must be accepted as true for purposes of Defendants' motions.

Preamble to Counts One through Five:  The Joliet TDF was located within the confines of the old Joliet Correctional Center.  (D.E. 1 ¶ 2.)  Plaintiff was under the constant watch of uniformed officers and surveillance cameras.  (*Id.* ¶ 5.)  Disciplinary rules for sexually violent persons were identical to the disciplinary procedures for convicted prisoners.  (*Id.* ¶ 6.)  Detainees were "written up" for the rule infractions and, when facing discipline, Plaintiff was not afforded advance notice of the charges.  (*Id.* ¶ 9.)  In many cases, the charged rule violations allegedly were "contrived, fabricated and falsified."  (*Id.*)  The Behavior Committee that adjudicated the disciplinary reports supposedly had no interest in fact-finding; rather, the Committee's goal was to punish detainees and to create a record justifying their continued confinement.  (*Id.* ¶¶ 9, 11.)  Whenever Plaintiff was in segregation status, he was required to wear a jumpsuit and handcuffs when leaving the segregation unit.  (*Id.* ¶ 11.)

---

[1]  Defense counsel has entered an appearance for Carol Adams.  However, Carol Adams does not appear to be a proper Defendant in this case; she is not named in the Complaint.

Grievances were routinely disregarded without any substantive review. (*Id.* ¶ 10.) In addition, Defendants Budz, Monahan, Glotz, Kegel, Heinze, Jumper, and Woods frequently retaliated against Plaintiff for his grievances and lawsuits. (*Id.* ¶ 13.)

The water at the Joliet TDF was polluted with radon, radium, and other contaminants. (*Id.* ¶ 15.)

It was the policy of the DHS and Liberty Healthcare to treat detainees who signed a form consenting to treatment better than those who refused to sign the consent form. (*Id.* ¶ 17.) Plaintiff maintains that he would not sign the consent form because he was unwilling to concede that he is a sexually violent person. (*Id.* ¶ 14.) (To this day, despite the overwhelming evidence of his guilt, Mr. Lieberman seemingly denies having ever committed any sexual crimes.) As a result of refusing to sign the form, Plaintiff was subjected to conditions he characterizes as "punishment." (*Id.* ¶ 9.) Pretrial detainees were housed with persons already adjudicated as sexually violent. (*Id.* ¶ 18.)

Incoming and outgoing mail, both legal and personal, supposedly was often suspiciously "lost." (*Id.* ¶ 13.)

In Count One, Plaintiff charges that he asked certain staff members to testify on his behalf regarding his day-to-day conduct, attitude, and demeanor. (*Id.* ¶ 21.) One officer, Defendant Kitanski, indicated that he preferred not to be called. (*Id.*) Plaintiff did not pester Kitanski; he simply thanked him and walked away. (*Id.*) However, the following day, Plaintiff supposedly was called to appear before the "Behavior Committee" without any advance notice. (*Id.*) Defendants Heinze, Kegel and Tooley, committee members, refused to allow Plaintiff to read Kitanski's false disciplinary report or to call witnesses and found him guilty even though they had

9

not yet even decided on a charge. (*Id.* ¶¶ 22-23.) Plaintiff contends that he was ultimately punished for the offense of giving false information to an employee. (*Id.* ¶¶ 23-24.)

Two days later, Kitanski filed another false disciplinary report. (*Id.* ¶ 32.) The same Behavior Committee members once again denied Plaintiff due process in the ensuing disciplinary proceedings. (*Id.* ¶ 33.) He was found guilty and certain privileges were suspended. (*Id.* ¶ 33.) The disciplinary reports were supposedly cited as one basis for finding Plaintiff deserving of civil commitment under the SVPA. (*Id.* ¶ 38.)

Plaintiff filed grievances challenging the disciplinary action. (*Id.* ¶ 34.) Defendants Baker, Budz, Glotz, Woods and Hopson denied the grievances, ignoring certain evidence and violating the Administrative Code's time frame. (*Id.* ¶¶ 34-36.)

Defendant Kegel was unlicensed and unqualified to act as Plaintiff's primary therapist; he was terminated when it was discovered that he was practicing without a license. (*Id.* ¶ 39.) Plaintiff contends that any decisions made by Kegel concerning Plaintiff should therefore be rendered "null and void." (*Id.*)

In Count Two, Plaintiff contends that the manner in which visitation was conducted at the Joliet TDF was more punitive and restrictive than at a maximum security prison. (*Id.* ¶ 42.) The facility put cumbersome procedures in place concerning advance registration. (*Id.* ¶¶ 43-44.) Plaintiff was forced to submit to a strip search before and after visits. (*Id.* ¶ 45.) Security cameras monitored all visits visually and audially. (*Id.* ¶ 47.) Security officers often stationed themselves a few feet away from Plaintiff and his visitors, disrupting the visit and ordering searches of Plaintiff's visitors after they used the washroom. (*Id.*)

10

In May of 2002, Plaintiff filed a supplemental complaint in one of his cases alleging a long-term pattern of harassment on the part of Defendant Collins. *See Lieberman v. Budz*, No. 00 C 5662 (N.D. Ill.), D.E. 34. Although the Court (Leinenweber, J.) directed that Plaintiff file a separate lawsuit, *Id.*, D.E. 44, Collins was served with the pleading.

