**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| John New, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 C 3147-HAB-CHE |
| v. | ) | |
| | ) | |
| Brian Thomas, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL AUTHORITY IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants, SHAN JUMPER, DIANE DOBIER, JOSEPH PROCTOR and LIBERTY

HEALTH CARE CORPORATION, submit the following SUPPLEMENTAL AUTHORITY in

support of their Motion to Dismiss Plaintiff's Complaint:

**I.     SUMMARY OF ALLEGATIONS**

1.     Plaintiff has been civilly detained as a "sexually violent person" pursuant

to the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1 *et seq.*, (the

"SVP Act").  Complaint, p. 6.  Plaintiff has filed a civil rights complaint pursuant to 42

U.S.C. § 1983.   This is Plaintiff's second civil rights complaint related to his

confinement.  Defendants moved to dismiss on December 31, 2007.

2.     Among other things, Plaintiff complains about room assignments and

conditions of confinement.  Plaintiff complains that as a civil detainee he should not

be housed with residents who have been formally committed under the SVP Act.

**II.     SUPPLEMENTAL AUTHORITY**

3.     On January 9, 2008, the Seventh Circuit issued an opinion in *Sain v.

Budz*, 2008 WL 80643 (7th Cir. 2007) which reversed the denial of qualified immunity

in a case brought by an SVP who alleged that he was held under squalid conditions of

confinement while housed by the former Department of Human Services ("DHS")

facility in Joliet, Illinois. **Exhibit A**. Among other things, the Seventh Circuit held that treatment staff complied with "professional judgment" when it declined to accept the plaintiff's various requests to live in a newly constructed wing of the DHS facility which contained air conditioning. *Id.* The Court held that treatment staff were justified in rejecting the plaintiffs' housing request. *Id.* at *8 ("Most rooms in the new unit were double-occupancy rooms. It is certainly within the bounds of reasonable professional judgment to avoid transferring an HIV-positive patient with a history of impermissible sexual behavior with other inmates to a room with another detainee. Mr. Sain offers no evidence to show that this justification was a sham or otherwise impermissible"). This citation serves to supplement Defendants' Memorandum of Law at page 9.

4.     Further, on January 10. 2008, the Honorable Amy St. Eve held that it was permissible for the DHS Defendants to afford privileges from residents who consent to sex offender treatment (and in turn deny the same privileges to residents who decline to consent to sex offender treatment). *Moore v. Monahan*, 2008 WL 111299 (N.D. Ill. 2008) (citing *Hargett v. Adams*, 2005 WL 399300, *8 (N.D. Ill. 2005). **Exhibit B**. This citation serves to supplement Defendants' Memorandum of Law at pages 9-11, 13.

5.     Judge St. Eve also rejected the plaintiff's claim that he was housed with someone that he did not get along with, holding that the Plaintiff did not allege that he suffered any cognizable physical injury. *Id.* at *4. This citation serves to supplement Defendants' Memorandum of Law at page 13.

WHEREFORE, for the reasons set forth above, Defendants, SHAN JUMPER, DIANE DOBIER, JOSEPH PROCTOR and LIBERTY HEALTH CARE CORPORATION, respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

By: /s/ James C. Vlahakis
Attorney for the Defendants

James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000
Jvlahakis@hinshawlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2007, I electronically filed the above document, with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.  I further certify that on December 31, 2007, I served mailed a copy of the above document to the following party of record:

John New
c/o Department of Human
Services
R.R. #1, Box 6A
Rushville, IL 62681



Respectfully submitted,

By:  <u>/s/ James C. Vlahakis</u>

James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000
Jvlahakis@hinshawlaw.com

--- F.3d ----
--- F.3d ----, 2008 WL 80643 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Sain v. Wood
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
**Timothy SAIN**, Plaintiff-Appellee,
v.
Raymond WOOD, Defendant-Appellant.
**No. 06-3919.**

Argued Sept. 27, 2007.
Decided Jan. 9, 2008.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 05 C 6394-Suzanne B. Conlon, Judge.

Barry S. Alberts, Schiff Hardin, Chicago, IL, for Plaintiff-Appellee.
Nancy G. Lischer, Hinshaw & Culbertson, Chicago, IL, for Defendant-Appellant.

Before BAUER, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.
**\*1** Timothy Sain has been civilly committed to the custody of the Illinois Department of Human Services ("IDHS") since 2000. Dr. Raymond Wood, the defendant, is one of several individuals whom Mr. Sain sued under 42 U.S.C. § 1983, claiming that his conditions of confinement violate the Fourteenth Amendment. Dr. Wood moved for summary judgment on the ground of qualified immunity. The district court denied his summary judgment motion, and Dr. Wood appeals the denial of qualified immunity. For the reasons set forth in this opinion, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

# I

## BACKGROUND

### A.

**Timothy Sain**, a repeat sex offender, was civilly committed to the custody of the IDHS under the Sexually Violent Persons Commitment Act, 725 ILCS 207/1. From 2000 to 2006, Mr. Sain was held at the Department's Joliet Treatment and Detention Facility. Mr. Sain is HIV positive, and he has a history of sexual interactions with other inmates.

Dr. Raymond Wood was employed by Liberty Healthcare Corporation, a private organization, as the clinical director of the Joliet facility. He was the physician in charge of the treatment program for residents found to be sexually violent under Illinois law. As the clinical director, he did not have responsibility for the physical building or room assignments, although he did serve occasionally on the rooming committee. Issues regarding the room conditions generally were handled by the IDHS Facilities Director, Tim Budz.

The Joliet facility is comprised of two units: a new unit, built in 2001, and an old unit, built in the late 1800s. Mr. Sain was housed in the old unit. The cells in the old unit are small and contain two bunks, a sink, a toilet and a small window. The paint was chipping off the walls of Mr. Sain's room, and the outdated plumbing in the unit emitted a foul odor.[FN1] The cells in the old unit also are not air conditioned. Residents cannot control the temperature of their cells in the heat of summer, and Mr. Sain's cell often became very hot. Residents were told to open their windows for ventilation, but some windows, including Mr. Sain's, did not have screens. Opening the window allowed bees, wasps and spiders to come into his cell.

> FN1. In both the old and new units, water was supplied by a Joliet facility well. The water smelled foul and was brown in color. Mr. Sain's complaint alleged health violations involving the water; Dr. Wood was not included in that count, however, and Mr. Sain maintains that he is not suing Dr. Wood based upon his problems with the drinking water.

Even during the winter, Mr. Sain's cell was infested with roaches. He claims that he saw roaches crawling around his cell, coming from under his bed and out of cracks in the wall and sink. He also states that he was bitten several times and was treated for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bites by the facility physician.FN2An exterminator visited the Joliet facility on a regular basis, however, and he frequently sprayed Mr. Sain's room.

FN2. His physician testified that he in fact had treated Mr. Sain, but he could not recall finding any evidence of a bite.

Mr. Sain alleges that he repeatedly requested to be moved to the air conditioned new unit. Each time his request was considered, however, it was denied by the facility's rooming committee. A variety of reasons were given for the denials, including Mr. Sain's HIV-positive status, his history of sexual interactions with other residents and his failure to participate in sex-offender treatment. Dr. Wood, as clinical director, was a member of the rooming committee and attended placement meetings on occasion; it is unknown, however, whether he was present at the meetings in which Mr. Sain's requests were discussed.

**\*2** Mr. Sain claims that he wrote a letter to Dr. Wood regarding the conditions in his cell, including the roaches, flies, bees, wasps, spiders, water odor and falling paint chips. Additionally, Mr. Sain alleges that he had a face-to-face discussion with Dr. Wood about his desire to move, although he admitted that he did not tell Dr. Wood that the reason he wanted to move to the new unit was related to the conditions of his room. He also did not mention bugs or water quality in this conversation. Mr. Sain also sent a number of official requests to speak with Dr. Wood, but they were each denied, and his complaints presumably were forwarded to his primary caseworker according to facility policy.