On December 21, 2002, Collins ordered Plaintiff to use the washroom in his housing unit rather than the visiting room bathroom during a visit. (D.E. 1 ¶ 52.) Plaintiff protested but followed Collins's orders. (*Id.*) When Plaintiff returned to the visiting room, another staff member confirmed that Plaintiff did not have to leave the visiting room and use his own bathroom. (*Id.*) That night, on Collins's orders, security aides Butler, Olson, Tolbert and Pickett searched Plaintiff's cell for two and a half hours, leaving the room in complete disarray. (*Id.*) Collins allegedly continued to harass Plaintiff's visitors afterwards. (*Id.* ¶ 53.)

On January 11, 2003, Plaintiff approached the control room where Collins was situated and asked to speak to him about the perceived harassment. (*Id.* ¶ 55.) Collins yelled, "I don't know what you're talking about" and shut the chuck hole door in Plaintiff's face. (*Id.*) Plaintiff later received a disciplinary report charging him with intimidation and threats although he had not threatened or intimidated Collins. (*Id.* ¶ 56.)

On January 16, 2003, Defendant Jumper and other John Doe members of the Behavior Committee conducted a hearing. (*Id.* ¶ 60.) They informed Plaintiff of a second write-up for additional threatening or intimidating comments Plaintiff had allegedly made to Collins and found him guilty of the offenses, despite exonerating evidence which allegedly should have been believed. (*Id.* ¶¶ 60-62.)

Defendant Henderson has likewise allegedly filed unwarranted disciplinary reports. (*Id.* ¶ 69.) Plaintiff specifically challenges a disciplinary report dated February 8, 2003, for an unspecified rule infraction after Plaintiff's visitor kissed his hand. (*Id.* ¶¶ 69-70.) Defendants Aden and Budz denied Plaintiff's subsequent grievance. (*Id.* ¶ 73-74.)

In Count Three, Plaintiff alleges that Defendants Budz, Liberty Healthcare Company, Glotz, Monahan, Baker, Woods, Kegel and others retaliated against Plaintiff for his multiple lawsuits. (*Id.* ¶ 84.)

In November 2001, Defendant Glotz refused to accept the delivery of dietary supplements that had been ordered for Plaintiff. (*Id.* ¶ 85.) The next month, Plaintiff received a written recommendation from his endocrinologist recommending or at least permitting the protein supplements, but TDF officials remained steadfast in their refusal. (*Id.* ¶¶ 86-88.) One of Plaintiff's attorneys contacted DHS counsel. (*Id.* ¶ 88.) Immediately thereafter, in direct retaliation for Plaintiff's efforts, he was called before a behavior committee for giving false information to an employee in connection with the doctor's orders. (*Id.* ¶ 89.) Plaintiff received no advance notice of the charges. (*Id.* ¶ 91.) Defendant Kegel berated Plaintiff for contacting DHS counsel. (*Id.* ¶ 90.) Plaintiff was found guilty of misrepresenting the doctor's recommendation as a doctor's order and he was placed in segregation. (*Id.* ¶¶ 92-93.) In reality, Plaintiff contends, Defendants were angry because Plaintiff had gone over their heads. (*Id.* ¶ 95.) While in segregation, Plaintiff could not exercise and was denied all personal property. (*Id.* ¶¶ 96-97.)

In Count Four, Plaintiff asserts that Kegel intentionally lodged false information in Plaintiff's medical file to justify his commitment under the Sexually Violent Persons Act. (*Id.* ¶¶

103, 106.) The other Defendants supposedly made no efforts to rectify Kegel's alleged errors after he was discharged from the facility. (*Id.* ¶¶ 108-11.)

As noted *supra*, Count Five, to the extent it challenged the constitutionality of the Sexually Violent Persons Act both on its face and as applied to Plaintiff, was dismissed by Minute Order of October 30, 2003. (D.E. 9.) In that count, Plaintiff also complains of nutritionally inadequate and bad-tasting food, problems with his mail, cell searches, and excessive noise. (D.E. 1 ¶¶ 114-18.)

## IV.   ANALYSIS

### A.   General Alleged Pleading Deficiencies

Defendants have filed a motion to dismiss the complaint for failure to comply with Fed. R. Civ. P. 8(e)(1), which requires that pleadings be "simple, concise, and direct," as well as Fed. R. Civ. P. 10(b), which requires that each claim be stated in separate, numbered paragraphs.