No letter to Dr. Wood from Mr. Sain ever was produced, and Dr. Wood denies ever seeing any such letter. He also does not recall discussing Mr. Sain's requests at any of the few rooming committee meetings that he attended. Dr. Wood claims that he does not remember any conversations with or letters from Mr. Sain, and that he was not aware of the problems with Mr. Sain's living conditions. Such complaints generally were handled by a patient's primary caseworker.

**B.**

Mr. Sain sued Dr. Wood and a number of other Joliet officials for violations of his Fourteenth Amendment due process rights. Dr. Wood moved for summary judgment, contending that Mr. Sain had not produced any evidence showing that Dr. Wood had known of Mr. Sain's conditions of confinement or that Dr. Wood had been deliberately indifferent to his plight. Additionally, Dr. Wood contended that he was entitled to qualified immunity.

The district court concluded that the evidence presented, viewed in the light most favorable to Mr. Sain, could support a reasonable inference that: (1) Dr. Wood knew of Mr. Sain's conditions of confinement, (2) Dr. Wood could have addressed his complaints by moving him to the new facility, and (3) his decision not to do so exhibited deliberate indifference. Therefore, a genuine issue of material fact existed for trial.

The district court also denied Dr. Wood's invocation of qualified immunity. It stated:

The Supreme Court articulated a well-established constitutional right to humane conditions of confinement.... Woods [sic] was clinical director of the Joliet facility. He supervised the associate clinical director and indirectly supervised the clinical staff. As the individual with the highest level of clinical responsibility, a reasonable person in Woods' [sic] position would have known Sain's purported living conditions were a constitutional deprivation. Wood is not entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

*Sain v. Budz,* 2006 WL 2796467 at \*7 (N.D.Ill.2006) (internal citations omitted). Accordingly, the court denied Dr. Wood's request for summary judgment. Dr. Wood now appeals the district court's refusal to grant him qualified immunity.

**II**

**DISCUSSION**

**A.**

**\*3** Generally, this court lacks jurisdiction under 28 U.S.C. § 1291 to review a district court's denial of summary judgment. An exception to the final judgment rule exists, however, for defendants requesting summary judgment based on qualified immunity. *Via v. LaGrand,* 469 F.3d 618, 622 (7th Cir.2006). Under the "collateral order doctrine," a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

denial of qualified immunity "is an immediately appealable 'final decision' ... to the extent that it turns on legal rather than factual questions."*Id.*

Inviting our attention to *Johnson v. Jones,* 515 U.S. 304 (1995), Mr. Sain contends that we lack jurisdiction over Dr. Wood's qualified immunity appeal because it involves a mixed question of fact and law rather than an "abstract question of law." *See id.* at 317. *Johnson* held that a party "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pre-trial record sets forth a genuine issue of fact for trial."515 U.S. at 319-20. Dr. Wood allocates a significant number of pages in his brief to parsing the facts regarding his knowledge of the allegedly inhumane conditions; this approach, Mr. Sain contends, illustrates that Dr. Wood is asking us to resolve genuine issues of material fact contrary to the Supreme Court's holding in *Johnson.*

Mr. Sain's reading of *Johnson* has been rejected on numerous occasions, by both the Supreme Court and this court. *See, e.g., Behrens v. Pelletier,* 516 U.S. 299, 312-13 (1996); *McKinney v. Duplain,* 463 F.3d 679, 686-91 (7th Cir.2006); *Via,* 469 F.3d at 623. It is well settled that *Johnson* did not prohibit appellate review of a district court's application of law to facts-it merely prohibited an appellate court from parsing the record to determine whether the proffered evidence was sufficient to prove a material fact.*Behrens,* 516 U.S. at 312-13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact ..., and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable.").*Johnson* addresses only those cases in which the issue on appeal is "nothing more than whether the evidence could support a finding that particular conduct occurred."*Id. Johnson* does not preclude appellate review of a district court's *legal* application, even if the court's decision necessarily involves mixed questions of fact and law. *See, e.g., Sallenger v. Oakes,* 473 F .3d 731, 738-39 (7th Cir.2007) (engaging in a "totality of the circumstances" inquiry into the reasonableness of a seizure); *Knox v. Smith,* 342 F.3d 651, 657 (7th Cir.2003) (accepting jurisdiction because "probable cause [and by analogy, reasonable suspicion] is normally a mixed question of law and fact, but where, as here, one side concedes the other's facts as to what happened, it is a question of law").

For the purpose of this appeal, Dr. Wood can assume Mr. Sain's version of the facts-specifically, that Dr. Wood had actual knowledge of Mr. Sain's living conditions and the ability to address them-but he may still maintain that his subsequent refusal to order relocation in those circumstances did not amount to legally actionable deliberate indifference. *McKinney,* 463 F.3d at 688 ("[T]he real question was whether, taking the facts as assumed by the district court, [defendant's] actions violated the Constitution."). Whether Dr. Wood knew of Mr. Sain's living conditions is a disputed question of fact, but for the purpose of this inquiry, we shall accept the plaintiff's assertions of actual knowledge. Whether Dr. Wood's actions based on that knowledge amounted to deliberate indifference is a mixed question of fact and law properly resolved by this court. Therefore, we have jurisdiction over this appeal.

**B.**

**\*4** For the first time on appeal, Mr. Sain contends that Dr. Wood is not a state actor, and therefore he is not entitled to invoke qualified immunity. He relies on *Richardson v. McKnight,* 521 U.S. 399, 412 (1997), which held that privately employed prison guards could not receive qualified immunity because they were not public officials for the purposes of the qualified immunity doctrine. Similarly, Mr. Sain submits, because Dr. Wood is employed by Liberty Healthcare, a private firm managing the Joliet detention facility, he is not entitled to invoke qualified immunity.

*Richardson* involved private prison guards employed by a large firm specializing in providing security for correctional facilities. The guards, although they were not directly employed by the government, contended that they should enjoy qualified immunity because they performed the same functions as state prison guards, who did receive immunity. The Court rejected this "functional approach." *Id.* at 408-09.Instead, it looked at the two purposes underlying government employee immunity to determine whether immunity should be extended to private employees performing public or quasi-public functions. These factors were: (1) a "firmly rooted" tradition of immunity, and (2) the "special policy concerns involved in suing governmental officials,"521 U.S. at 404, namely "protecting the public from unwarranted timidity on the part of public officials" and ensuring that "talented

candidates were not deterred by the threat of damages suits from entering public service,"*id.* at 408.

The Court in *Richardson* concluded that no firmly rooted tradition of immunity existed for a private prison guard, an occupation that had been in existence in a private capacity (and without immunity) throughout most of our Nation's history. *Id.* at 407.Additionally, it found that the special policy considerations justifying government employee immunity were not present in that case: The threat of competition from other organized private corrections firms would prevent unwarranted timidity from the guards, and readily available insurance and private compensation packages ensured that talented employees would not be deterred by this type of service. *Id.* at 409-13.

The Court specifically noted, however, that its determination in *Richardson* was limited to the facts of that case, in which "a private firm, systematically organized to assume a major lengthy administrative task ... with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms."*Id.* at 413.It further clarified: "The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision."*Id.*

Prior to 1997, we twice granted qualified immunity to privately employed prison psychologists because they were performing a government function.*Williams v. O'Leary,* 55 F.3d 320, 324 (7th Cir.1995); *Sherman v. Four County Counseling Ctr.,* 987 F.2d 397, 405-06 (7th Cir.1993). However, we have no comparable post-*Richardson* cases, and *Richardson* specifically rejected the "public function" analysis. 521 U.S. at 408-09. The law in this circuit is therefore far from conclusive on this question.