As noted above, the Court must construe *pro se* complaints generously. "Usually . . . [plaintiffs] need do no more than narrate a grievance simply and directly, so that Defendant knows what he has been accused of." *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005). The Complaint in this case satisfies this low standard: although the Complaint is meandering and unorganized, Plaintiff's basic claims are not difficult to ascertain. These arguments do not justify dismissal of the Complaint.

### B.   Failure to State a Claim

Defendants have moved to dismiss the complaint for failure to state a claim. Their motions are granted in part and denied in part, for the reasons explained below.

13

### 1.    Prison-Like Conditions

Plaintiff maintains that the Joliet TDF was operated like a prison. The Constitution required Defendants to house Plaintiff under "humane conditions" and to provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, \*2 (N.D. Ill. Mar. 3, 2006) (Conlon, J.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)) (internal quotation marks omitted). Like a pretrial detainee, a sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 320-21 (1982). In this regard, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.*; *see also id.* ("At the same time, this standard is lower than the 'compelling' or 'substantial' necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety."). "[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).

Detainees may nevertheless "be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (citing *Allen v. Illinois*, 478 U.S. 364, 373-74 (1986)). In this regard, the Seventh Circuit has taught:

> Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by *Bell v. Wolfish*, 441 U.S. 520 (1979), is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rules, which are designed to assure safety and security.

14

*Allison*, 332 F.3d at 1079.

Furthermore, in *Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005), a sweeping class action lawsuit brought by the American Civil Liberties Union relating to the treatment of sexually violent committees, Judge Leinenweber found that although the "prison-like" environment of the Joliet TDF was not optimally conducive to a "positive therapeutic milieu," the setting did not significantly impede the delivery of effective treatment. *Id.*, 2005 WL 399300 at *2. The fact that Joliet TDF was operated much like a prison did not, itself, violate Plaintiff's constitutional rights. Plaintiff's complaints about the overarching conditions of the prison—*i.e.*, that they are prison-like—appear to have been squarely addressed in *Hargett*. While a plaintiff can avoid the consequences of a general finding in a class action suit by advancing a claim that is materially different from the issues resolved in the class action, the claim as pleaded appears to run foursquare into *Hargett*, which resolved this contention as comprehensively litigated by the ACLU. This claim is dismissed without prejudice. *Id.* at *14.

### 2.    The Water at Joliet TDF

The judges of this district have addressed numerous complaints by Illinois prisoners that the water is unsafe in the Joliet area, and those courts have uniformly held that these complaints about the water are not actionable under 42 U.S.C. § 1983. *See, e.g., Ford v. Page*, No. 00 C 1044, 2001 WL 477149, at **4-5 (N.D. Ill. May 3, 2001). More important, the Seventh Circuit has rejected this same claim:

> Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. *McNeil v. Lane* . . . [16 F.3d 123, 125 (7th Cir. 1993)]; *Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990). It would be inconsistent with this principle to impose

15

upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures.

*Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001); *see also id.* at 472 (stating that the constitution does not require a confining institution "to provide a maximally safe environment, one completely free from pollution or safety hazards") (citing *McNeil*, 16 F.3d at 125; *Steading v. Thompson*, 941 F.2d 498 (7th Cir. 1991); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988); *Clemmons v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir. 1992) (en banc)). Plaintiff's claim that he had to drink and wash with contaminated water—*i.e.*, the same water used by the area's general population, including the overwhelming majority of women, men, and children who are not confined there as sexually violent persons but simply live and work in the area—does not state a cognizable claim. This claim is dismissed without prejudice.[2]

### 3. Denial of Privileges for Refusing to Sign a Request for Treatment

Plaintiff claims that he was denied certain privileges and amenities because he refused to sign a form agreeing to participate in the sex offender treatment program; those inmates who agreed to therapy received preferential treatment. (D.E. 1 ¶ 17.) Defendants' motion to dismiss this claim is granted.

---

[2] In his brief, at times Mr. Lieberman appears to attempt to add allegations that the water in Joliet caused him to have skin cancer. Precedent teaches that it is not appropriate to attempt to amend a complaint in a response brief. *See, e.g., Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996) (stating that a complaint may not properly be amended by a response to a motion to dismiss); *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) (same). Mr. Lieberman's is free to amend his complaint as to this issue, although the claim (that the water caused him alleged skin cancer) seems like a difficult one on which to establish any triable case—given that: (1) over 100,000 people live in Joliet and most of them never get skin cancer; (2) numerous people get skin cancer elsewhere.