**\*5** Other circuits have encountered cases involving similar circumstances, however, and have determined that certain private medical personnel working in public facilities are not entitled to qualified immunity under *Richardson.*In *Jensen v. Lane County,* 222 F.3d 570, 576-79 (9th Cir.2000), the Ninth Circuit held that a contract psychiatrist in a county facility was not entitled to immunity because: (1) there was no firmly rooted tradition of immunity for psychiatrists, (2) private market forces operate to ensure psychiatrists adequately perform their duties,

or fear replacement, (3) the psychiatrist's role in that case was a complex administrative task rather than a discrete public service task, and (4) the threat of distraction by lawsuits was insufficient because private psychiatrists often deal with such lawsuits.*Id.* at 577-79.In *Hinson v. Edmond,* 192 F.3d 1342 (11th Cir.1999), the Eleventh Circuit, following the same *Richardson* analysis, held that a privately contracted medical director of a county jail was not entitled to qualified immunity. *Id.* at 1346-47.The court emphasized that the physician had a good degree of autonomy in his medical treatment and policies, external market forces would ensure adequate treatment, and private salaries and insurance would prevent deterrence of qualified candidates. There are two First Circuit cases reaching an opposite conclusion; however, both failed to cite *Richardson,* and their analysis of the issue was cursory. *See Burke v. Town of Walpole,* 405 F.3d 66, 88 (1st Cir.2005); *Camilo-Robles v. Hoyos,* 151 F.3d 1, 10 (1st Cir.1998).

It is extremely difficult to apply the *Richardson* standard to the facts of this case. This difficulty stems not only from the lack of Seventh Circuit guidance on the issue, but also from the lack of relevant factual development in the record. The history of sex offender detention programs in Illinois, the extent of Liberty's control over the facility, the details of its interaction with the state, and the robustness of market competition in Liberty's field are not readily ascertainable, either from the district court's opinion or from the record. Dr. Wood attempts to address these issues in his reply brief, claiming that he had limited autonomy under the relevant statute, that he served as an adjunct to IDHS, and that no competitive market exists for his specific type of "sexually violent persons" specialty. The sparse record, however, neither supports nor negates these assertions.

This dearth of information in the record stems directly from Mr. Sain's failure to contest Dr. Wood's assertion of qualified immunity before the district court. In fact, despite numerous opportunities to do so, there was never a mention of Dr. Wood's status as a private contractor until Mr. Sain's brief on appeal. The parties and the district court apparently assumed that Dr. Wood was an appropriate party to assert qualified immunity; the briefs to the district court, as well as the district court's decision, discussed only whether Dr. Wood had disqualified himself from immunity by violating a clearly established

--- F.3d ----

--- F.3d ----, 2008 WL 80643 (C.A.7 (Ill.))

**(Cite as: --- F.3d ----)**

constitutional right. Because the issue of Dr. Wood's status as a private employee was never raised at the district level, the record is silent on the facts necessary to determine whether he nevertheless may invoke qualified immunity under *Richardson*.

**\*6** Mr. Sain's failure to raise at the district court level the issue of Dr. Wood's ineligibility for qualified immunity because of his private employment resulted in a forfeiture of the argument, which we review only for plain error. *See, e.g., United States v. Thigpen, 456 F.3d 766, 769 (7th Cir.2006).* Given the absence of any record addressing *Richardson's* multi-factored test, the district court did not commit plain error in assuming (albeit implicitly) that Dr. Wood was entitled to assert qualified immunity. We therefore decline to address the merits of this argument and assume, for the purpose of this case only, that Dr. Wood is entitled to assert qualified immunity. *See Perez v. Oakland County, 466 F.3d 416 (6th Cir.2006)* (adopting a similar approach).

### C.

Governmental and quasi-governmental actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Sallenger v. Oakes, 473 F.3d 731, 739 (7th Cir.2007)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*). In *Saucier v. Katz, 533 U.S. 194, 200 (2001),* the Supreme Court articulated a two-part test for determining whether an actor is entitled to qualified immunity: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"(2) "If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."*Id. at 201.*We review de novo a district court's denial of summary judgment on qualified immunity grounds. *Sallenger, 473 F.3d at 739.*

As a civilly committed detainee, Mr. Sain is protected by the Due Process Clause of the Fourteenth Amendment. *Collignon v. Milwaukee County, 163 F.3d 982, 987 (7th Cir.1998).* His protection against cruel and inhumane treatment has been defined as at least as extensive as that afforded to prisoners by the Eighth Amendment. *Id.; see also*

*Brown v. Budz,* 398 F.3d 904, 909 (7th Cir.2005) (applying Eighth Amendment analysis to a section 1983 claim brought by a Joliet facility resident awaiting a civil commitment trial). The Eighth (and Fourteenth) Amendment requires that Mr. Sain be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care."*Farmer v. Brennan, 511 U.S. 825, 832 (1994).* To show a constitutional violation and defeat Dr. Wood's invocation of qualified immunity, Mr. Sain must prove *both* (1) that he suffered a sufficiently serious deprivation and (2) that Dr. Wood acted with "deliberate indifference" to his conditions of confinement. *Id.* at 837.

Mr. Sain contends that his conditions of confinement amounted to a sufficiently serious deprivation. Specifically, he submits that the peeling paint, foul odor and lack of air-conditioning in his cell, his inability to open his window without letting in bugs, and a cockroach infestation in the unit amounted to inhumane treatment in violation of the Fourteenth Amendment.

**\*7** Mr. Sain relies upon *Board v. Farnham, 394 F.3d 469 (7th Cir.2005),* for his assertion that poor ventilation may amount to a constitutional deprivation. However, this case involved toxic mold in air ducts and evidence of severe nosebleeds and respiratory problems, conditions far more serious than those alleged by Mr. Sain. Similarly, his suggestion that the lack of air-conditioning is a serious deprivation relies on a case involving substantially different circumstances-there, a failure to provide working heat for an extended period of time in extremely cold temperatures. *See Henderson v. DeRobertis, 940 F.2d 1055 (7th Cir.1991).* The peeling paint or an unpleasant odor in a cell described in this record, along with the absence of any evidence of serious injury, does not amount to constitutional deprivation.

Mr. Sain also contends that the cockroaches in his cell were so unsanitary that they established inhumane living conditions. We have held that a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation. *Antonelli v. Sheahan, 81 F.3d 1422, 1431 (7th Cir.1996).* In *Antonelli,* however, we emphasized that "the allegation of sixteen months of infestation and significant physical harm" distinguished his case from the typical pest-

infestation complaint. *Id.* Here, Mr. Sain alleges that, during his approximately six-year confinement in the old unit, he often saw "several" cockroaches crawling in his cell. R.113 at 5. He also alleges that he was bitten by a cockroach twice during his time in detention. *Id.* He concedes, however, that an exterminator regularly visited his cell-every month or month and a half-and also would come in response to Mr. Sain's complaints. *Id.*

The conditions of Mr. Sain's detention were certainly unpleasant. The state deserves no praise for permitting them to persist. However, we cannot say that, whether considered individually or collectively, they constitute a constitutional violation. To be considered a constitutional violation, Mr. Sain's deprivations must be "objectively serious." We conclude that a reasonable jury could not conclude that Mr. Sain's conditions of confinement were objectively serious enough to establish a constitutional violation.

Even if Mr. Sain were able to show that his conditions of confinement were sufficiently serious to establish a constitutional deprivation, he must also show that Dr. Wood's failure to transfer him into the new unit was a result of "deliberate indifference." The test for deliberate indifference is a subjective one: The official must "both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

In the context of medical professionals, this standard also has been described as the "professional judgment" standard: A medical professional is entitled to deference in treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir.1998). A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon,* 163 F.3d at 988 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 322-23 (1982)); *see also Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir.2006).

**\*8** The district court concluded that Mr. Sain's evidence that Dr. Wood had knowledge of Mr. Sain's

conditions of confinement, and that he had the ability to correct the deprivations, was sufficient to survive summary judgment. Even assuming that Dr. Wood knew of the conditions of confinement and had the authority to remedy them, the record does not support the conclusion that he acted with deliberate indifference.