In *Hargett, supra*, Judge Leinenweber found in favor of the treatment program on identical claims. Following a full trial, in a class action suit ably litigated by the ACLU on behalf of a class that encompassed Mr. Lieberman, Judge Leinenweber concluded that it was proper to base the receipt of privileges on "participation in treatment" and good behavior. Specifically, Judge Leinenweber ruled:

> The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff do not initially know the potential risks of a new patient. In addition, making privileges contingent on good behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior.

*Hargett*, 2005 WL 399300 at *8.

Pursuant to *Hargett*, Judge Lefkow of this district has recently dismissed a plaintiff's claim that he was subject to putative "retaliation" in the form of greatly reduced amenities for refusing to sign a consent-to-treatment form: "[B]ecause Plaintiff has not signed up for the treatment program, he is not entitled to the same privileges, including better housing, as those residents who have agreed to treatment. Because this issue has already been addressed and decided in *Hargett*, Plaintiff's claim . . . is dismissed." *See Williams v. Monahan*, No. 06 C 2447 (N.D. Ill.), D.E. 5 (Minute Order of June 30, 2006) at 2 (Lefkow, J.).

In short, because Plaintiff refused to sign up for the treatment program, he was not entitled to the same privileges and amenities as those detainees who agreed to undergo treatment. This court agrees with the rulings made by Judges Leinenweber and Lefkow and adopts their shared conclusion that the preferential treatment of those who agree to treatment does not violate the

17

Equal Protection Clause. Moreover, and independently, as Mr. Lieberman was part of the class in the Hargett suit, the ruling in that case is binding upon him.[3]

**4.    Housing of Pretrial Detainees with Committed Persons**

Plaintiff asserts that Defendants made "absolutely no attempt to comply" with the dictates of Title 59, Ill. Admin. Code § 299.200, which requires that "detained" persons be kept separate from "committed" persons. (D.E. 1 ¶ 18.) First, precedent is clear that the mere fact that state rules or statutes may have been violated does not in and of itself amount to a constitutional violation or give rise to an actionable Section 1983 claim. *See, e.g.*, *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) (collecting cases). In this regard, the Seventh Circuit has stressed that, "[t]he federal government is not the enforcer of state laws." *Pasiewicz v. Lake Co. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001).[4] Furthermore, Plaintiff alleges no injury resulting from the commingling of committed and pretrial detainees. In the absence of any allegation that a constitutional right was infringed on account of the housing assignments, Plaintiff has no viable cause of action regarding the commingling of pretrial and adjudicated civil detainees. Nor has Plaintiff, who is no longer a pretrial detainee, standing to sue for injunctive relief.

_____

[3] Again, a class adjudication is not invariably binding on a class member—at least where his claim is materially different than the one adjudicated in the class proceeding. However, Mr. Lieberman's claim—*i.e.*, that it is unconstitutional to deny him certain privileges or advantages if he refuses to participate in treatment after a jury found him to "dangerous because he or she suffers from a mental disorder that makes it substantially probable that . . . [he] will engage in acts of sexual violence" again, 725 ILCS 207/5(f)—was resolved by Judge Leinenweber. This is not a fact-specific question; it is one fairly resolved as a principle of law, and it was resolved against the class by Judge Leinenweber.

[4] In addition, and independently, even if this Court were ignore the fact that Section 1983 is unavailable to addressed supposed state law errors (otherwise, virtually every case could be litigated in federal court), the regulation Mr. Lieberman cites only encourages the separation of pretrial and committed persons "to the extent possible considering operational, programmatic and security needs." Title 59, Ill. Admin. Code § 299.200.

### 5.    Problems with Mail

Plaintiff may proceed on his claim that DHS officials have supposedly interfered with his

incoming and outgoing mail.  Prisoners have protected First Amendment rights to send and

receive mail. *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  In addition, prisoners have a

constitutional right under the First Amendment to meaningful access to the courts. *Id.* (citing

*Lewis v. Casey*, 518 U.S. 343 (1996)).  To prove a violation of the right of access to the courts,

Plaintiff ultimately will need to make various showings: The Supreme Court teaches that the right

of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have

suffered injury by being shut out of court." *Christopher v. Harbury,* 536 U.S. 403, 415 (2002).

Thus, to succeed on a denial of access case, the "plaintiff must identify a 'nonfrivolous,'

'arguable' underlying claim." *Id.* (quoting *Lewis*, 518 U.S. at 353 and n.3).  In this regard,

precedent further teaches that "[t]o prove a violation [of the constitutional right of access to the

courts], a plaintiff must demonstrate that state action hindered his or her efforts to pursue a non-

frivolous legal claim and that consequently the plaintiff suffered some actual concrete injury."

*May v. Sheahan*, 226 F.3d 876, 883 (7th Cir.2004) (citing *Lewis,* 518 U.S. at 350-54).

For the present time, at least, Mr. Lieberman has stated a putative claim.  While a more

fully developed record may reflect isolated instances of mishandled mail rather than intentional

interference or rampant problems, Plaintiff has articulated a colorable constitutional claim.