Mr. Sain focuses on Dr. Wood's failure to transfer him to the new unit, which was more sanitary and comfortable than the old unit. The record reflects, however, that Dr. Wood, in his professional judgment, decided that transferring Mr. Sain to the new unit would contravene his treatment objectives. Therefore, he chose to address Mr. Sain's pest-infestation complaints by regularly exterminating his cell.

The record is undisputed that the rooms in the old unit were regularly (in the plaintiff's words, "frequently") exterminated. R.113 at 5. Although we have held that an occasional extermination (twice in sixteen months) does not, by itself, negate a showing of deliberate indifference, *Antonelli,* 81 F.3d at 1431, the policy of "frequent" exterminations in this case, made monthly and in response to plaintiff's requests, certainly cannot support a claim of deliberate indifference here.

Additionally, substantial and uncontroverted evidence in the record shows that Mr. Sain's requests to transfer to the new unit were denied on the basis of permissible, professional justifications. Dr. Wood testified that patients' requests to transfer to the new unit often were denied because of a facility policy that kept those detainees who refused to participate in sex-offender treatment in the old unit. Transfers to the new unit were used as a reward-an incentive to participate in treatment programs.[FN3] Mr. Sain admits that this policy was the explanation given to him after each of his requests for removal, and that he nevertheless refused to participate in treatment.

FN3. *See, e.g., Bd. v. Farnham,* 394 F.3d 469, 477 (7th Cir.2005) ( "[C]onditions of confinement which are reasonably related to a legitimate and non-punitive government goal are not unconstitutional, and we caution that this court will give a high degree of deference to the discretion of prison administration to adopt policies and practices to maintain the safety and security of this country's penitentiaries.") (internal

--- F.3d ----
--- F.3d ----, 2008 WL 80643 (C.A.7 (Ill.)) <span>Page 7</span>
**(Cite as: --- F.3d ----)**

quotations omitted).

Moreover, Mr. Sain was HIV positive and had been sexually aggressive. Most rooms in the new unit were double-occupancy rooms. It is certainly within the bounds of reasonable professional judgment to avoid transferring an HIV-positive patient with a history of impermissible sexual behavior with other inmates to a room with another detainee. Mr. Sain offers no evidence to show that this justification was a sham or otherwise impermissible.

In sum, even assuming that Dr. Wood knew of Mr. Sain's complaints about the heat, bugs, paint chips and foul odor, undisputed evidence in the record shows that Dr. Wood's refusal to transfer Mr. Sain was not indicative of "deliberate indifference." Instead, the decision to house Mr. Sain in the old unit (to the extent that Dr. Wood was involved in this decision) was based on a professional judgment as clinical director of the Joliet facility that we cannot say amounted to deliberate indifference. Therefore, even if his living conditions were sufficiently serious to constitute a constitutional violation, Dr. Wood was not deliberately indifferent and therefore cannot be held to have violated Mr. Sain's clearly-established constitutional rights.

### Conclusion

**\*9** The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED

C.A.7 (Ill.),2008.
Sain v. Wood
--- F.3d ----, 2008 WL 80643 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                          Page 1
Slip Copy, 2008 WL 111299 (N.D.Ill.)
**(Cite as: Slip Copy)**

Moore v. Monahan
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Allen L. MOORE, Plaintiff,
v.
Thomas MONAHAN, et al., Defendants.
**No. 06 C 6088.**

Jan. 10, 2008.

Allen L. Moore, Rushville, IL, pro se.
Alice Elizabeth Keane, Illinois Attorney General's
Office, James Constantine Vlahakis, Hinshaw &
Culbertson, Jack T. Riley, Brian Patrick Gainer,
Johnson & Bell, Ltd., Illinois Department of Human
Services, Illinois Department of Human Services,
Chicago, IL, Prisoner Correspondence, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.
   **\*1** Plaintiff Allen L. Moore, currently a detainee
in the custody of the Illinois Department of Human
Services ("DHS") under the Illinois **Sexually Violent**
Persons Commitment Act, 725 ILCS 207/1 et seq.
("SVP Act"),[FN1] brings this pro se action under 42 U
.S.C. § 1983 regarding events that occurred at the
Joliet Treatment and Detention Facility ("TDF").[FN2]
Defendants Thomas Monahan, Darrell Sanders, and
Tarry Williams ("DHS Defendants") filed the present
motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6).[FN3] Defendants Liberty
Healthcare Corporation, Shan Jumper, and Gerald
Grisphover ("Liberty Defendants"), as well as
Defendant Carol Vance, Director of Health Care
Services, have also filed motions to dismiss. For the
following reasons, the Court grants in part and denies
in part Defendants' motions.

   FN1. "This statute allows the court to civilly
   commit an individual who has been
   convicted of a **sexually violent** offense and
   is dangerous because the person suffers from
   a mental disorder that makes it substantially
   likely he will commit further acts of sexual
   violence." *Lieberman v. Thomas,* 505 F.3d

665, 667 (7th Cir.2007).

   FN2. Moore has since been transferred to
   the DHS facility in Rushville, Illinois.

   FN3. The Court granted Defendants Jack
   Graham, Shawndo Cleveland, Leslie Hogan,
   Steve Strock, Bernard M. Akpan, and
   Tammy Chasteen leave to adopt the DHS
   Defendants' motion to dismiss.

*STANDARD OF REVIEW*

051 Extra cent-Y found within cent-Y markup.
   "A motion under Rule 12(b)(6) challenges the
sufficiency of the complaint."*Christensen v. County
of Boone, Ill.,* 483 F.3d 454, 458 (7th Cir.2007).
Under Fed.R.Civ.P. 8(a)(2), a complaint need only
include "a short and plain statement of the claim
showing that the pleader is entitled to relief."This
statement must "give the defendant fair notice of
what the plaintiff's claim is and the grounds upon
which is rests."*Swierkiewicz v. Sorema N.A.,* 534
U.S. 506, 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)
(quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct.
99, 2 L.Ed.2d 80 (1957)); *see also Erickson v.
Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167
L.Ed.2d 1081 (2007). Under Rule 8(a)(2), a plaintiff's
"factual allegations must be enough to raise a right to
relief above the speculative level."*Bell Atlantic v.
Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1959,
167 L.Ed.2d 929 (2007); *see also EEOC. v.
Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th
Cir.2007). As the Seventh Circuit recently explained,
the Supreme Court's decision in *"Twombly did not
signal a switch to fact-pleading in the federal
courts."Airborne Beepers & Video, Inc. v. AT & T
Mobility LLC,* 499 F.3d 663, 667 (7th Cir.2007)
(citing *Erickson,* 127 S.Ct. at 2200)."[W]hen ruling
on a defendant's motion to dismiss, a judge must
accept as true all of the factual allegations contained
in the complaint."*Erickson,* 127 S.Ct. at 2200. In
addition, the Court construes Moore's pro se
Complaint liberally. *See Kaba v. Stepp,* 458 F.3d 678,
681 (7th Cir.2006).

*BACKGROUND*

**I. Cell Reassignment**

Slip Copy
Slip Copy, 2008 WL 111299 (N.D.Ill.)
**(Cite as: Slip Copy)**

In his Complaint, Moore alleges that on December 19, 2005, at about 2:35 p.m., Defendant Jack Graham told him that the cell assignment committee had reassigned him to a cell already occupied by inmate Vincent Limpscomb. Moore alleges that he told Graham that he did not want to move in with Limpscomb because Limpscomb outweighed Moore by 80 pounds and they did not get along. Moore informed Graham that he would move cells, but not into a cell with just anyone. Graham then informed Moore that he did not have an option in the matter-either he moved in with Limpscomb or they would place him on secure lockdown. Moore further alleges that he did not argue with Graham, but asked him if he could get some ice. Graham gave Moore permission to do so. After he got his ice, Graham and a security therapist escorted Moore back to his cell, which Moore entered without incident.