### 6.    Disciplinary Proceedings

In Count One, Plaintiff challenges two disciplinary reports which he claims were

fabricated.  Plaintiff additionally contends that he was not afforded due process in connection with

either report. The Court agrees with Defendants that Plaintiff may be disciplined for rule infractions; however, the Court disagrees that Plaintiff is not entitled to procedural due process.

In *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002), the Seventh Circuit applied the seminal case of *Sandin v. Connor*, 515 U.S. 472 (1995), to civilly detained individuals. In *Sandin*, the Supreme Court held that state-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484 (citations omitted).

Although *Sandin* involved prison discipline, the Seventh Circuit applied the same reasoning to the civil detainee setting. In *Thielman*, a Wisconsin detainee committed under that state's sexually violent persons statute challenged the use of restraints during transport from the detention facility to an outside medical hospital or clinic. *Thielman* upheld the use of restraints, noting,

> [s]omeone is involuntarily committed, generally speaking, because his mental illness makes him a safety risk to himself or others. Accordingly, his commitment entails some sort of restraint, and that restraint is often significant. The *Sandin* rule simply gives state officials some discretion in determining how much restraint is necessary in a given situation . . . .

*Thielman*, 282 F.3d at 483 n.1. Moreover, the Seventh Circuit has held that civil detainees, just like prisoners, are subject to security measures typically used at correctional facilities. *See Allison*, 332 F.3d at 1079 ("If pretrial detainees may be subjected to the ordinary conditions of confinement, as *Wolfish* holds, then so may persons detained before trial as sexually dangerous persons.").

20

In *West, supra,* the Seventh Circuit explicitly addressed discipline and related behavioral restrictions as to the State of Wisconsin's Sexually Violent Persons Commitment Program and held:

> To the extent that plaintiffs are uncontrollably violent, and thus pose a danger to others, Wisconsin is entitled to hold them in segregation for that reason alone; preserving the safety of the staff and other detainees takes precedence over medical goals. So we said in *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002) . . . . Just as a pretrial detainee may be put in isolation–indeed, may be *punished* for violating institutional rules, provided that the jailers furnish notice and an opportunity for a hearing, see *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002)–so a civil detainee may be isolated to protect other detainees from aggression. Institutions may employ both incapacitation and deterrence to reduce violence within their walls . . . . (emphasis in original).

*Id.*, 333 F.3d at 748.

Illinois' SVP regulations themselves do not create any additional rights. To the contrary, the Illinois Administrative Code, *see* 59 Ill. Admin. Code 299.620 *et seq.*, gives the staff considerable discretion with regard to institutional disturbances, safety and security measures, and room confinement. The rules also provide for differing management levels, from "secure management" status to "high privilege" status. *See* Section 299.600. The withdrawal of positive incentives is intended to discourage misbehavior and encourage appropriate activities. *Id.*

Nevertheless, despite the availability of disciplinary sanctions, as well as the wide latitude afforded the TDF staff in their management of the detainees in their care, the Court cannot adopt Defendants' implicit contention that they must be granted *carte blanche* to discipline civil detainees. Even in upholding disciplinary measures in the SVP setting, the Seventh Circuit in *West* took care to note that detainees must receive notice and an opportunity to be heard. *Id.*, 333 F.3d at 748.

21

The exact contours of due process required can be addressed by more focused briefing as the case goes forward. Mr. Lieberman contends that he is entitled to various due process rights, citing *Ehrlich v. Mantzke*, No. 01 C 7449, 2002 WL 265177 (N.D. Ill. Feb. 25, 2002). Defendants cite various cases and suggest that much less process is required. *See, e.g., Holly v. Woolfolk*, 415 F.3d 678 (7th Cir. 2005). The briefing on this issue is not fully comprehensive, and potential open factual issues also may intersect so as to bear on the appropriate analysis. For the present time, at least, the Court will err in Plaintiff's favor (subject to refinement as the case proceeds) and allow these claims to go forward. Plaintiff may proceed on his claims that he was deprived of due process with regard to the disciplinary reports cited in Count Two.[5]

### 7. Grievances

Plaintiff complains that his grievances were routinely denied without any substantive review. A prison official can be liable under 42 U.S.C. § 1983 for failing to respond to violations of a prisoner's constitutional rights that come to his or her attention via the grievance process. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). This, however, occurs (if it occurs) as a consequence of the official's duty under federal law to prevent and remedy constitutional violations, not a duty to respond to grievances. There is no constitutional right to an institutional grievance procedure. Illinois statutes and