**II. Extraction of Moore From His Cell**

**\*2** Shortly after Moore returned to his cell, Defendants Graham and Tarry Williams came to his cell and told him that they were there to confiscate his personal property, informing him that if he refused to move into the cell with Limpscomb, they would move Moore's property there. Moore also alleges that Williams refused his request for an inventory list and receipt of his property.

Moore further maintains that at about 3:00 p.m., Defendants Williams, Graham, Bernard Akpan, Leslie Hogan, Shawndo Cleveland, Tony Humphrey, and Timothy Burnette came to his cell. Williams and Akpan then ordered Graham, Hogan, Cleveland, and Humphrey to extract Moore from his cell, while Burnette videotaped the extraction. Moore claims he was punched and kicked multiple times and then dragged onto the walk way.

Also, Moore alleges that Defendants Thomas Monahan and Darrell Sanders were aware of this attack because they initially approved and ordered it. Moore also claims that Defendants Monahan, Sanders, Williams, Shan Jumper, Lea Chankin, and the Liberty Healthcare Corporation approved of a "policy" of moving a detainee's personal property to the cell to which the detainee had refused to move because he could not get along with the cell's current occupant. Moore alleges that this policy-in effect-placed the personal property in the care of the person with whom the detainee could not get along. Moore alleges that because he refused to give up his personal property, he was physically assaulted and suffered injuries to his head and back and had blood in his urine.

**III. Medical Treatment**

Moore further claims that after the alleged assault he asked Defendant Tammy Chasteen if he could see a doctor. She told him that he looked fine to her. Shortly thereafter, Moore alleges that he became dizzy and fell onto the floor of the observation cell in which he had been placed. Chasteen then called the medical health care unit, allegedly stating that she thought Moore was faking it. Thereafter, Defendants Williams, Akpan, Thompson, and a nurse came to the observation cell. Williams and Akpan told Moore to get up so that he could be handcuffed. Moore told them he was in extreme pain and could not get up off the floor. Williams responded that if he did not get up to be handcuffed, then the nurse would not examine him. Further, Moore alleges that the nurse argued with Williams and Akpan and that they finally allowed her to enter the observation cell to examine Moore who was bleeding profusely from a deep cut on his head. Thereafter, Moore was taken to the hospital care unit where his cut was bandaged. Several days later a doctor saw him, gave him pain medication, and scheduled him for X-rays.

**IV. Incidents After Moore's Alleged Assault**

Next, Moore alleges that Williams-in order to prevent Moore from filing a lawsuit-gave orders that no one was allowed to talk to Moore, refused to allow Moore to call his family or his attorney, and allegedly made false and fraudulent charges against Moore so that he would violate his parole and accordingly would be returned to prison. In addition, Moore claims that when Defendants returned his personal property on October 4, 2006, family photographs and legal documents that he intends to use at his SVP Act trial were missing.

**V. Cell Assignment & Cell Conditions**

**\*3** Finally, Moore alleges that Monahan, Sanders, Jumper, Chankin, Vance, and Liberty Healthcare use cell assignments as a means to pressure pre-trial detainees into consenting to sexual

Slip Copy
Slip Copy, 2008 WL 111299 (N.D.Ill.)
(Cite as: Slip Copy)

offender treatment. Moore also alleges that he was housed in a cell that was roach-infested year round and plagued with "wasp spiders" and bees during the summer. He claims the water was foul and contained pollutants. He also alleges that his small cell contained a double steel bunk, toilet, sink, but had no chair or table. Moore further alleges that his cell was inadequately heated in the winter and extremely hot in the summer.

### ANALYSIS

### I. Moore's Claims

In his Complaint, Moore brings several constitutional claims pursuant to 42 U.S.C. § 1983. To state a constitutional claim under Section 1983, a plaintiff must allege that a government official (1) acting under color of state law, (2) deprived him of a right secured by the Constitution or laws of the United States. *Christensen v. County of Boone, IL,* 483 F.3d 454, 459 (7th Cir.2007).

### A. Sharing Cell with Limpscomb

First, Moore alleges that Defendants violated his constitutional rights when they informed him that he would be moved into a cell already occupied by Limpscomb, although Moore objected to this move because he did not get along with Limpscomb and Limpscomb outweighed him. Moore also argues that this cell reassignment was contrary to a policy providing that inmates who did not get along would not be celled together.

### 1. Double Celling

Construing Moore's pro se Complaint liberally, *see Kaba,* 458 F.3d at 681, the Court first addresses the claim of **double celling**. It is well-established that **double celling** of detainees does not amount to punishment, and therefore, does not violate a detainee's constitutional right to be free from punishment without the benefit of due process. *See Bell v. Wolfish,* 441 U.S. 520, 530-43, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Allison v. Snyder,* 332 F.3d 1076, 1079 (7th Cir.2003). In *Wolfish,* the Supreme Court held that a double bunking policy was not meant to punish pre-trial detainees housed at the facility, and thus did not violate the detainees' constitutional rights. *Id.* at 540.The Supreme Court commented that there is not "some sort of one man,

one cell principle lurking in the Due Process Clause of the Fifth Amendment."*Id.* at 542.In *Allison,* the Seventh Circuit considered the conditions of confinement of individuals detained under the Illinois **Sexually Violent** Persons Act at the Big Muddy Correctional Facility and determined that **double celling** did not amount to punishment, explaining:

Details such as **double celling** add nothing to plaintiffs' contentions.*Wolfish* rejected an argument that this practice equates to punishment. 441 U.S. at 530-43, 99 S.Ct. 1861, 60 L.Ed.2d 447. College dorms, hospitals, and military barracks house people more than one to a room without amounting to punishment. Just so at Big Muddy.

**\*4***Id.* at 1079.Therefore, any claim regarding **double celling** is not actionable under Section 1983.

### 2. Failure to Protect

Although **double celling** does not violate Moore's constitutional rights, any claim that prison officials were deliberately indifferent to Moore's safety may be actionable under the Eighth Amendment.[FN4]*See Brown v. Budz,* 398 F.3d 904, 909 (7th Cir.2005). Specifically, under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates," in particular, "to protect prisoners from violence at the hands of other prisoners."*Id.* (citation omitted). To state a failure to protect claim, Moore must allege that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) Defendants acted with "deliberate indifference" to that risk. *Brown,* 398 F.3d at 909 (citation omitted). To satisfy the first prong, "a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur."*Id.* at 910.To satisfy the second prong, a plaintiff must show that the defendant actually knew of the substantial risk of serious harm, yet disregarded it.*Guzman v. Sheahan,* 495 F.3d 852, 859 (7th Cir.2007).

FN4. The Court recognizes that detainees such as Moore are protected by the Fourteenth Amendment's Due Process Clause under the circumstances. *See Brown v. Budz,* 398 F.3d 904, 910 (7th Cir.2005) (there is little practical difference between Eighth Amendment and Fourteenth Amendment standards).

Slip Copy
Slip Copy, 2008 WL 111299 (N.D.Ill.)
(Cite as: Slip Copy)

In this case, Moore's allegations do not satisfy either prong of his failure to protect claim. According to the Complaint, Moore told Defendants that he did not get along with inmate Limpscomb and that Limpscomb outweighed him. Moore, however, does not allege that he told Defendants that Limpscomb had threatened him in any way or that he was exposed to any serious harm, and thus Moore's allegations fail to properly allege the first prong. Next, Moore does not allege that Defendants knew of any substantial risk of serious harm and yet disregarded it-as required under the second prong of a failure to protect claim. *See Guzman, 495 F.3d at 859;Brown, 398 F.3d at 913.* Because Moore's factual allegations do not "raise a right to relief above the speculative level,"*see Bell Atlantic v. Twombly, 127 S.Ct. at 1959,* he has failed to properly allege his failure to protect claim. The Court thereby dismisses this claim without prejudice.