---

[5] In proceeding forward on this theory, the Court acknowledges that a "due process" violation is not shown (and is not litigable) simply because a litigant claims that a prison or institution confining the plaintiff erred in its adjudication of a grievance. *See, e.g., Lagerstrom v. Kingston*, 463 F.3d 621, 625-26 (7th Cir. 2006). This is true even where the plaintiff alleges that the prison or institutional officials knowingly interjected perjured or false evidence into the adjudication. *See, e.g., id.* at 624-25 ("The fact (if it were true) that the evidence [in the lieutenant's disciplinary report] against Lagerstrom had been made up would similarly not cast doubt on the basic procedures that were followed. The system has direct remedies for perjury. Here, Lagerstrom received all the process he was due.") (collecting cases; internal citations omitted).

regulations establishing the Department of Corrections' grievance procedures do not create a liberty interest under the Fourteenth Amendment's due process clause. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Therefore, Plaintiff may proceed against supervisory officials who were aware of his grievances and in a position to assist him with regard to putative constitutional violations, but he has no independent cause of action for failure to respond to, or rule favorably on, his grievances.

### 8.   Disqualification of Plaintiff's Primary Therapist

In Count One and again in Count Four, Plaintiff alleges that Defendant Kegel, Plaintiff's primary therapist, was discharged after it was discovered that he was unlicensed. Plaintiff asserts that Kegel was unqualified to make any decisions regarding Plaintiff's treatment; he further contends that Kegel intentionally made false entries in Plaintiff's records to justify his commitment. Kegel has never been served.

To the extent that Plaintiff argues that any diagnoses and treatment decisions made by Kegel should be nullified, Plaintiff's suit runs up against *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Plaintiff cannot sue for damages under § 1983 for his allegedly unconstitutional confinement, or for other harm caused by actions whose putative unlawfulness would render his commitment invalid, until that commitment has been declared invalid through the proper channels provided by state law and/or federal habeas review. *Id.* A finding that Kegel's inexpert and erroneous assessments played a major part in Plaintiff's civil commitment would, if true, potentially call into question the validity of that commitment—although even if Kegel were inexpert, for example, ultimately another unquestionable expert might agree with the assessments in follow-up proceedings. In addition, some threats may be so obvious (the Court expresses no

23

view about whether Mr. Lieberman would fall into this category) that any reasonable person, expert or otherwise, would appreciate them. In any event, if Plaintiff wishes to contest the validity of his civil commitment in federal court on the ground that Kegel was not competent, he must file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Cain v. Ryan*, 171 F.Supp.2d 813, 823 (N.D. Ill. 2001) (Gettleman, J.) (collecting cases). This claim is dismissed. *Accord, e.g.*, *Heck*, 512 U.S. at 486-87; *Cain*, 171 F.2d at 823 (collecting cases).

### 9. Putative Obstacles to Receiving Visitors

Plaintiff contests the cumbersome nature of visitation privileges. A detainee, however, retains only those rights that are consistent with his detention or incarceration. *See, e.g.*, *Shaw v. Murphy*, 532 U.S. 223, 229 (2001); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977). "[F]reedom of association is among the rights least compatible" with such detention or incarceration. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (citing, *inter alia*, *Jones*, *supra*, at 125-126). Some curtailment of that freedom must be expected in the institutional context.

As a sexually violent person, Plaintiff's claims are governed by the "professional judgment" standard set out in *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). In *Youngberg*, the Supreme Court held that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321-22. "'Due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed.'" *West*, 333 F.3d at 748 (quoting *Seling*, 531 U.S. at 265). Nevertheless, under the professional judgment standard, it is not appropriate for the courts to

specify which of several professionally acceptable choices should have been made. *See Youngberg*, 457 U.S. at 321. A violation of the "professional judgment" standard will be found to exist only when the complained of practice constitutes "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 323; *accord, e.g., West*, 333 F.3d at 749 ("[A]ll the Constitution requires is that punishment be avoided and medical judgment be exercised."); *Hargett*, 2005 WL 399300 at *13 (same).

The same concerns relevant to the prison context (escape, assault, introduction of weapons and other contraband) apply equally to a detention facility for sexually violent offenders. *See, e.g., West*, 333 F.3d at 748. Therefore, advance registration of guests, searches of inmates before and after visits, monitoring of the visit room, and the other security precautions described by Plaintiff are constitutionally valid for the same reason the courts have found them to be reasonable in the prison setting. In *Hargett*, the class suit, Judge Leinenweber already ruled that family members are not unreasonably excluded from visiting detainees. *Hargett*, 2005 WL 399300 at *13. As explained, Mr. Lieberman was a member of the plaintiff class; he offers no explanation as to how that judgment about the validity of the regulations is not equally binding here. This claim is dismissed without prejudice.