**3. DHS Policy**

In his Complaint, Moore also asserts that DHS has a policy regarding the celling of inmates who do not get along, yet Defendants forced him to bunk with Limpscomb. Assuming, *arguendo,* that any such policy exists, DHS' violation of its own rule or policy-in and of itself-does not amount to a constitutional violation. *See Allison, 332 F.3d at 1078-79;Pasiewicz v. Lake Co. Forest Pres. Dist., 270 F.3d 520, 526 (7th Cir.2001).* Because Moore has failed to allege a constitutional claim based on the alleged DHS policy, the Court dismisses this claim without prejudice.

**B. Use of Excessive Force in Extracting Moore from His Cell**

*\*5* Construing Moore's pro se Complaint liberally, Moore also alleges that Defendants violated the Eighth Amendment by using excessive force when they extracted him from his cell after he refused to move. Defendants, on the other hand, argue that the core judicial inquiry in determining whether an official used excessive force in violation of the Eighth Amendment is whether the force was applied in a good-faith effort to maintain or restore discipline rather than to maliciously and sadistically cause harm. *See Hudson v. McMillian, 503 U.S. 1, 6, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); see also O'Malley v. Litscher, 465 F.3d 799, 804 (7th*

Cir.2006). Put differently, Defendants argue that the force that the security officers used was the type authorized for security purposes in a good-faith effort to maintain discipline.

As discussed, the purpose of a motion to dismiss is to test the sufficiency of a complaint-not to decide the merits of a plaintiff's claim. *See Christensen, 483 F.3d at 458.* Therefore, at this procedural posture, the Court will not-and cannot-determine whether the alleged force was the type authorized for security purposes as Defendants maintain. Because Moore properly alleges an Eighth Amendment excessive force claim, the Court denies Defendants' motion to dismiss this claim.

**C. Denial & Delay of Medical Care**

Next, Moore alleges that Defendants initially denied him medical care after the alleged assault and that his medical care was ultimately delayed. "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs."*Williams v. Liefer, 491 F.3d 710, 714 (7th Cir.2007)* (citing *Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*). Moreover, the Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees. *Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir.2001).* Deliberate indifference has both objective and subjective elements. *See Edwards v. Snyder, 478 F.3d 827, 830 (7th Cir.2007)* (*Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)*). Specifically, to state a claim of deliberate indifference, a plaintiff must allege: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that medical condition. *Williams, 491 F.3d at 714.*

A medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention" constitutes a serious medical need. *Edwards, 478 F.3d at 830-31* (citation omitted). In this case, Moore alleges that he suffered injuries to his head and back and that he had blood in his urine as a result of the assault. He further alleges that after he was placed in an observation cell, he became dizzy and fell down and was in so much pain that he could not get up off the floor when ordered to do so. Moore also alleges that he was bleeding profusely from a cut on his head. Based on his

allegations, Moore describes an arguably serious medical condition, and thus satisfies the objective component of his deliberate indifference claim. *See Williams,* 491 F.3d at 714;*Edwards,* 478 F.3d at 830-31.

**\*6** Moore has also sufficiently alleged the subjective component of his deliberate indifference claim. To satisfy the subjective prong of deliberate indifference, Moore must allege that Defendants were aware of and consciously disregarded his medical needs. *See Farmer,* 511 U.S. at 837;*Estelle v. Gamble,* 429 U.S. at 103-04. As alleged in his Complaint, Chasteen's delay in seeking medical care for Moore and the alleged delay by Williams, Akpan, and Thompson in allowing the nurse to examine him sufficiently states a claim. *See Williams,* 491 F.3d at 716 ("reasonable jury could have concluded that a delay in medical treatment unnecessarily prolonged" plaintiff's "pain and may have exacerbated [his] medical condition"); *see also Gil v. Reed,* 381 F.3d 649, 662 (7th Cir.2004) (recognizing that "hours of needless suffering" can constitute compensable harm). Accordingly, the Court denies Defendants' motion to dismiss Moore's deliberate indifference claim.

**D. Loss of Photographs & Legal Papers**

Next, Moore alleges that Defendants lost two types of personal property-photographs of his family and legal documents for his trial. First, the loss of family photographs does not constitute a deprivation of property without due process of law in violation of the Fourteenth Amendment if the government provides an adequate postdeprivation remedy for the loss. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 543-44, 101 S.Ct. 1908, 68 L.Ed. 420 (1981); *see also Wynn v. Southward,* 251 F.3d 588, 592-93 (7th Cir.2001). Illinois law provides actions for replevin and conversion that are sufficient to redress Moore's claim regarding his photographs. *See Gable v. City of Chicago,* 296 F.3d 531, 539-40 (7th Cir.2002) (Illinois cause of action for replevin provides adequate postdeprivation remedy); *Stewart v. McGinnis,* 5 F.3d 1031, 1035-37 (7th Cir.1993) (tort claim may be filed in the Illinois Court of Claims in regard to destruction of property); *Greco v. Guss,* 775 F.2d 161, 169 (7th Cir.1985) (Illinois cause of action for conversion provides adequate postdeprivation remedy). The Court thereby dismisses Moore's claim regarding the loss of his

photographs with prejudice.

In addition, Moore claims that legal papers consisting of documents regarding his conviction which he intends to use in his defense at his anticipated trial are also missing-allegations that trigger a possible constitutional claim concerning the deprivation of his access to the courts. *See Gregory v. Nunn,* 895 F.2d 413, 414-15 (7th Cir.1990) (per curiam). Moore, however, also alleges that he was not allowed to call his attorney who represents him in his SVP Act claim. Because Moore has alleged that he has an attorney in his underlying action, his right to access to the courts is satisfied. *See Walters v. Edgar,* 163 F.3d 430, 436 (7th Cir.1998) (inmate represented by counsel "can hardly complain of a denial of access to the courts."); *see also Kunzelman v. Thompson,* 799 F.2d 1172, 1178-80 (7th Cir.1986) (inadequate law library claim not cognizable when jail provided system of legal assistance by public defenders). Because Moore alleges that he is represented by counsel in his underlying action, the Court dismisses his access to courts claim with prejudice. *See Edwards,* 478 F.3d at 830 ("A complaint can also allege too much; a plaintiff may unwittingly plead himself out of court by alleging facts that preclude recovery.").

**E. Conditions of Confinement**

**\*7** Moore also alleges that Defendants violated his constitutional rights by denying him "humane conditions of confinement." *See Farmer,* 511 U.S. at 832-33, 37. "Humane conditions of confinement" include "adequate food, clothing, shelter, and medical care."*Farmer,* 511 U.S. at 832-33. A **sexually violent** person-similar to a pretrial detainee-may not be subjected to conditions that amount to punishment without due process of law. *See Youngberg v. Romeo,* 457 U.S. 307, 320-21, 102 S.Ct. 2453, 73 L.Ed.2d 28 (1982); *Sain v. Wood,* ---F.3d ----, 2008 WL 80643, at \*6 (7th Cir. Jan.9, 2008); *Allison,* 332 F.3d at 1079. In this regard, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."*Youngberg,* 457 U.S. at 320-21;*see also Allison,* 332 F.3d at 1079. Moreover, "[d]ue process requires that the conditions and duration of confinement ... bear some reasonable relation to the purpose for which persons are committed."*Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). Under this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standard, the Constitution does not require that detainees receive "optimal treatment." *See West v. Schwebke,* 333 F.3d 745, 748 (7th Cir.2003). Instead, "all the Constitution requires is that punishment be avoided and medical judgment exercised."*Id. at 749;see also Wolfish,* 441 U.S. at 537 (fact that "detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment .' "). Put differently, detainees may "be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished."*Allison,* 332 F.3d at 1079 (citation omitted) (persons detained before trial are subjected to the ordinary conditions of confinement).