### 10. Retaliation

Plaintiff may be able to establish claims of retaliation and equal protection. Inmates are entitled under the First Amendment to file grievances and lawsuits, and officers may not retaliate against them for exercising those rights. *Walker v. Thompson*, 288 F.3d 1005, 1008-09 (7th Cir. 2002). If Plaintiff and his visitors were singled out for harassment and extra hurdles on account

25

of his grievances, prior litigation, or other impermissible concerns, he may be entitled to redress for the discriminatory treatment. Plaintiff may proceed on his retaliation claims recounted in Count Three.

### 11. Conditions in Segregation

Plaintiff states that when he was placed in segregation in November 2001, he was denied exercise privileges and all personal property. This claim will require further factual development.

As discussed in preceding paragraphs, Plaintiff's placement in a less-desirable housing unit for violation of facility rules would not violate his constitutional rights. *See, e.g., West*, 333 F.3d at 748. It is not unreasonable to treat detainees who follow rules differently than those who do not. However, depending upon the length of time Plaintiff spent in segregation, the conditions of his confinement may conceivably have risen to the level of a constitutional violation. *See, e.g., Dixon v. Godinez*, 114 F.3d 640, 646 (7th Cir. 1997).

If Plaintiff was denied the opportunity to exercise for protracted periods, he might be entitled to relief under 42 U.S.C. § 1983. Precedent teaches, however, that "[u]nless extreme and prolonged, lack of exercise is not equivalent to a medically threatening situation." *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988). There is a significant difference between a lack of outdoor or extensive recreation opportunities (such as may occur in segregation, or can occur generally at a facility any time it is required to go onto lockdown status) and an inability to exercise at all. *See id.* An inmate confined to the segregation unit retains the ability to improvise an exercise regimen in his cell or unit. *Id.*

By the same token, the denial of "all personal property" could rise to the level of constitutional magnitude depending upon what Plaintiff means by "all" and how long he went

26

without his belongings. Being placed in a cell with no clothes, no toiletries, etc., would be more serious a deprivation than, say, simply being denied a television (which may be part of the sanction of segregation, for example, if prompted by rules violations or threats to others). Furthermore, the length of time Plaintiff was supposedly denied his personal property would be a factor in determining whether his constitutional rights were violated. But at this stage of the proceedings, Plaintiff has articulated potentially colorable claims. It is not the case that he could prove "no set of facts" entitling him to relief under 42 U.S.C. § 1983 with respect to the conditions of segregation. Further factual development will be required.

### 12. Conditions in General Population

#### (a) Food

Plaintiff has stated a viable claim regarding the food at the Joliet TDF. Defendants are correct that some of Plaintiff's quibbles do not implicate the Constitution: being served "the same cereals for weeks," receiving meals that are "not hot enough," and having to consume a lot of "processed" meat are not actionable under 42 U.S.C. § 1983. (D.E. 1 ¶ 115.) Nevertheless, Plaintiff goes on to assert, "[t]he food is unhealthy and is not just unappetizing but is low in protein, high in fat and sugar and has caused numerous residents to be diagnosed with diabetes. . . . On paper, the diet is healthy, balanced and proper but in actuality, the food is below acceptable standards." (*Id.*)

Precedent reflects that detainees and prisoners have a constitutional right to a nutritionally adequate diet. *See, e.g.*, *Antonelli*, 81 F.3d at 1432. "[T]he state must provide an inmate with a 'healthy, habitable environment.'" *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (internal quotation marks and citation omitted). This entails "providing nutritionally adequate

27

food that is prepared and served under conditions which do not present an immediate danger to
the health and well being of the inmates who consume it." *Id.* To survive a motion for summary
judgment, Plaintiff will have to prove his claims, of course. But his allegations are sufficient to
withstand a motion to dismiss.

### (b) Cell Searches

Plaintiff's objection to cell searches is precluded by *Hargett.* In that case, Judge
Leinenweber found:

> Patients' rooms are routinely searched for contraband. Although this feature is
> more akin to a prison environment, as opposed to a forensic mental hospital or
> other treatment facility, Defendants presented evidence that numerous items,
> including a makeshift knife ("shank") and devices to conceal contraband, have
> been uncovered as a result of these searches. Thus, there are legitimate
> institutional security concerns underlying the room searches.

*Hargett*, 2005 WL 399300 at *3. Judge Leinenweber went on to conclude:

> [T]he room and personal searches, use of the black box, use of close management
> status, and use of intercoms, are not substantial departures from accepted
> professional judgment and standards, and therefore are constitutionally
> permissible. Specifically, as noted above under the Findings of Fact, there are
> legitimate security and institutional concerns underlying these policies that indicate
> that professional judgment is being properly exercised.

*Id.*, 2005 WL 399300 at *16. Consequently, Plaintiff's claim regarding cell searches is dismissed
without prejudice. This dismissal does not affect Plaintiff's retaliation claim, which is a separate
concern.