**1. Forced Consent to Participate in Sexual Offender Treatment**

Moore alleges that Defendants used cell assignments as punishment and to pressure "**sexually violent** persons" to consent to participating in sexual offender treatment.[FN5] Courts in this district have addressed similar claims concluding that the use of cell assignments and privileges for detainees who participate in sexual offender treatment is warranted based on prison safety and security concerns. *See, e.g., Hargett v. Adams,* No. 02 C 1456, 2005 WL 399300, at *8 (N.D.Ill. Jan.14, 2005). In *Hargett,* it was not unconstitutional to base the receipt of privileges on a detainee's participation in sexual offender treatment and the detainee's good behavior, stating:

> FN5. Reviewing Moore's pro se Complaint liberally, he makes no allegations that Defendants somehow violated his equal protection rights. *See Brown v. Budz,* 398 F.3d 904, 916 (7th Cir.2005).

The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff do not initially know the potential risks of a new patient. In addition, making privileges contingent on good behavior and participation in treatment, creates

positive contingencies and reinforcements for productive therapeutic behavior.

**\*8***Hargett,* 2005 WL 399300, at *8. Indeed, the Supreme Court has reasoned that "[a]n essential tool of prison administration ... is the authority to offer inmates various incentives to behave" and the "Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit."*Kune v. Lile,* 536 U.S. 24, 39, 122 S.Ct. 2017, 153 L.E.2d 47 (2002). Meanwhile, other courts in this district have adopted Judge Leinenweber's reasoning in *Hargett.See McGee v. Monahan,* No. 06 C 3538, 2007 WL 2728756, at *4-5 (N.D.Ill. Sept.14, 2007); *Lieberman v. Budz,* No. 03 C 2009, 2007 WL 1810493, at *9 (N.D.Ill. June 19, 2007). The Court agrees with these rulings and likewise adopts the *Hargett* court's reasoning. The Court therefore dismisses this claim with prejudice.

**2. Foul, Polluted Water**

Next, Moore alleges that the water at the Joliet TDF was foul and contained pollutants. Courts in this district have addressed similar pro se prisoner complaints that the water is unsafe in the Joliet, Illinois area and have uniformly rejected these claims. *See, e.g., Lieberman v. Budz,* No. 03 C 2009, 2007 WL 1810493, at *9 (N.D.Ill. June 19, 2007). As the Seventh Circuit has explained:

Poisoning the prison water supply or deliberately inducing cancer in a prisoner might be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than certain and immediate, *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not. *McNeil v. Lane,* 16 F.3d 123, 125 (7th Cir.1993); *Steading v. Thompson,* 941 F.2d 498 (7th Cir.1991); *Harris v. Fleming,* 839 F.2d 1232, 1235-36 (7th Cir.1988); *Clemmons v. Bohannon,* 956 F.2d 1523, 1527 (10th Cir.1992) (en banc). Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans.*McNeil v. Lane, supra,* 16 F.3d at 125;*Givens v. Jones,* 900 F.2d 1229, 1234 (8th Cir.1990). It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsible for the control of these hazards do not think require remedial measures.

_Carroll v. DeTella,_ 255 F.3d 470, 472-73 (7th Cir.2001). Based on this precedent, Moore's claim that the water at the Joliet TDF was foul and polluted-the same water used by the area's general population-is without merit. The Court thereby dismisses this claim with prejudice.

### 3. Lack of Table & Chair in Cell

Moore also complains that his small cell at the Joliet TDF did not have a table or chair, and thus Defendants somehow violated his constitutional rights. It is well-settled in this circuit that the deprivation of amenities does not amount to cruel and unusual punishment under the Eighth Amendment. _See Henderson v. Lane,_ 979 F.2d 466, 469 (7th Cir.1992); _Davenport v. DeRobertis,_ 844 F.2d 1310, 1316 (7th Cir.1988). Accordingly, a prison official's failure to provide a desk and chair in a plaintiff's cell does not amount to conditions that constitute punishment without due process of law. _Cf. Luedtke v. Gudmanson,_ 971 F.Supp. 1263, 1270 (E.D.Wis.1997). The Court thus dismisses Moore's claim based on the lack of a table and chair in his cell with prejudice.

### 4. Inadequate Heat in Winter & Extreme Heat in Summer

**\*9** Next, Moore alleges that his cell was inadequately heated in the winter and extremely hot in the summer. Indeed, prison officials must provide inmates with adequate heat and ventilation. _See Del Raine v. Williford,_ 32 F.3d 1024, 1035 (7th Cir.1994); _Henderson v. DeRobertis,_ 940 F.2d 1055, 1059 (7th Cir.1991). In _Del Raine,_ the plaintiff alleged that he was stripped searched, placed in an empty cell without any clothing for 15 to 30 minutes at a time, and on one day the wind chill factor was 40 to 50 degrees below zero._Id._ at 1050.Based on the plaintiff's allegations, the Seventh Circuit concluded that "Del Raine's allegations create a possible inference that he was routinely placed in a cell with unreasonably low temperatures and without adequate clothing," and thus the plaintiff sufficiently alleged his claim based on the cold conditions of his confinement. _Id._ at 1050-51.

Here, Moore's allegations that his cell was inadequately heated in the winter and extremely hot in the summer does not create any such inference. _See Antonelli v. Sheahan,_ 81 F.3d 1422, 1433 (7th Cir.1996) ("Prisoners have a right to protection from **extreme** cold.") (emphasis added). Put differently, Moore's bare-boned allegations do not suggest that he has a "right to relief above the speculative level."_Bell Atlantic v. Twombly,_ 127 S.Ct. at 1959. As such, the Court dismisses Moore's claim based on the alleged heat and cold without prejudice.

### 5. Pest Infestation

Moore claims he was housed in a cell that was roach-infested year round and plagued with "wasp spiders" and bees during the summer. Allegations of prolonged exposure to pests, along with significant physical harm, may rise to a constitutional violation. _See Sain v. Wood,_ --- F.3d ----, 2008 WL 80643, at \*7;_Antonelli v. Sheahan,_ 81 F.3d 1422, 1431 (7th Cir.1996) (sixteen months of pest infestation is a prolonged deprivation affecting prisoner's health); _see, e.g., Pritchett v. Page,_ No. 99 C 8174, 2000 WL 1129891, at \*9 (N.D.Ill. Aug.9, 2000) ("plaintiff's claim that his cell has been infested for many months by 'hazardous bugs' that regularly bite him states a cognizable claim for relief under Section 1983."). Although Moore contends that his cell was infested with pests year round, his factual allegations fail to raise his right to relief above the speculative level because he makes no allegations concerning the prolonged infestation impacting his health. _See Antonelli,_ 81 F.3d at 1431. Therefore, the Court dismisses Moore's pest infestation claim without prejudice.

### F. False Information Concerning Parole Report

Moore also alleges that Williams-in order to prevent Moore from filing a lawsuit-gave orders that no one was allowed to talk to Moore and refused to allow Moore to call his family or his attorney. Further, Moore maintains that Williams made false and fraudulent charges against Moore so that he would violate his parole and be returned to prison. Moore attaches to his Complaint the parole violation report indicating that he would be afforded a revocation hearing before the Prisoner Review Board or Parole Board. (R. 1-1, Compl., Exs.A-1.) Moore also attaches the Prisoner Review Board's Report revoking his parole. _See McCready v. eBay, Inc.,_ 453 F.3d 882, 891 (7th Cir.2006) ( Federal Rule of Civil Procedure 10(c) provides that "[a] copy of any

written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

**\*10** It has long been held that when an inmate has been accorded due process in the form of a disciplinary hearing, his allegation that a disciplinary or conduct report was falsified does not state a cognizable due process claim. *See Lagerstrom v. Kingston,* 463 F.3d 621, 624-25 (7th Cir.2006); *McPherson v. McBride,* 188 F.3d 784, 787 (7th Cir.1999); *Hanrahan v. Lane,* 747 F.2d 1137, 1139-41 (7th Cir.1984). Because Moore was afforded a parole revocation hearing, his claim that Williams fabricated information so that Moore's parole would be revoked does not state a due process claim. *See Lagerstrom,* 463 F.3d at 623 (hearing's procedural safeguards protect against prison official's arbitrary actions). Thus, the Court dismisses Moore's claim based on Williams' alleged "fraudulent" charges against Moore with prejudice.