### © Noise

Plaintiff claims that noise levels at the Joliet TDF were so overwhelming that he could not
hear his television in his cell, even with his door closed. (D.E. 1 ¶ 118.) Plaintiff says that he
filed "literally dozens" of grievances regarding the "torturous and mentally destabilizing" noise.

28

(D.E. 93 at 11-12.) Subjection to constant and unnecessary noise, even if it does not inflict enduring injury, may possibly rise to the level of a constitutional violation. *See Antonelli*, 81 F.3d at 1433 (citation omitted). Although Defendants maintain that Plaintiff's assertions are factually "preposterous," they are not so implausible as to be legally frivolous. *See, e.g., Edwards v. Snyder*, 478 F.3d 827, 829 (7th Cir. 2007) ("A claim is factually frivolous if its allegations are bizarre, irrational or incredible"). Plaintiff may proceed on his claim regarding unendurable noise levels.

### C. Personal Involvement

Defendants contend that Plaintiff has failed to state a cause of action against "upper level officials." It is true that liability under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "[u]nder any theory, to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (collecting case; internal quotation marks omitted). The doctrine of *respondeat superior* does not apply to actions filed under 42 U.S.C. § 1983. *See, e.g., Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (collecting cases). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (internal quotation marks and citation marks omitted); *see also Vance*, 97 F.3d at 992-93 ("As we have noted previously, a supervising . . . official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right.") (collecting cases).

29

Nevertheless, *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), teaches that dismissal of a *pro se* complaint on grounds of lack of active personal involvement is inappropriate where the official's position justifies an inference that the official had some direct involvement in the alleged violation. *Antonelli* concerned sweeping claims of unconstitutional conditions of confinement. In that case, the Court of Appeals found that an inference of involvement was justified to sustain claims asserted against certain senior officials, such as the county sheriff or the prison warden, where the claims alleged "systemic," rather than "localized," constitutional violations. *Id.* at 1428-29. In the case at bar, Plaintiff's claims focus on non-localized, systemic putative violations—he takes issue with numerous aspects of the conditions of his confinement. Furthermore, Plaintiff contests express policies of Liberty Healthcare. *Compare Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).[6] The complaint sets forth arguable claims against supervisory officials, at least at this early stage.

**D.    Qualified Immunity**

Defendants' motion to dismiss on grounds of qualified immunity is respectfully denied. "[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (citation omitted). Defendants may wish to renew their affirmative defense of qualified immunity in a properly supported motion for summary judgment, but the claim cannot be granted at this stage of the proceedings. *See, e.g., id.*;

---

[6] Liberty is alleged to be a contractor of the State of Illinois. No argument is made that Liberty is not a state actor for purposes of Section 1983.

*see also Senty-Haugen v. Goodno*, 462 F.3d 876 (8th Cir. 2006) (affirming summary judgment dismissal of various claims brought by civilly-committed sex offender in Missouri).[7]

### E. Mootness of Claims for Injunctive Relief

It would seem that some or all of Plaintiff's claims for injunctive relief may have been mooted by his transfer to the new facility in Rushville. Certainly, he is no longer subject to the conditions of confinement presented in the old wing at the Joliet Treatment and Detention Facility. If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to return to that prison. *See, e.g., Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (per curiam). However, Plaintiff's claims concerning alleged mistreatment by DHS and Liberty officials may be ongoing. Therefore, the Court will not at this time address the issue of mootness.

### CONCLUSION

In view of the foregoing, Defendants' motions to dismiss (D.E. 76 and 84) are respectfully granted in part and denied in part. The following claims are dismissed pursuant to Fed. R. Civ. P. 12(b)(6), subject to the conditions stated above: (1) that the Joliet TDF was operated like a prison; (2) that the water was contaminated; (3) that inmates who consented to treatment received preferential treatment; (4) that pretrial and adjudicated detainees were housed together; (5) that officials denied grievances without substantive review or reached incorrect substantive outcomes; (6) that Kegel's entries in Plaintiff's mental health records were invalid; (7) that visitation requirements were unduly burdensome; and (8) that excessive cell searches were conducted.

---

[7] The Court assumes that Mr. Lieberman is not attempting to state any monetary claims against state officials in their official capacities. Such suits would be barred by the Eleventh Amendment. *See, e.g., MSA Realty Corp. v. State of Illinois*, 990 F.2d 288, 291 (7th Cir. 1993).

Plaintiff may proceed on the following claims: (1) mishandling of mail; (2) denial of due process in connection with disciplinary proceedings; (3) retaliation for grievances and lawsuits; (4) conditions in segregation (denial of exercise and personal effects); (5) non-nutritious food; and (6) overwhelming noise. It is further ordered, on the Court's own motion, that Carol Adams is dismissed as a Defendant (counsel apparently entered an appearance for her in error).

Mark Filip
United States District Judge
Northern District of Illinois

Dated: _June 19, 2007_