Meanwhile, how Williams' conduct of not allowing anyone to talk to Moore or refusing to let Moore make calls to his family or attorney would prevent Moore from filing this action is not clear, especially because Moore did file this action-well within the two-year statute of limitations for his constitutional claims. *See Jogi v. Voges,* 480 F.3d 822, 836 (7th Cir.2007). The Court accordingly dismisses this claim with prejudice.

In sum, the Court dismisses the following claims with prejudice: (1) Moore's claim based on **double celling**; (2) Moore's loss of photographs and legal papers; (3) Moore's conditions of confinement claims based on the lack of a table or chair and polluted water; (4) Moore's allegations that cell assignments were used as punishment and to force him to obtain treatment; and (5) Moore's claims based on Williams' alleged conduct of prohibiting him to talk to people and Williams' alleged falsification of Moore's parole report. The Court, however, dismisses Moore's condition of confinement claims based on inadequate heat in winter, extreme heat in summer, and pest infestation without prejudice. Also, the Court dismisses without prejudice Moore's failure to protect claim and his claim based on the alleged DHS policy concerning inmates who do not get along. The following claims remain in this lawsuit: (1) Moore's claim based on the alleged excessive force in extracting him from his cell; and (2) the alleged denial and delay of medical care.

**II. Defendants' Involvement**

The Liberty Defendants argue that the Court should dismiss Gerald Grishover from Moore's Complaint because Moore only states Grishover's last name under the recitation of the parties. Because Moore fails to make any allegations against Grishover, he has not put Grishover on notice of the claims against him and the grounds upon which they rest. *See Swierkiewicz,* 534 U.S. at 506,*Conley v. Gibson,* 355 U.S. at 47. The Court accordingly grants Defendants' motion to dismiss as to Defendant Grishover, but also grants Moore leave to amend his Complaint concerning any allegations against Grishover.

**\*11** Defendants also argue that some Defendants were not personally involved in one or more of the remaining constitutional claims. For an individual to be liable under Section 1983, he or she must have participated directly in the constitutional violation. *See Palmer v. Marion Cty.,* 327 F.3d 588, 594 (7th Cir.2003)."Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation."*Vance v. Peters,* 97 F.3d 987, 991 (7th Cir.1996). In other words, Moore must establish that each Defendant "acquiesced in some demonstrable way in the alleged constitutional violation."*Palmer,* 327 F.3d at 594;*see also Pepper v. Village of Oak Park,* 430 F.3d 809, 810 (7th Cir.2005) ("to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation."). In addition, the doctrine of respondeat superior does not apply to Section 1983 actions. *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir.2001). Thus, to be held liable under Section 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference."*Id.*

Nevertheless, in *Antonelli,* the Seventh Circuit held that dismissing a pro se complaint based on the lack of personal involvement is inappropriate when an official's position justifies an inference that the official may have had some direct involvement in the alleged constitutional violation. *Id.* at 1428.Specifically, the Seventh Circuit concluded that an inference of personal involvement was justified against certain senior officials-such as a county

sheriff or prison warden-when the claims alleged "potentially systemic" rather than "clearly localized" constitutional violations. *Id.* at 1428-29.

Moore maintains that the following Defendants were involved in the alleged use of excessive force in extracting him from his cell-Thomas Monahan and Darrell Sanders authorized the use of excessive force; Tarry Williams, Bernard Akpan, Jack Graham, Leslie Hogan, and Tony Humphrey used excessive force; Timothy Burnette video taped the extraction. Further, Moore claims that the following Defendants were involved in the alleged denial and delay in his medical care-Tammy Chasteen, Tarry Williams, Bernard Akpan, and Nathaniel Thompson. Therefore, these Defendants remain in this action.

In addition, Moore alleges that the following Defendants were directly involved in his cell assignment-Lea Chankin, Steve Strock, Shan Jumper, Carol Vance, and Liberty Healthcare Corporation. As discussed, housing Moore in a pest-infested cell that was extremely cold or hot may rise to a constitutional violation, as well as his allegations concerning Defendants' failure to protect him. Because the Court grants Moore leave to amend these claims, it is premature to dismiss any of the individual Defendants at this time.

**\*12** The Court, however, grants Liberty Healthcare's motion to dismiss it as a Defendant in this matter because a private corporation cannot be held vicariously liable for its employees' violations of others' civil rights.*Jackson v. Illinois Medi-Car, Inc., 300 F.3d 760, 766 (7th Cir.2002).* In addition, although private corporations acting under color of state law are treated as municipalities, Moore has failed to allege that any of the remaining constitutional violations occurred as a result of an express custom or policy. *See id.*The Court grants Moore leave to amend his claim against Liberty Healthcare accordingly.

**III. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity as to Moore's constitutional claims. *See Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Sain v. Wood, --- F.3d ----, 2008 WL 80643, at \*6.* "[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds."*Alvarado v.*

*Litscher, 267 F.3d 648, 651-52 (7th Cir.2001).* Indeed, a plaintiff need not plead factual allegations that anticipate and also overcome the defense of qualified immunity. *See id.;Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir.2003)* ("Affirmative defenses do not justify dismissal under Rule 12(b) (6)."). Under the present circumstances, the Court will not address Defendants' qualified immunity arguments at this time, especially in light of Defendants' inadequate briefing on this subject and Moore's present status as a pro se litigant. Defendants may renew their affirmative defense of qualified immunity later in this litigation.

**IV. Non-Service on Certain Defendants**

Finally, a review of the Court's docket reveals that Moore has failed to make proof of service on Nathaniel Thompson as required by Rule 4 of the Federal Rules of Civil Procedure. The Federal Rules provide: "If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant...."Fed.R.Civ.P. 4(m).

By Minute Order of November 27, 2006, the Court provided for service on Defendants by the United States Marshals Service. The Marshal, however, filed unexecuted returns of service for Defendant Thompson on April 19, 2007, and October 3, 2007. Both returns indicate that Thompson does not reside at the address given for him and that no one at the residence knew him. Ultimately, it is Moore's responsibility to assure service on Defendants. *See*Fed .R.Civ.P. 4(c)(1). The Court thus orders Moore to show good cause in writing why the Court should not dismiss his Complaint against Defendant Thompson for want of service. The Court will set the deadline once appointed counsel has appeared in the case.

Meanwhile, counsel for Liberty Defendants asserts that Chankin has not been served, yet the Court's docket shows a return of service on August 29, 2007. (*See* R. 108-1.) Counsel must address this matter in further detail. It also appears that the girlfriend of Timothy Burnette accepted service on his behalf on October 31, 2007. (*See* R. 120-1.) Nonetheless, no one has filed an appearance on Burnette's behalf nor is it entirely clear whether service was properly served under Rule 4(e)(2).

Slip Copy                                                                                          Page 10
Slip Copy, 2008 WL 111299 (N.D.Ill.)
**(Cite as: Slip Copy)**

Counsel for the DHS Defendants must address this matter.

### *CONCLUSION*

**\*13** For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part. The Court grants Moore leave to file an Amended Complaint based on the Defendant's failure to protect him, the pest infestation and extreme heat and cold allegations, whether Defendant Grisphover was personally involved in the alleged constitutional violations, and whether Liberty Healthcare had a custom or policy as discussed above. The Court also orders Moore to show good cause in writing why the Court should not dismiss his allegations against Defendant Thompson for want of service.

N.D.Ill.,2008.
Moore v. Monahan
Slip Copy, 2008 WL 111299 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.